IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STARR INDEMNITY & LIABILITY COMPANY,  )<br>)<br>Plaintiff,    )<br>v.            )<br>)<br>BRIGHTSTAR CORP., et al.,   )<br>)<br>Defendants.   )<br>)    | CASE NO. 1:13-cv-08580-GHW-GWG |

**BRIGHTSTAR CORP. & BRIGHTSTAR GERMANY GmbH'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants Brightstar Corp. and Brightstar Germany GmbH (collectively "Brightstar") submit this Statement of Undisputed Facts pursuant to Local Rule 56.1(a) in support of Brightstar's Motion for Partial Summary Judgment. There is no genuine issue to be tried regarding the following material facts:

1. Brightstar is a global distributor of mobile phones. (*See* Deposition of Oscar Fumagali, at 87:10-15, copy attached as Ex. 1 to the Declaration of Charles P. Edwards ("Edwards Decl.").)

2. In January 2013, Brightstar entered into a Master Agreement for Performance of Logistics Services ("Logistics Agreement") with a third-party provider, getgoods.de Vertriebs GmbH AG ("Getgoods"), to store Brightstar phones in a warehouse operated by Getgoods and located in Frankfurt, Germany. (*See* Edwards Decl., Ex. 2.)

3. Brightstar began storing phones in the Frankfurt warehouse in March 2013. (*Id*., Ex. 3 at 63:16-19.)

4. On October 30, 2013, representatives from Brightstar and Getgoods inspected Brightstar's inventory in the Frankfurt warehouse. (*Id*., Ex. 4 at 117:10-118:13, 130:19-132:21.) Specifically, the representatives inspected two rooms containing Brightstar's stock; one room contained approximately 70 pallets and the other contained approximately 100 pallets. (*Id*. at 121:13-15, 138:6-10.)  The representatives cut open the black shrink wrap on several of the pallets and confirmed they contained boxes of phones. (*Id*. at 119:13-123:22.)

5. A full inspection was scheduled for the following week. (*Id*., Ex. 3 at 192:3-21.)

6. On November 7, 2013, however, Getgoods' CEO informed Brightstar that Brightstar's inventory of mobile phones was missing from the Frankfurt warehouse (the "Loss"). (*Id*., Ex. 1 at 130:20-131:24, Ex. 3 at 205:6-23.)

7. Getgoods' CEO confessed to taking the phones and has been indicted for misappropriation by German authorities. (*Id*., Ex. 1 at 562:22-25.)

8. Starr and Brightstar have stipulated that Brightstar's Loss is greater than $35 million. (Dkt. #123, Letter to the Court at 2.)

9. Brightstar had a global marine cargo insurance program in effect at the time of the Loss covering phones stored in warehouses, like the Frankfurt warehouse. Brightstar's insurance program consisted of three layers. The first layer was provided by the Marine Cargo Policy No. MASICNY0154US13 (the "Starr Policy") and provided the first $25 million in coverage. (Dkt. #1, Compl., ¶¶ 22, 25.)

10. The second layer provided coverage between $25 million and $50 million under a policy issued by Certain Underwriters at Lloyd's of London (the "First Excess Layer"). (Civ. Action No. 5297, Dkt. #2, Compl., ¶ 38.)

2

11. The third layer provided coverage between $50 million and $80 million under policies issued by Great American Insurance Company of New York, XL Specialty Insurance Company, Catlin Syndicate Limited, Montpelier at Lloyd's Limited, and Axis Specialty Europe SE (the "Second Excess Layer"). (Civ. Action No. 5062, Dkt. #2, Compl., ¶ 39.)

12. The Starr Policy was first placed in March 2011, but it was renewed annually and separate warehouse endorsements were added to the Starr Policy in 2012 and in 2013, respectively. (Edwards Decl., Ex. 5, End. 2, 17 and 40.)

13. The warehouse endorsement in effect at the time of Brightstar's Loss was added to the Starr Policy as Endorsement 40. (*Id.*, Ex. 5, End. 40.)

14. Endorsement 40 was drafted by Starr and delivered to the broker, Arthur J. Gallagher ("AJG"), on September 10, 2013, although it was effective March 26, 2013. (*Id.*, Ex. 8.)

15. Starr's Second Cause of Action seeks to deny coverage for Brightstar's Loss based on exclusion 3.b. to Endorsement 40 (the "Controlled Warehouse Exclusion"). (Dkt. #1, Compl., ¶ 59.)

16. The Controlled Warehouse Exclusion reads:

> 3. Notwithstanding anything contained elsewhere herein to the contrary, this policy shall not pay for loss of or damage to the goods and merchandise while covered under this endorsement caused by or resulting from:
>
> …
>
> b. Misappropriation, secretion, conversion, infidelity or any dishonest act done by or at the instigation of the Assured at any time during the currency of coverage, or by the Assured or other party of interest, his or their employees or agents while insured merchandise is stored in warehouses or stores, owned, leased or controlled by the Assured.

(Edwards Decl., Ex. 5, End. 40 at AJG0000297.)

17.     The language in the Controlled Warehouse Exclusion is from a Starr form. (*Id*., Ex. 12 at 71:15-73:15; Ex. 11 at 4.b.)

18.     Starr required its underwriters to add the language in the Controlled Warehouse Exclusion to the form that served as the basis for the original 2011 policy. (*Id*., Ex. 12 at 20:1-9, 29:2-13, 30:21-31:9; Ex. 9 at STARR30390 (FILED UNDER SEAL); *see also id*., Ex. 10.)

19.     The parties stipulated that the Brightstar Loss was caused by "misappropriation." (Dkt. #123, Letter to the Court at 2.)

20.     Starr does not contend that Brightstar was involved in the circumstances of the Loss. (*See* Dkt. #1, Compl.)

21.     Starr contends, instead, that the Controlled Warehouse Exclusion should apply because (1) the Frankfurt warehouse should be considered to have been "controlled" by Brightstar, and (2) Getgoods should be considered an "agent" of Brightstar or an "other party of interest." (Dkt. #1, Compl., ¶¶ 55-56.)

22.     The Starr Policy does not define "controlled." (*See* Edwards Decl., Ex. 5.)

23.     The Starr Policy does, however, use a variation of "controlled" in other provisions. For example, a Starr Policy provision addressing concealed damage refers to goods "received into the custody and control of the receiver at the warehouse, store or other location at destination…." (*Id*., End. 40 at AJG0000188.)

24.     Brightstar did not own or lease any portion of the Frankfurt warehouse. (*Id*., Ex. 3 at 67:13-17.)

25.     The warehouse was operated by Getgoods. (*Id*. at 65:8-18.)

4

26. Brightstar did not have any employees in the warehouse, or the right to control any of Getgoods' employees. (*Id*. 67:18-69:25; *Id*., Ex. 1 at 620:20-621:3.).

27. The Logistics Agreement, which is governed by German law, (*id*. § 23), stated that the phones "shall be warehoused in suitable proprietary warehouses at getgoods" and that "getgoods shall have domiciliary rights," (*Id.,* Annex A, § 1.3.).

28. Under German law, "domiciliary rights" mean rights to control access to the warehouse and to exclude people from the warehouse. (*Id*., Ex. 13 at 12.)

29. Brightstar was entitled to inspect its inventory only upon providing "suitable advance notice," only "during customary business hours," and only "in the presence of a getgoods employee." (*Id*., Ex. 2, Annex A, § 3.1.)

30. Getgoods, not Brightstar, performed inventory management at the Frankfurt warehouse. (*Id*., § 9.)

31. Brightstar provided expected levels of logistics service regarding its inventory to Getgoods, but Getgoods controlled the warehouse and decided how to meet those service levels. (*Id*., Ex. 3 at 69:5-20.)

32. Brightstar had difficulty gaining access to the warehouse prior to the Loss. (*See, e.g., id*. at 98:16-100:6, 131:22-132:9.)

33. For example, in August, Brightstar requested access to the Frankfurt warehouse for purposes of conducting a physical inventory of its phones as part of a migration to a new accounting system. (*Id*., Ex. 3 at 98:16-99:3.) Getgoods did not agree to the inspection and, therefore, it did not take place at that time. (*Id*. 99:4-100:6.) Getgoods postponed the inspection again in September, and it was eventually scheduled for the end of October. (*Id*. at 131:22-132:9.)

34. The term "other party of interest" is not defined by the Starr Policy. (*See id*., Ex. 5.)

35. The Starr Policy does, however, use the term "interest" in provisions beyond the Controlled Warehouse Exclusion. One provision uses the term to refer to entities in which Brightstar may have an interest and which are insured under the Starr Policy. (*Id*. at AJG0000165.) Other provisions use "interest" to refer to a property interest insured under the Starr Policy. (*Id*. at AJG0000176 ("Interest Insured"); *id*. at AJG0000166 ("Any loss payable hereunder shall be payable … to the order of Named Insured thirty days after the full proofs of loss and proofs of interest have been filed"); *id*. at AJG0000167 (referring to "the interest hereby insured"); *id*. at AJG0000181 (discussing an "accumulation of the interests insured hereunder"); id. at AJG0000220 (discussing bank's "insurable interest" in "goods and/or merchandise and/or property insured under this policy").) Still other provisions use the term "interest" to refer to loan interest (Edwards Decl., Ex. 6 at AJG0000193, AJG0000200) and to interest on judgments (*id*. at AJG0000245).

36. Endorsement 15 to the Starr Policy states:

> This endorsement does not insure against loss, damage or expense caused by or resulting from: … Misappropriation, secretion, conversion, infidelity, or any dishonest act on the part of the Assured or other party of interest, his or their employees or agents **or others to whom the property may be entrusted** (carriers for hire excepted)….

(*Id*., End. 15 at AJG0000232) (emphasis added.)

37. As a matter of industry custom and practice, "interest" usually means an interest insured under a marine cargo policy. (*Id*., Ex. 14 at 15.)

6

38. The purpose of dishonesty exclusions such as the Controlled Warehouse Exclusion is to exclude moral hazard losses – those caused by someone who would benefit by making a claim under the Starr Policy. (*Id.*, Ex. 15 at 17.)

39. Getgoods did not have any interest in the insurance proceeds from the Brightstar phones insured under the Starr Policy. (*Id.*, Ex. 12, Deposition of Starr's Fed. R. Civ. P. 30(b)(6) Witness Jeffrey Factor, at 269:2-5) ("Q. Do you agree with me that getgoods is not insured under the [P]olicy?  A. Insured under the [P]olicy, they are not.  I would agree, sorry.")

40. The term "agent" is not defined by the Starr Policy. (*See id.*, Ex. 5.)

41. Brightstar and Starr have submitted expert reports offering different opinions on whether Getgoods was an "agent" of Brightstar under German law, which governs the Logistics Agreement due to a provision selecting German law. (*Id.*, Ex. 13 at 5-6, 17-19; Edwards Decl., Ex. 16 at 12-16.).

42. Brightstar did not authorize Getgoods or its CEO to misappropriate Brightstar's phones. (*See* Dkt. #1, Compl.)

Dated:  May 25, 2018                                **BARNES & THORNBURG LLP**

By: */s/ Mark Durbin*
Mark L. Durbin
One North Wacker Drive, Suite 4400
Chicago, IL  60606-2833
mdurbin@btlaw.com

Charles P. Edwards
11 South Meridian Street
Indianapolis, IN  46204
cedwards@btlaw.com

Kara Cleary
3475 Piedmont Road, N.E., Suite 1700
Atlanta, GA 30341
kcleary@btlaw.com


**ANDERSON KILL P.C.**

Dennis Nolan
Vivian Costandy Michael
1251 Avenue of the Americas
New York, NY 10020
dnolan@andersonkill.com
vmichael@andersonkill.com

**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**

Valerie Jackson
9300 S. Dadeland Blvd., 4th Floor
Miami, FL 33156
valerie.jackson@qpwblaw.com

*Attorneys for Brightstar*

DMS 12486939v1