**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

STARR INDEMNITY & LIABILITY COMPANY,

               Plaintiff,

vs.

13 Civ. 8580 (GWG)

BRIGHTSTAR CORP. and
BRIGHTSTAR GERMANY GmbH,

               Defendants.

## PLAINTIFF'S RESPONSE TO DEFENDANTS'
## LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS
## IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Starr Indemnity & Liability Company responds to Defendants Brightstar Corp. and Brightstar Germany GmbH's Local Rule 56.1 Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment ("Brightstar SOF;" ECF Doc. 132) as follows:

1.     Brightstar is a global distributor of mobile phones.  (*See* Deposition of Oscar Fumagali, at 87:10-15, copy attached as Ex. 1 to the Declaration of Charles P. Edwards ("Edwards Decl.").)

**RESPONSE:** Admits, but this is not a material fact because it would not affect the outcome of Defendants' motion under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

2.     In January 2013, Brightstar entered into a Master Agreement for Performance of Logistics Services ("Logistics Agreement") with a third-party provider, getgoods.de Vertriebs GmbH AG ("Getgoods"), to store Brightstar phones in a warehouse operated by Getgoods and located in Frankfurt, Germany.  (*See* Edwards Decl., Ex. 2.)

**RESPONSE:** Admits.

3.     Brightstar began storing phones in the Frankfurt warehouse in March 2013.  (*Id.*, Ex. 3 at 63:16-19.)

**RESPONSE:** Admits.

4. On October 30, 2013, representatives from Brightstar and Getgoods inspected Brightstar's inventory in the Frankfurt warehouse. (*Id.*, Ex. 4 at 117:10-118:13, 130:19-132:21.) Specifically, the representatives inspected two rooms containing Brightstar's stock; one room contained approximately 70 pallets and the other contained approximately 100 pallets. (*Id.* at 121:13-15, 138:6-10.) The representatives cut open the black shrink wrap on several of the pallets and confirmed they contained boxes of phones. (*Id.* at 119:13-123:22.)

**RESPONSE:** Denies that all of the stock in the two rooms inspected by Brightstar's representatives on October 30, 2013 was Brightstar's stock. (Ex. 61 to Declaration of Kevin J.B. O'Malley in Opposition to Defendants' Motion for Partial Summary Judgment executed on June 22, 2018 ("O'Malley Opp. Decl.") at 185-90, 194-204 & 303-08; Ex. 62 to O'Malley Opp. Decl. at 110-125, 128, 130-34 & 145; Ex. 67 to O'Malley Opp. Decl. at AJG921-22; Ex. 71 to O'Malley Opp. Decl. at BSupp28797 ¶10), and admits the remaining factual assertions, though none of the factual assertions are material because they would not affect the outcome of Defendants' motion under the governing law. *See Anderson*, 477 U.S. at 248.

5. A full inspection was scheduled for the following week. (*Id.*, Ex. 3 at 192:3-21.)

**RESPONSE:** Admits, but this is not a material fact because it would not affect the outcome of Defendants' motion under the governing law. *See Anderson*, 477 U.S. at 248.

6. On November 7, 2013, however, Getgoods' CEO informed Brightstar that Brightstar's inventory of mobile phones was missing from the Frankfurt warehouse (the "Loss"). (*Id.*, Ex. 1 at 130:20-131:24, Ex. 3 at 205:6-23.)

**RESPONSE:** Admits.

7. Getgoods' CEO confessed to taking the phones and has been indicted for misappropriation by German authorities. (*Id.*, Ex. 1 at 562:22-25.)

**RESPONSE:** Admits but denies the inference that it was just Getgoods' CEO that was implicated in the Loss. A criminal complaint was filed against both Getgoods and its CEO. Ex. 68 to O'Malley Opp. Decl. at B*7098-9. While only the CEO was ultimately indicted, this may be explained by the fact that Getgoods went into receivership shortly after the Loss. Ex. 70

to O'Malley Opp. Decl.   There is evidence that Brightstar's devices were misappropriated to bolster Getgoods' financial standing.   Revenue received by Getgoods from the sale of Brightstar's devices was used to pay Getgoods' creditors.   Ex. 69 to O'Malley Opp. Decl.   It was also used to generate cash flow for Getgoods, thereby increasing Getgoods' stock value.   Ex. 71 to O'Malley Opp. Decl. at BSupp28797 ¶ 9.

8.      Starr and Brightstar have stipulated that Brightstar's Loss is greater than $35 million. (Dkt. #123, Letter to the Court at 2.)

**RESPONSE:** Admits, but this is not a material fact because it would not affect the outcome of Defendants' motion under the governing law.   *See Anderson*, 477 U.S. at 248.

9.      Brightstar had a global marine cargo insurance program in effect at the time of the Loss covering phones stored in warehouses, like the Frankfurt warehouse.   Brightstar's insurance program consisted of three layers.   The first layer was provided by the Marine Cargo Policy No. MASICNY0154US13 (the "Starr Policy") and provided the first $25 million in coverage. (Dkt. #1, Compl., ¶¶ 22, 25.)

**RESPONSE:** Admits that Brightstar's global marine cargo insurance program in effect at the time of the Loss consisted of three layers and that the first layer was provided by Marine Cargo Policy No. MASICNY0154US13 (the "Starr Policy").

Denies that the Starr Policy generally provided $25 million in coverage for phones stored in warehouses, and denies that the Starr Policy provided $25 million in coverage for phones stored in the Frankfurt warehouse.   Endorsement No. 40, which Brightstar admits was in effect at the time of the Loss (Brightstar SOF ¶ 13), provided: a "$25,000,000 Limit per occurrence at all locations as per schedule on file with underwriters, subject to Quarterly Statement of Values Report with actual values in storage at each location;" a "$25,000,000 Limit per occurrence for all newly locations (maximum 90 days to report) if they meet the minimum standards, as stated [in the endorsement];" and a "$3,000,000 Limit per occurrence for any unnamed/unscheduled

3

location." Ex. 3 to Declaration of Kevin J.B. O'Malley in Support of Plaintiff's Motion for Partial Summary Judgment ("O'Malley Decl.;" ECF Doc. 129) at STARR 15702.

Starr never accepted the Frankfurt warehouse in writing or otherwise or agreed to add the Frankfurt warehouse to the "schedule on file" with Starr under Endorsement No. 40. Ex. 39 to O'Malley Decl. at STARR CL00004. Therefore, the $25 million limit of liability under Endorsement No. 40 for locations on the "schedule on file" with Starr does not apply.

The Frankfurt warehouse did not qualify for "automatic coverage" because there is no evidence that the warehouse met all of the minimum standards stated in Endorsement No. 40 that were required for "automatic coverage" to attach up to a $25 million limit of liability. In particular, there is no evidence that (1) there was a central station alarm at the Frankfurt warehouse or that such an alarm was hot wired to local police and alarm company with line security or (2) the guards at the Frankfurt warehouse had call in times to a central station every hour - after hours, weekends and holidays.

10. The second layer provided coverage between $25 million and $50 million under a policy issued by Certain Underwriters at Lloyd's of London (the "First Excess Layer"). (Civ. Action No. 5297, Dkt. #2, Compl., ¶ 38.)

**RESPONSE:** Admits, but this is not a material fact because it would not affect the outcome of Defendants' motion under the governing law. *See Anderson*, 477 U.S. at 248.

11. The third layer provided coverage between $50 million and $80 million under policies issued by Great American Insurance Company of New York, XL Specialty Insurance Company, Catlin Syndicate Limited, Montpelier at Lloyd's Limited, and Axis Specialty Europe SE (the "Second Excess Layer"). (Civ. Action No. 5062, Dkt. #2, Compl., ¶ 39.)

**RESPONSE:** Admits, but this is not a material fact because it would not affect the outcome of Defendants' motion under the governing law. *See Anderson*, 477 U.S. at 248.

12. The Starr Policy was first placed in March 2011, but it was renewed annually and separate warehouse endorsements were added to the Starr Policy in 2012 and in 2013, respectively. (Edwards Decl., Ex. 5, End. 2, 17 and 40.)

**RESPONSE:** Admits that the Starr Policy was first placed in March 2011 and that certain terms and conditions were adjusted by endorsement on an annual basis, including separate warehouse endorsements being added to the Starr Policy in 2012 and in 2013.  Denies that the annual adjustments were renewals.  Ex. 48 to O'Malley Decl. at 32; Ex. 52 to O'Malley Decl. at 156, 167 203, 214 & 226-27; Ex. 53 to O'Malley Decl. at 34-37.

13.     The warehouse endorsement in effect at the time of Brightstar's Loss was added to the Starr Policy as Endorsement 40.  (*Id.*, Ex. 5, End. 40.)

**RESPONSE:** Admits.

14.     Endorsement 40 was drafted by Starr and delivered to the broker, Arthur J. Gallagher ("AJG"), on September 10, 2013, although it was effective March 26, 2013.  (*Id.*, Ex. 8.)

**RESPONSE:** Admits that Starr prepared Endorsement No. 40 based on the negotiated terms agreed to by Brightstar through its broker, Arthur J. Gallagher, and that Starr delivered the endorsement to AJG on September 10, 2013, although it was effective March 26, 2013.  Exs. 14, 16 & 17 to O'Malley Decl.  Denies that Starr was the author of, among other provisions, the exclusion in clause 3(b) (the "Misappropriation Exclusion") of Endorsement No. 40.  The language in the Misappropriation Exclusion was taken verbatim from Endorsement No. 2, which was the warehouse endorsement in the policy form supplied by Brightstar's broker in 2011. *Compare* Ex. 3 to O'Malley Decl. at STARR 15604, cl. 3(b) (Endorsement No. 2) *with id.* at STARR 15701, cl. 3(b) (Endorsement No. 40); Ex. 5 to O'Malley Decl.; Ex. 49 to O'Malley Decl. at 64-65 & 68-71.  Endorsement No. 2 is a Marsh broker form.  Ex. 58 to O'Malley Opp. Decl. at 95-96.  The individual broker who supplied the policy form to Starr in 2011 testified that he did not know who the author of Endorsement No. 2 was and that the language in the Misappropriation Exclusion "may have come from the previous Willis wording" (*i.e.*, Brightstar's prior broker).  *Id.*

15. Starr's Second Cause of Action seeks to deny coverage for Brightstar's Loss based on exclusion 3.b. to Endorsement 40 (the "Controlled Warehouse Exclusion"). (Dkt. #1, Compl., ¶ 59.)

**RESPONSE:** Admits that Starr's Second Cause of Action seeks to deny coverage for Brightstar's Loss based on exclusion 3.b. to Endorsement 40 but denies that the exclusion has the heading "Controlled Warehouse Exclusion."  Ex. 3 to O'Malley Decl. at STARR 15701, cl. 3(b).

16. The Controlled Warehouse Exclusion reads:

> 3. Notwithstanding anything contained elsewhere herein to the contrary, this policy shall not pay for loss of or damage to the goods and merchandise while covered under this endorsement caused by or resulting from:
>
> …
>
> b. Misappropriation, secretion, conversion, infidelity or any dishonest act done by or at the instigation of the Assured at any time during the currency of coverage, or by the Assured or other party of interest, his or their employees or agents while insured merchandise is stored in warehouses or stores, owned, leased or controlled by the Assured.

(Edwards Decl., Ex. 5, End. 40 at AJG297.)

**RESPONSE:** Admits that the Starr Policy contains the quoted provision but denies that the exclusion has the heading "Controlled Warehouse Exclusion."  Ex. 3 to O'Malley Decl. at STARR 15701, cl. 3(b).

17. The language in the Controlled Warehouse Exclusion is from a Starr form.  (*Id.*, Ex. 12 at 71:15-73:15; Ex. 11 at 4.b.)

**RESPONSE:** Denies.  The language in the Misappropriation Exclusion was taken verbatim from Endorsement No. 2, which was the warehouse endorsement in the policy form supplied by Brightstar's broker in 2011.  *Compare* Ex. 3 to O'Malley Decl. at STARR 15604, cl. 3(b) (Endorsement No. 2) *with id.* at STARR 15701, cl. 3(b) (Endorsement No. 40); Ex. 5 to O'Malley Decl.; Ex. 49 to O'Malley Decl. at 64-65 & 68-71.  Endorsement No. 2 is a Marsh

broker form.  Ex. 58 to O'Malley Opp. Decl. at 95-96.  Even though the language in the Misappropriation Exclusion matches the language used in Starr's form, there is no evidence that Starr required this particular language be used in the Misappropriation Exclusion in the Starr Policy.  Ex. 59 to O'Malley Opp. Decl. at 28-29 & 31-32.  The individual broker who supplied the policy form to Starr in 2011 testified that he did not know who the author of Endorsement No. 2 was and that the language in the Misappropriation Exclusion "may have come from the previous Willis wording" (*i.e.*, Brightstar's prior broker).  Ex. 58 to O'Malley Opp. Decl. at 95-96.

18.     Starr required its underwriters to add the language in the Controlled Warehouse Exclusion to the form that served as the basis for the original 2011 policy.  (*Id.*, Ex. 12 at 20:1-9, 29:2-13, 30:21-31:9; Ex. 9 at STARR30390 (FILED UNDER SEAL); *see also id.*, Ex. 10.)

**RESPONSE:** Denies.  The material cited does not support Brightstar's factual assertion.  Brightstar cites to the testimony from the deposition of Starr by its designated corporate representative, Jeffrey Factor.  Mr. Factor testified that what is referenced here as Exhibit 9 is Starr's broker form guide but also testified that he did not know whether the Marsh policy form used in 2011 for the Starr Policy had been revised per the broker form guide.  Ex. 59 to O'Malley Opp. Decl. at 28-29 & 31-32.

The language in the Misappropriation Exclusion was taken verbatim from Endorsement No. 2, which was the warehouse endorsement in the policy form supplied by Brightstar's broker in 2011.  *Compare* Ex. 3 to O'Malley Decl. at STARR 15604, cl. 3(b) (Endorsement No. 2) *with id.* at STARR 15701, cl. 3(b) (Endorsement No. 40); Ex. 5 to O'Malley Decl.; Ex. 49 to O'Malley Decl. at 64-65 & 68-71.  Endorsement No. 2 is a Marsh broker form.  Ex. 58 to O'Malley Opp. Decl. at 95-96.  Even though the language in the Misappropriation Exclusion matches the language used in Starr's broker form guide, there is no evidence that Starr required this particular language be used in the Misappropriation Exclusion in the Starr Policy.  Ex. 59 to O'Malley Opp.

Decl. at 28-29 & 31-32.  The individual broker who supplied the policy form to Starr in 2011 testified that he did not know who the author of Endorsement No. 2 was and that the language in the Misappropriation Exclusion "may have come from the previous Willis wording" (*i.e.*, Brightstar's prior broker).  Ex. 58 to O'Malley Opp. Decl. at 95-96.

19.     The parties stipulated that the Brightstar Loss was caused by "misappropriation." (Dkt. #123, Letter to the Court at 2.)

**RESPONSE:** Admits.

20.     Starr does not contend that Brightstar was involved in the circumstances of the Loss.  (*See* Dkt. #1, Compl.)

**RESPONSE:** Admits.

21.     Starr contends, instead, that the Controlled Warehouse Exclusion should apply because (1) the Frankfurt warehouse should be considered to have been "controlled" by Brightstar, and (2) Getgoods should be considered an "agent" of Brightstar or an "other party of interest."  (Dkt. #1, Compl., ¶¶ 55-56.)

**RESPONSE:** Admits but denies that the exclusion has the heading "Controlled Warehouse Exclusion."  Ex. 3 to O'Malley Decl. at STARR 15701, cl. 3(b).

22.     The Starr Policy does not define "controlled." (*See* Edwards Decl., Ex. 5.)

**RESPONSE:** Admits.

23.     The Starr Policy does, however, use a variation of "controlled" in other provisions. For example, a Starr Policy provision addressing concealed damage refers to goods "received into the custody and control of the receiver at the warehouse, store or other location at destination…." (*Id.*, End. 40 at AJG188.)

**RESPONSE:** Admits that the Starr Policy contains the quoted provision.

24.     Brightstar did not own or lease any portion of the Frankfurt warehouse.  (*Id.*, Ex. 3 at 67:13-17.)

**RESPONSE:** Admits.

25.     The warehouse was operated by Getgoods.  (*Id.* at 65:8-18.)

**RESPONSE:** Admits.

26.     Brightstar did not have any employees in the warehouse, or the right to control any of Getgoods' employees.  (*Id.* 67:18-69:25; Id., Ex. 1 at 620:20-621:3.).

**RESPONSE:** Admits that Brightstar did not have any employees in the warehouse, but denies that Brightstar did not have the right to control any of Getgoods' employees.  The Logistics Agreement and the Standard Operating Procedure for 3PL Warehousing Frankfurt (Oder) – Germany ("Frankfurt SOP") each have provisions under which Brightstar exercised control over Getgoods' employees.  Exs. 65 & 66 to O'Malley Opp. Decl.  For example, the Logistics Agreement states that certain services will "be performed in accordance with specific instructions from [Brightstar Germany]" and "in accordance with [Brightstar Germany's] written instructions." Ex. 65 to O'Malley Opp. Decl. at BSupp267 & 269, cls. 1.5 & 2.1(c).  The agreement also states that Brightstar Germany "shall provide getgoods in good time with all information and instructions necessary for appropriate warehousing and treatment."  *Id.* at BSupp267, cl. 1.1.  The Frankfurt SOP states, among other things, that "[t]he decision to receive or reject a shipment if any loss or damage needs to be agreed upon with a Brightstar representative."  Ex. 66 to O'Malley Opp. Decl. at BSupp294, cl. 4.3.

27.     The Logistics Agreement, which is governed by German law, (*id.* § 23), stated that the phones "shall be warehoused in suitable proprietary warehouses at getgoods" and that "getgoods shall have domiciliary rights," (*Id.*, Annex A, § 1.3.).

**RESPONSE:** Admits that the Logistics Agreement contains the quoted provision but respectfully refers the Court to the entire Logistics Agreement for the terms and conditions thereof.

28.     Under German law, "domiciliary rights" mean rights to control access to the warehouse and to exclude people from the warehouse. (*Id.*, Ex. 13 at 12.)

**RESPONSE:** Denies.   This assertion calls for a legal conclusion. *See Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, No. 07-CV-6304, 2015 WL 5729783, at *21

(S.D.N.Y. Sept. 29, 2015) ("the Court can also disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement"); *Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 361 n. 2 (S.D.N.Y. 2011) (declining to consider assertions in plaintiff's Local Civil Rule 56.1 Statement "that [were] legal arguments under the guise of undisputed facts").

29.     Brightstar was entitled to inspect its inventory only upon providing "suitable advance notice," only "during customary business hours," and only "in the presence of a getgoods employee." (*Id.*, Ex. 2, Annex A, § 3.1.)

**RESPONSE:** Denies.  Brightstar's representatives showed up at the Frankfurt warehouse unannounced at approximately 8:00 p.m. on October 30, 2013 and, upon simply requesting access to the facility, they were immediately let in by Getgoods.  Ex. 61 to O'Malley Opp. Decl. at 180-82; Ex. 62 to O'Malley Opp. Decl. at 115, 117-18 & 145; Ex. 67 to O'Malley Opp. Decl. at AJG920.  Thus, contrary to its contention, Brightstar needed neither to give "suitable advance notice" nor arrive "during customary business hours."

30.     Getgoods, not Brightstar, performed inventory management at the Frankfurt warehouse. (*Id.*, § 9.)

**RESPONSE:** Denies that Brightstar did not perform inventory management.  Brightstar received daily, weekly and monthly inventory reports from Getgoods.  Ex. 66 to O'Malley Opp. Decl. at BSupp298, cl. 10.2.  Admits that Getgoods performed inventories.

31.     Brightstar provided expected levels of logistics service regarding its inventory to Getgoods, but Getgoods controlled the warehouse and decided how to meet those service levels. (*Id.*, Ex. 3 at 69:5-20.)

**RESPONSE:** Denies.  Brightstar did more than tell Getgoods what was "expected." Under its agreements with Getgoods, Brightstar either set forth how Getgoods was to operate or stated that instructions would be provided.  For example, the Logistics Agreement provides that

Brightstar Germany "shall provide getgoods ... with all information and instructions necessary for appropriate warehousing and treatment." Ex. 65 to O'Malley Opp. Decl. at BSupp267, cl. 1.1.

Brightstar admitted that it controlled the Frankfurt warehouse. An Insurance Master Schedule created by Brightstar for submission to Starr after the Loss expressly represented that Brightstar "Owned or Controlled" the Frankfurt warehouse. Ex. 60 to O'Malley Opp. Decl. at 379 & 381-83; Ex. 64 to O'Malley Opp. Decl. at BSupp448497 & BSupp448500. This schedule was created in connection with the annual adjustment of the Policy in March 2014. Ex. 60 to O'Malley Opp. Decl. at 379 & 381-83; Ex. 64 to O'Malley Opp. Decl. at BSupp448497.

|  | E | F | G | H | I | J |
|---|---|---|---|---|---|---|
| 1 |  |  |  |  |  |  |
| 2 |  |  |  |  | Entity, Address & Contact |  |
| 3 | Region | Country | Name of Insured Enity or Branch | Location Owned or Controlled by Brightstar? | Address | Contact |

\* \* \*

|  | E | F | G | H | I | J |
|---|---|---|---|---|---|---|
| 5 | Europe | Germany | Brightstar Germany GmbH | Yes | Werner-von-Siemens-Straße 6/Quinckestraße 1, 15236 Frankfurt (Oder) | Dr. Markus Dubon |

Ex. 64 to O'Malley Opp. Decl. at BSupp448500.

The representation of Brightstar's control of the warehouse has never been disavowed or disputed by Brightstar. Brightstar's corporate representative was asked about the schedule at his deposition, but he did not challenge it. Ex. 60 to O'Malley Opp. Decl. at 379-89. Instead, he explained that Brightstar's contractual relationship with Getgoods was the basis for such control. *Id.* at 388-89.

32. Brightstar had difficulty gaining access to the warehouse prior to the Loss. (*See*, *e.g.*, *id.* at 98:16-100:6, 131:22-132:9.)

**RESPONSE:** Denies. While Getgoods postponed on several occasions the physical inventory requested by Brightstar, Brightstar agreed to the postponements. Ex. 63 to O'Malley

Opp. Decl. at 98-100; Ex. 67 to O'Malley Opp. Decl. at AJG920.   When Brightstar's representatives showed up at the Frankfurt warehouse unannounced at approximately 8:00 p.m. on October 30, 2013, they simply requested access to the facility and were immediately let in by Getgoods.  Ex. 61 to O'Malley Opp. Decl. at 180-82; Ex. 62 to O'Malley Opp. Decl. at 115, 117-18 & 145; Ex. 67 to O'Malley Opp. Decl. at AJG920.

33.     For example, in August, Brightstar requested access to the Frankfurt warehouse for purposes of conducting a physical inventory of its phones as part of a migration to a new accounting system.   (*Id.*, Ex. 3 at 98:16-99:3.)  Getgoods did not agree to the inspection and, therefore, it did not take place at that time.  (*Id.* 99:4-100:6.)  Getgoods postponed the inspection again in September, and it was eventually scheduled for the end of October.   (*Id.* at 131:22-132:9.)

**RESPONSE:** Denies the implication that Brightstar was denied access to the Frankfurt warehouse in August and September 2013.  Brightstar agreed to the postponements.  Ex. 63 to O'Malley Opp. Decl. at 98-100; Ex. 67 to O'Malley Opp. Decl. at AJG920.

34.     The term "other party of interest" is not defined by the Starr Policy. (*See id.*, Ex. 5.)

**RESPONSE:** Admits.

35.     The Starr Policy does, however, use the term "interest" in provisions beyond the Controlled Warehouse Exclusion. One provision uses the term to refer to entities in which Brightstar may have an interest and which are insured under the Starr Policy.  (*Id.* at AJG0000165.)  Other provisions use "interest" to refer to a property interest insured under the Starr Policy.  (*Id.* at AJG0000176 ("Interest Insured"); *id.* at AJG0000166 ("Any loss payable hereunder shall be payable … to the order of Named Insured thirty days after the full proofs of loss and proofs of interest have been filed"); *id.* at AJG0000167 (referring to "the interest hereby insured"); *id.* at AJG0000181 (discussing an "accumulation of the interests insured hereunder"); *id.* at AJG0000220 (discussing bank's "insurable interest" in "goods and/or merchandise and/or property insured under this policy").) Still other provisions use the term "interest" to refer to loan interest (Edwards Decl., Ex. 6 at AJG0000193, AJG0000200) and to interest on judgments (*id.* at AJG0000245).

**RESPONSE:** Denies, except admits that the Starr Policy uses the term "interest" in provisions beyond the Misappropriation Exclusion, that the provision at AJG0000220 discusses the bank's "insurable interest" in "goods and/or merchandise and/or property insured under this

policy," that the provisions at AJG0000193 and AJG0000200 use the term "interest" to refer to loan interest and that the provision at AJG0000245 uses the term "interest" to refer to interest on judgments.

The provisions at AJG0000165, AJG0000166 and AJG0000167 are in the War Risks policy. Ex. 5 to Edwards Decl. at AJG165-70. That policy is a separate contract. *Id.* In any event, the provision at AJG0000167 uses the term "interest" to refer to the insured goods themselves, not a property interest insured under the War Risks policy.

The provision at AJG0000176 uses the term "interest" to refer to the insured goods themselves and to an interest in the insured goods. The provision at AJG0000181 uses the term "interest" to refer to the insured goods.

36. Endorsement 15 to the Starr Policy states:

> This endorsement does not insure against loss, damage or expense caused by or resulting from: … Misappropriation, secretion, conversion, infidelity, or any dishonest act on the part of the Assured or other party of interest, his or their employees or agents or others to whom the property may be entrusted (carriers for hire excepted)….

(*Id.*, End. 15 at AJG0000232) (emphasis added.)

**RESPONSE:** Admits that the Starr Policy contains the quoted provision.

37. As a matter of industry custom and practice, "interest" usually means an interest insured under a marine cargo policy. (*Id.*, Ex. 14 at 15.)

**RESPONSE:** Denies. Brightstar relies on the following from the report of its proffered expert witness, Douglas Parks, to support the factual assertion:

> As a matter of industry customs, standards and practices, I conclude that "other party of interest" means "an other party (not the Insured) having a first party insurable interest under the Policy covering the goods insured." The term "interest" is typically used to mean an interest insured under a policy.

Ex. 14 to Edwards Decl. at 15.

The material cited to support the factual assertion cannot be presented in a form that would be admissible in evidence because the proffered opinion does not meet the reliability requirements of Federal Rule of Evidence 702. *See* Fed. R. Civ. P. 56(c)(2). Mr. Parks' statements are nothing more than conclusory opinions and, thus, *ipse dixit*. "[A]n expert basing his opinion solely on experience 'must do more than aver conclusorily that his experience led to his opinion' ...." *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003), *aff'd*, 99 Fed. Appx. 274 (2d Cir. 2004) (quoting *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 530 (S.D.N.Y. 2001)). "Rather, an expert who is relying 'solely . . . on experience . . . must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.' " *Lippe*, 288 B.R. at 686 (quoting Fed. R. Evid. 702 Advisory Committee's Note (2000 amendments)); *see also Mikeron v. Exxon Co., U.S.A.*, 264 F. Supp. 2d 268, 274 (D. Md. 2003). The Court, therefore, "is not required 'to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.' " *In re Rezulin Products Liability Litig.*, 369 F. Supp. 2d 398, 420 (S.D.N.Y. 2005) (citations omitted); *see also Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005). "Conclusory opinions are a form of '*ipse dixit*,' and often provide an insufficient basis upon which to assess reliability." *Estate of Jaquez v. City of N.Y.*, 104 F. Supp. 3d 414, 426 (S.D.N.Y. 2015) (citation omitted).

Furthermore, the material cited does not support the factual assertion because the proffered opinion is insufficient to establish a custom and practice. The advocate of a trade usage must establish that (1) the term in question has a " 'fixed and invariable' " usage and (2) that the "party sought to be bound was aware of the custom, or that the custom's existence was 'so notorious' that it should have been aware of it." *British Int'l Insur. Co. v. Seguros La Republica, S.A.*, 342 F.3d 78, 84 (2d Cir.2003) (citations omitted); *see also El Encanto, Inc. v. Boca Raton Club, Inc.*, 68

So. 2d 819, 820 (Fla. 1953).  "A custom or usage, if it is to be read into a contract to ascertain the intention of the parties, must fix a definite standard by proof establishing that it was general, uniform and unvarying."  *Belasco Theatre Corp. v. Jelin Prods.*, 59 N.Y.S.2d 42, 45 (1st Dep't 1945).  Mr. Parks' statements do meet this standard.  He states that the "term 'interest' is *typically* used to mean ...."  Ex. 14 to Edwards Decl. at 15 (emphasis added).  That is not a "fixed and invariable" usage.  *See Hunter v. Greene*, 734 F.2d 896, 900 (2d Cir. 1984) (an affidavit alleging that a practice is "often used" does not establish a fixed and invariable custom).  Neither Brightstar nor Mr. Parks offer anything on whether Starr was aware of the supposed custom or whether the supposed custom's existence was so notorious that Starr should have been aware of it.

In any event, "[w]hether a usage exists is a question of fact, to be determined by the trier of fact."  12 Richard A. Lord, *Williston on Contracts* § 34:19 (4th ed. & Supp. 2005) (footnotes omitted); *Walls v. Bailey*, 49 N.Y. 464, 476 (1872) ("Not only the existence of such a usage, but whether knowledge of it exists in any particular case, is a question of fact for the jury."); *Sullivan v. Jernigan*, 21 Fla. 264 (1885) (same).

38.    The purpose of dishonesty exclusions such as the Controlled Warehouse Exclusion is to exclude moral hazard losses – those caused by someone who would benefit by making a claim under the Starr Policy.  (*Id.*, Ex. 15 at 17.)

**RESPONSE:**  Denies.  Brightstar relies on the following from the report of its proffered expert witness, Michael Fitzgerald, to support the factual assertion:

> As a matter of insurance industry custom and practice, property insurance policies (including Marine Cargo/Storage policies) never intend to pay for moral hazard losses - that is, losses deliberately caused by or at the direction of the policyholder/assured.  Dishonest acts exclusions in Marine Cargo/Storage policies, for example as expressed in AIMU AIR 2004, in Banker's Endorsements and in the Warehouse Coverage Endorsements (2, 17 and 40), are all intended to allow insurers to avoid paying for moral hazard losses deliberately caused by the policyholder/assured, or someone who would benefit from making a claim under the policy.

Ex. 15 to Edwards Decl. at 17.

The material cited to support the factual assertion cannot be presented in a form that would be admissible in evidence because the proffered opinion does not meet the reliability requirements of Federal Rule of Evidence 702. *See* Fed. R. Civ. P. 56(c)(2). Mr. Fitzgerald's statements are nothing more than conclusory opinions and, thus, *ipse dixit*. *See* discussion in response to Brightstar SOF ¶ 37.

Furthermore, the material cited does not support the factual assertion because Mr. Fitzgerald's statements do not meet the standard for establishing a custom and practice. *See* discussion in response to Brightstar SOF ¶ 37. There is nothing about whether the supposed custom and practice was "fixed and invariable." And neither Brightstar nor Mr. Fitzgerald offer anything on whether Starr was aware of the supposed custom or whether the supposed custom's existence was so notorious that Starr should have been aware of it.

In any event, "[w]hether a usage exists is a question of fact, to be determined by the trier of fact." Lord, *supra*, *Williston on Contracts* § 34:19 (footnotes omitted); *Walls*, 49 N.Y. at 476; *Sullivan*, 21 Fla. at 264.

39.    Getgoods did not have any interest in the insurance proceeds from the Brightstar phones insured under the Starr Policy. (*Id.*, Ex. 12, Deposition of Starr's Fed. R. Civ. P. 30(b)(6) Witness Jeffrey Factor, at 269:2-5) ("Q.  Do you agree with me that getgoods is not insured under the [P]olicy? A.  Insured under the [P]olicy, they are not.  I would agree, sorry.")

**RESPONSE:** Admits.

40.    The term "agent" is not defined by the Starr Policy. (*See id.*, Ex. 5.)

**RESPONSE:** Admits.

41.    Brightstar and Starr have submitted expert reports offering different opinions on whether Getgoods was an "agent" of Brightstar under German law, which governs the Logistics Agreement due to a provision selecting German law. (*Id.*, Ex. 13 at 5-6, 17-19; Edwards Decl., Ex. 16 at 12-16.).

**RESPONSE:** Admits.

42.    Brightstar did not authorize Getgoods or its CEO to misappropriate Brightstar's phones. (*See* Dkt. #1, Compl.)

**RESPONSE:** Denies.  The material cited does not support Brightstar's factual assertion.

There is no allegation in the Complaint that "Brightstar did not authorize Getgoods or its CEO to

misappropriate Brightstar's phones," and no allegation therein can be fairly read to support the

factual assertion.

Dated: New York, New York
       June 22, 2018

                    NICOLETTI HORNIG & SWEENEY
                    Attorneys for Plaintiff

      By:    John A.V. Nicoletti (nn)
                John A.V. Nicoletti
                Nooshin Namazi
                Kevin J.B. O'Malley
                Wall Street Plaza
                88 Pine Street, Seventh Floor
                New York, New York 10005
                (212) 220-3830
                jnicoletti@nicolettihornig.com
                nnamazi@nicolettihornig.com
                komalley@nicolettihornig.com