UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STARR INDEMNITY & LIABILITY COMPANY,<br><br>      Plaintiff,<br><br>v.<br><br>BRIGHTSTAR CORP., and BRIGHTSTAR GERMANY GmbH<br><br>      Defendants. | Case No. 1:13-cv-08580-GHW-GWG |

**BRIGHTSTAR CORP. & BRIGHTSTAR GERMANY GmbH'S
RESPONSE TO STARR'S STATEMENT OF PURPORTEDLY UNDISPUTED
MATERIAL FACTS**

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, Defendants Brightstar Corp. and Brightstar Germany GmbH (collectively, "Brightstar") set forth the following Response to Starr's Statement of Undisputed Material Facts. Many of Starr's purported facts are disputed, immaterial, or both.

To the extent this Response cites exhibits already submitted by Starr, it cites to Starr's Declaration of Kevin J.B. O'Malley. Otherwise, the Response cites exhibits attached to the May 25, 2018 Declaration of Charlie P. Edwards and the June 22, 2018 Declaration of Mark L. Durbin.

Brightstar responds to Starr's statements as follows:

1.   Starr Indemnity & Liability Company insured Brightstar Corp. and Brightstar Germany GmbH (collectively, "Brightstar") under the terms and conditions of an open marine cargo policy (the "Policy"). Ex. 3.

**RESPONSE: Undisputed.**

2. Brightstar submitted a claim to Starr seeking to recover $25 million under the Policy for the loss of Brightstar's wireless communication devices that were stored at a warehouse in Germany (the "German Warehouse"). Ex. 38 at STARR FRF 429.

**RESPONSE: Undisputed.**

3. A true and correct copy of the Policy is attached as Exhibit "3" to the Declaration of Kevin J.B. O'Malley in Support of Plaintiff's Motion for Partial Summary Judgment executed on May 25, 2018. Ex. 3.

**RESPONSE: Undisputed that Ex. 3 is a true and correct copy of the Policy, except that Starr has highlighted some of the language in yellow.**

4. The Policy was continuous until cancelled and coverage first attached under the Policy on and after March 26, 2011. Ex. 3 at STARR 15574, cl. 4; Ex. 1 ¶ 23; Ex. 2 (Amended Answer) ¶ 23.

**RESPONSE: Undisputed.**

**5.** Certain terms and conditions were thereafter adjusted by endorsement, including on an annual basis. Ex. 1 ¶ 23; Ex. 2 (Amended Answer) ¶ 23; Ex. 3.

**RESPONSE: Undisputed.**

6. The annual adjustments were not renewals. Ex. 48 at 32; Ex. 52 at 156, 167 & 214; Ex. 53 at 34-37.

**RESPONSE: Statement of Fact ("SOF") paragraph 6 is a legal conclusion, not a "fact" for purposes of Local Rule 56.1. To the extent it involves facts, those facts are disputed. The parties often referred to the annual changes as "renewals." (Edwards Decl., Exs. 6-7).**

7. The Policy's most recent annual adjustment prior to the loss was effective on and after March 26, 2013. Ex. 1 ¶ 24; Ex. 2 (Amended Answer) ¶ 24.

**RESPONSE: Undisputed.**

8. Brightstar Corp.'s principal place of business is in Florida.  Ex. 1 ¶ 3; Ex 2 (Amended Answer) ¶ 3.

**RESPONSE: Undisputed.**

9. Brightstar Germany's exclusive place of business was in Germany. Ex. 1 ¶ 4; Ex 2 (Amended Answer) ¶ 4; Ex. 2 (Counterclaim) ¶ 86.

**RESPONSE: Disputed.  Brightstar Germany is an indirect, wholly owned subsidiary of Brightstar Corp. and one of its directors is Oscar Fumagali, who lives and works in Florida.  (Durbin Decl., Ex. 7 at 116:18-25, Ex. 32 ¶¶ 4, 6.)  Where Brightstar Germany operates, however, is not "material" to Starr's Motion.**

10. Starr's principal place of business is in New York. Ex. 46 ¶ 8.

**RESPONSE: Undisputed.  However, Starr's cited document does not support the statement's proposition.  The cited document does not state that Starr's principal place of business was in New York, only that a former Brightstar broker "correspond[ed] with the Starr Companies' office in New York."**

11. Starr's performance under the Policy (e.g., payment of covered claims) was done from New York. Ex. 46 ¶ 10.

**RESPONSE:  Disputed.  Although certain aspects of Starr's performance occurred in New York, not all of its performance occurred in New York.  For example, Starr met with Brightstar in Florida in connection with the Policy (*see, e.g.*, Durbin Decl., Ex. 2 at 213:3-20, 241:4-20, Ex. 4 at 155:24-157:8, Ex. 5 at 53:7-55:2, Ex. 32 ¶ 7), received payments from Florida (*id*., Ex. 32 ¶ 6), and surveyed locations around the world under the Policy (*id*., Ex. 3 at 152:11-23, 166:5-167:11).  Also, this purported fact is immaterial to Starr's Motion, including to the choice-of-law analysis. The controlling choice-of-law factor in insurance cases like this one, which involve multi-jurisdictional risk, is the insured's domicile.  (O'Malley Decl., Ex. 3.)  Brightstar's domicile is Florida. (*Id*., Ex. 32 ¶ 4.)**

3

12. Premium payments for the Policy were made to Starr in New York. Ex. 46 ¶ 9.

**RESPONSE: Disputed. Brightstar wired premium payments to Florida-based AJG. (Durbin Decl., Ex. 32 ¶ 6.). This was consistent with the Starr Policy, which states that premiums and taxes were to be "invoiced to and paid by Brightstar Corporate in Miami, Florida." (O'Malley Decl., Ex. 3 at STARR 15576.)**

13. Marsh in New York was the insurance broker for Brightstar in 2011. Ex. 1 ¶ 18; Ex. 2 (Amended Answer) ¶ 18; Ex. 49 at 18-19.

**RESPONSE: Undisputed. (O'Malley Decl., Ex. 1 ¶ 18; Ex. 2 (Amended Answer) ¶ 18.) This fact, however, is immaterial to Starr's Motion, including to the choice-of-law analysis. *See* response to SOF 11. It is "Starr's position that Endorsement No. 40 controls" (Dkt. #130, Starr Mem. in Supp. of Mot. for Partial Summ. J., p. 2), which was negotiated and issued in 2012 and 2013 (Durbin Decl., Ex. 32 ¶¶ 6-7, Ex. 2 at 151:4-15.). Even assuming that the broker's domicile is dispositive, the broker for Brightstar for the 2012 and 2013 Policy renewals was not New-York-based Marsh, but rather Florida-based AJG. (Durbin Decl., Ex. 32 ¶¶ 6-7, Ex. 2 at 151:4-15.)**

14. Marsh negotiated the insurance contract on behalf of Brightstar with Starr in New York. Ex. 4; Ex. 5; Ex. 46 ¶ 8; Ex. 49 at 18-19, 62-65 & 68-71.

**RESPONSE: Disputed. Although the initial Policy was negotiated with Marsh, Endorsements 17 and 40, which are part of the insurance contract, *i.e.*, the Policy, were negotiated with AJG in Florida. (*See, e.g.*, Durbin Decl., Ex. 2 at 213:3-20, 241:4-20, Ex. 4 at 155:24-157:8, Ex. 5 at 53:7-55:2, Ex. 32 ¶ 7.) Moreover, Starr travelled to Florida to meet with Brightstar in connection in an effort to obtain and retain its insurance program documented in the insurance contract. (*Id*., Ex. 5 at 53:7-55:2, Ex. 2 at 213:3-20, 241:4-20.) Again, however, this fact is immaterial to Starr's Motion, including to the choice-of-law analysis, for the reasons stated in responses to SOF 11-13.**

15. It was the New York offices of Marsh and Starr that negotiated the Policy. Ex. 4; Ex. 5; Ex. 46 ¶ 8; Ex. 49 at 18-19, 62-65 & 68-71.

**RESPONSE: Disputed. Again, however, this fact is immaterial to Starr's Motion, including to the choice-of-law analysis. *See* responses to SOF 11-14.**

4

16. Marsh sent an order to bind coverage from New York to Starr in New York on behalf of Brightstar on March 25, 2011. Ex. 4 at MARSH00421.

> **RESPONSE: Undisputed.** Again, however, this fact is immaterial to Starr's Motion, including to the choice-of-law analysis. *See* **responses to SOF 11-14.**

17. The underwriter in Starr's New York office responded to Marsh on March 25, 2011 in an e-mail stating, "As we have discussed I have confirmed the Brightstar renewal in Marshcargo.com." Ex. 4 at MARSH420.

> **RESPONSE: Undisputed that Starr's Michael Cecora stated the quoted language in his email dated March 25, 2011.**

18. The binder was sent to Marsh in New York by the underwriter in Starr's New York office on March 25, 2011. Ex. 4 at MARSH420.

> **RESPONSE: Undisputed.** Indeed, the binder was "sent to" a New York-based broker via the Starr email contained in Exhibit 4. But this fact is immaterial to Starr's Motion, including to the choice-of-law analysis. *See* **responses to SOF 11-14.**

19. Marsh drafted the Policy and submitted it to Starr in New York. Ex. 5 at MARSH00303; Ex. 46 ¶ 8; Ex. 49 at 64-65 & 68-71.

> **RESPONSE: Disputed.** The cited documents do not show who drafted the 2011 Policy, or how much of the language of the 2011 Policy was required by Starr. The cited paragraph from Exhibit 46, for example, is merely an assertion by Starr's Jeffrey Factor that Marsh "handled the solicitation and negotiation of the Policy." (O'Malley Decl., Ex. 46 ¶ 8.)  And regardless, the 2012 and 2013 warehouse endorsements (*id*., Ex. 3, End. 17 and 40) were drafted by Starr and included Starr's language.  (Durbin Decl., Ex. 2 at 176:2-15; Edwards Decl., Ex. 8; *id*., 9 at STARR30390 (FILED UNDER SEAL); *id*., Ex. 12 at 20:1-9, 29:2-13, 30:21-31:9, 71:15-73:15; *id*., Ex. 11 at 4.b.)

20. Arthur J. Gallagher & Co. replaced Marsh as Brightstar's broker of record as of January 10, 2012. Ex. 7.

> **RESPONSE: Undisputed.**

5

21. Endorsement No. 17 to the Policy was the warehouse coverage endorsement that was issued in connection with the annual adjustment of the Policy effective March 26, 2012. Ex. 3 at STARR 15638-44.

**RESPONSE: Undisputed.**

22. Endorsement No. 17 states, in relevant part:

> 1. Attaching on all goods and merchandise as described above at the risk of the Insured on or after March 26, 2012.
>
> * * *
>
> 10. The un-named location limit of $3,000,000 is provided without prior approval, with the exception of the 150 Hartlauer and 20 Hutchinson shops in Austria that are limited to an aggregate of $1,500,000 for all shops combined, at any one time.
>
> 11. Notwithstanding anything else stated in the policy or other endorsements thereto, the most This Company agrees to pay of a claim made under this endorsement are those limits of liability in the schedule below:
>
> [The endorsement then includes a schedule with columns entitled "Country," "Entity Name," "Address" and "Limit of Liability." There are numerous locations named in the schedule.]
>
> 12. Automatic coverage up to $25,000,000 (S50,000,000 for Brightstar/Tech Data Europe locations) is provided for new locations upon an affirmative representation of specific location minimum standards noted below, subject to receipt of quarterly statement of values.
>
> [The endorsement then enumerates the minimum standards, which are discussed below.]

Ex. 3 at STARR 15638-44.

**RESPONSE: Undisputed.**

23. Under Endorsement No. 17, "[a]utomatic coverage up to $25,000,000 ... is provided for new locations upon an affirmative representation of specific location minimum standards noted [in the endorsement], subject to receipt of quarterly statement of values." Ex. 3 at STARR 15643, cl. 12.

**RESPONSE: Undisputed.**

24. The minimum standards stated in Endorsement No. 17 include:

- Facility equipped with central station alarm - hot wired to local police and alarm company with line security

- Facility protected by guards 24/7 with call in times to a central station every hour - after hours, weekends, and holidays

Ex. 3 at STARR 15644.

**RESPONSE: Undisputed that Endorsement No. 17 provides the two bulleted minimum standards. It is disputed, however, to what extent these standards were mandatory versus discretionary. As Jeffrey Factor admitted when testifying at Starr's 30(b)(6) representative, "the standards of care are not warranties. They are suggestions, recommendations. So they would not by themselves void coverage if they were not complied with." (Durbin Decl., Ex. 3 at 60:16-21.) Factor further admitted that "there were many locations that we [Starr] agreed to insure that did not meet minimum standards." (*Id*. at 157:24-158:8.) Indeed, Factor testified, "more often than not, new locations did not meet minimum standards." (*Id*. at 158:20-23.) Factor explained the process for determining whether Starr would agree to insure a location that did not meet minimum standards: "we would make sure that we would survey them, and if there is any recommendations or anything we were uncomfortable with we would make sure they complied." (*Id*. at 160:5-8.)**

25. There is no evidence that there was a central station alarm at the German Warehouse or that such an alarm was hot wired to local police and alarm company with line security.

**RESPONSE: Disputed. Unlike Starr, Brightstar surveyed the Frankfurt warehouse and concluded it met the Policy's minimum standards. (Durbin Decl., Ex. 28.) Specifically, on March 7, 2013, Brightstar's Kevin O'Brien, Klaus Freese, and Axel Grellhorst conducted an onsite security assessment of the Frankfurt warehouse. (*Id*.) The purpose of Mr. O'Brien's visit was to ensure that the facility met the insurance requirements, along with Brightstar's own security requirements. (*Id*.,**

7

**Ex. 6 at 222:13-223:17;** *see also id.* **at 42:25-43:14, 179:17-20, 183:1-6.) Within a few weeks, on March 21, 2013, Mr. O'Brien completed a written Security Assessment, concluding that the security measures at the warehouse were acceptable. (***Id.***, Ex. 28 at BSupp00491337.) He specifically noted that the warehouse had an onsite 24/7 security guard operation supported by external alarm monitoring. (***Id.***) Mr. O'Brien also noted that the "CCTV system has excellent coverage at the access point and inside the storage/3PL area designated for Brightstar." (***Id.***) Mr. O'Brien explained that the requirement of a direct line to the local police was satisfied by having an alarm system that resulted in notification to the local police. (***Id.***, Ex. 6 at 61:7-63:25.) Based on Mr. O'Brien's assessment, Brightstar determined that the Frankfurt warehouse met the Policy's minimum standards. (***Id.***, Ex. at 7 at 207:13-210:13; 214:15-215:18.)**

26. There is no evidence that the guards at the German Warehouse had call in times to a central station every hour - after hours, weekends and holidays.

**RESPONSE: Disputed.** *See* **response to SOF 25.**

27. The named locations covered under Endorsement No. 17 were identified in a schedule in Clause 11 of the endorsement with corresponding and varying limits of liability stated next to each location. Ex. 3 at STARR 15639-43, cl. 11.

**RESPONSE: Undisputed that Endorsement No. 17's Clause 11 contains a schedule of locations, assigning the locations varying limits of liability. It is disputed, however, that a location is "unnamed" if it does not appear on such a schedule. It is also disputed that locations not appearing on a schedule are not covered by the Policy. Factor admitted that pursuant to an unwritten "held coverage agreement" (Durbin Decl., Ex. 2 at 168:24-169:20), all of the warehouses ultimately listed in Endorsement 17 were covered from the date the Policy incepted on March 26, 2012, until the date the endorsement was finally signed and added to the Policy on June 15, 2012. (***Id.* at 198:18-199:15.)**

28. There was no provision in Endorsement No. 17 for adding a new named location to the schedule in Clause 11. Ex. 3 at STARR 15638-44; Ex. 47 at 365-70.

**RESPONSE: Undisputed that there was no such provision in the Endorsement 17. However, the parties had a "held coverage agreement" as noted in responses to SOF 27 & 30.**

29. There was no provision in the Policy for adding a new named location to the schedule in Clause 11 in Endorsement No. 17. Ex. 3; Ex. 47 at 365-70.

> **RESPONSE: Undisputed that there was no such provision in the Policy. However, the parties had a "held coverage agreement" as noted in responses to SOF 27 & 30.**

30. Starr would confirm its agreement to add a new named location by issuing an endorsement amending Clause 11 in Endorsement No. 17. Ex. 3 (Endorsement Nos. 22, 24, 26, 27 & 29-34).

> **RESPONSE: Disputed. (O'Malley Decl., Ex. 3, End. 7-14, 22, 24, 27, 29-34.) Starr ultimately did add endorsements to the Policy before 2013, but they are not what confirmed coverage; they simply reflected the addition of the location to the Policy and the effective date of coverage. As Starr's Factor put it, Brightstar "was a constantly changing account, with constantly adding and deleting locations." (Durbin Decl., Ex. 2 at 186:6-8.) Starr therefore often did not issue endorsements for weeks, or even months, after it was notified of a location. (*Id.* at 186:6-8.) Endorsement 27, for example, was executed by Factor on September 5, 2012, but effective July 31, 2012. (O'Malley Decl., Ex. 3, End. 27; Durbin Decl., Ex. 2 at 168:8-11.) Factor testified that Starr agreed to insure warehouse locations during the time before endorsements were issued formally adding them to the Policy, pursuant to an unwritten "held coverage agreement." (Durbin Decl., Ex. 2 at 168:24-169:20.) Factor admitted that pursuant to this informal agreement, all of the warehouses ultimately listed in the 2012 warehouse endorsement (O'Malley Decl., Ex. 3, End. 17) were covered from the date the policy incepted on March 26, 2012, until the date the endorsement was finally signed and added to the policy on June 15, 2012. (Durbin Decl., Ex. 2 at 198:18-199:15.)**

31. No endorsement was ever issued amending Clause 11 in Endorsement No. 17 to add the German Warehouse to the schedule in Clause 11. Ex. 3.

> **RESPONSE: Undisputed that Starr failed to issue an endorsement to the Policy before the coverage changed to no longer require such endorsements, effective March 26, 2013. However, Starr's failure to issue an endorsement is immaterial because, among other things, Starr had notice of the German Warehouse on February 20, 2013 (Durbin Decl., Ex. 20); automatic coverage applied under Section 12 of Endorsement 17 (O'Malley Decl., Ex. 3, End. 17); and Starr's Factor admitted that warehouses were added to the Policy during 2012 before formal endorsements**

9

were added, pursuant to an informal "held coverage" agreement (Durbin Decl., Ex. 2 at 168:24-169:20, 198:18-199:15.)

32. Starr never assented to add the German Warehouse to the Policy under endorsement No. 17. Ex. 39 at STARR CL000004.

**RESPONSE: Disputed. Starr assented to and accepted the addition of the German warehouse to the Policy through at least the following actions: Starr charged and was paid a premium for coverage that was based on and included the revenues from the German warehouse after being notified on February 20, 2013 of Brightstar's desire for coverage for the German location (*See* O'Malley Decl., Ex. 3, End. 36; Durbin Decl., Ex. 20; *id*., Ex 2 at 266:8-267:16; Edwards Decl., Ex. 14 at 8); Starr's internal acknowledgement of that request and internal direction to take further action as required by the Policy (Durbin Decl., Ex. 21; O'Malley Decl., Ex. 3, End. 17); and Starr's receipt of the schedule of revenues that included Germany on which Starr based the premium (Durbin Decl., Ex. 37 (FILD UNDER SEAL)). In addition, at no point did Starr ever affirmatively reject or refuse to provide coverage after receiving Brightstar's request for coverage and never sought further information from Brightstar regarding the location prior to the Loss. (Durbin Decl., Ex. 2 at 257:13-24, 260:10-15.) Furthermore, there is no language in Endorsement No. 17 requiring assent. (*See* O'Malley Decl., Ex. 3, End. 17.). Even if such language existed, Starr would be estopped or would have waived any right to require such assent based on its conduct. In addition, Starr's Factor admitted that warehouses were added to the Policy during 2012 before formal endorsements were added, pursuant to an informal "held coverage" agreement. (Durbin Decl., Ex. 2 at 168:24-169:20, 198:18-199:15.)**

33. There is no evidence that Starr manifested its assent to add the German Warehouse to the schedule in Clause 11 in Endorsement No. 17. Ex. 39 at STARR CL000004.

**RESPONSE: Disputed.** *See* **response to SOF 32.**

34. Jeffrey Factor, an underwriter at Starr, sent an e-mail to Robin Thompson at Gallagher on July 23, 2012 stating:

> Before we can add a location to the schedule, we need the following:
> Full Name
> Complete Address
> COPE Details
> Limit Required
> Current value of inventory

       Also, once added, we will need contact details for a possible survey.

Ex. 8.

> **RESPONSE: Undisputed that Factor sent such email in 2012 reflecting information Starr wanted to add a location to a schedule in a formal endorsement in 2012. But disputed that "COPE Details" were required as of February 2013, when Brightstar notified Starr of the Frankfurt warehouse. Through January 2013, AJG had been sending Factor the current warehouse spreadsheet containing COPE Details. (Durbin Decl., Ex. 4 at 251:9-252:9.) However, AJG's Lisa Rodriguez testified that, in early 2013, Factor told AJG to stop sending Starr such spreadsheets. (*Id.* at 248:25-253:2; *id.*, Ex. 36.) Specifically, on January 16, 2013, AJG sent Factor the current master spreadsheet (*id.*, Ex. 16), and Factor responded the same day in an email saying the master spreadsheet that was sent was "NOT what we are looking for" (Factor's emphasis) and enclosing a shorter "Statement of Values" or "SOV" Starr had prepared, which did not include COPE information. (*Id.*, Ex. 36.)**

       35. Brightstar had received similar advices from Gallagher and Marsh on prior occasions. Ex. 9 at STARR 3036-37; Ex. 6 at MARSH919.

> **RESPONSE: It is disputed that the cited emails from Gallagher and Marsh are "similar" to Starr's July 23, 2012, email to AJG; the cited emails ask for different information. It is also disputed that Endorsement 40 required Brightstar to provide the requested information before obtaining $25 million coverage; Endorsement 40 does not so provide and, indeed, Endorsement 40 became effective *after* the cited emails were sent. *See also* response to SOF 34.**

       36. Endorsement No. 40 to the Policy was the warehouse coverage endorsement that was issued in connection with the annual adjustment effective March 26, 2013. Ex. 3 at STARR 15701-04.

> **RESPONSE: Undisputed.**

    37. Endorsement No. 40 states, in relevant part:

> 1. Effective March 26, 2013, Endorsement 17 Warehouse Endorsement, and all subsequent warehouse endorsements are replaced with the:
>
> * * *
>
> 8. Attaching on all goods and merchandise as described above at the risk of the Insured on or after March 26, 2013.
>
> Notwithstanding anything else stated in the policy or other endorsements thereto, the most This Company agrees to pay of a claim made under this endorsement are those limits of liability in the schedule below:
>
> $25,000,000 Limit per occurrence at all locations as per schedule on file with underwriters, subject to Quarterly Statement of Values Report with actual values in storage at each location.
>
> $25,000,000 Limit per occurrence for all newly locations (maximum 90 days to report) if they meet the minimum standards, as stated below.
>
> Upon notification of any new location, Starr Marine will order a loss control survey and forward the resulting recommendations for compliance as soon as received.
>
> $3,000,000 Limit per occurrence for any unnamed/unscheduled location.
>
> [The endorsement then enumerates the minimum standards, which are discussed below.]

Ex. 3 at STARR 15701-04.

    **RESPONSE: Undisputed that Endorsement 40 so states.**

    38. Endorsement No. 40 provides a "$25,000,000 Limit per occurrence for all newly locations (maximum 90 days to report) if they meet the minimum standards, as stated [in the endorsement]." Ex. 3 at STARR 15702.

    **RESPONSE: Undisputed.**

39. The minimum standards stated in Endorsement No. 40 include:

- Facility equipped with Central Station Alarm - hot wired to local police and Alarm Company with line security

- Facility protected by guards 24/7 ... with call in times to a central station every hour - after hours, weekends, and holidays

Ex. 3 at STARR 15703.

> **RESPONSE: Undisputed that Endorsement No. 40 provides the two bulleted minimum standards. It is disputed, however, to what extent these standards were mandatory versus discretionary.** *See* **response to SOF 24.**

40. There is no evidence that there was a central station alarm at the German Warehouse or that such an alarm was hot wired to local police and alarm company with line security.

> **RESPONSE: Disputed.** *See* **response to SOF 25.**

41. There is no evidence that the guards at the German Warehouse had call in times to a central station every hour - after hours, weekends and holidays.

> **RESPONSE: Disputed.** *See* **response to SOF 25.**

42. Endorsement No. 40 provides a "$25,000,000 Limit per occurrence at all locations as per schedule on file with underwriters, subject to Quarterly Statement of Values Report with actual values in storage at each location." Ex. 3 at STARR 15702.

> **RESPONSE: Undisputed that Endorsement 40 so provides. However, it is disputed what the phrases "as per schedule on file" and what the phrase "subject to Quarterly Statement of Values Report" mean.**

43. Robin Thompson at Gallagher sent Jeffrey Factor at Starr an e-mail on February 11, 2013, stating, in relevant part:

> Following your conversation with Lisa [Rodriguez], attached please find the above insured's Master Exposure Spreadsheet with information we have received to date for the renewal.

Ex. 10.

**RESPONSE: Undisputed that Robin Thompson's email contained the quoted language.**

44. The German Warehouse was not on the Master Exposure Spreadsheet attached to Ms. Thompson's e-mail of February 11, 2013. Ex. 10.

**RESPONSE: Undisputed but immaterial. It was not until over a week later—on February 20, 2013—that Brightstar's Kevin O'Brien notified Starr of the Frankfurt warehouse and that the Frankfurt warehouse was added to the master spreadsheet. (Durbin Decl., Ex. 20.)**

45. Gallagher sent Starr another spreadsheet on February 11, 2013 under cover of an e-mail stating: "Please find the most up to date SOV." Ex. 11.

**RESPONSE: Undisputed.** *But see* **response to SOF 44.**

46. The German Warehouse was not on this SOV. Ex. 11.

**RESPONSE: Undisputed.** *But see* **response to SOF 44.**

47. Gallagher sent Starr another spreadsheet on February 11, 2013 stating: "... attached please find . . . insured's Master Exposure Spreadsheet with information we have received to date …." Ex. 12.

**RESPONSE: Undisputed.** *But see* **response to SOF 44.**

14

48. The German Warehouse was not on this spreadsheet. Ex. 12.

**RESPONSE: Undisputed.  *But see* response to SOF 44.**

49.  Mr. Factor sent an e-mail to Lisa Rodriguez at Gallagher on March 19, 2013, stating, in relevant part:

> As discussed, we can agree to a FLAT warehouse premium of $1,750,000. All locations currently listed with values (see attached schedule which I took from your SOV) have a $25M limit (please confirm that all locations are listed). All new locations will have a $25M limit if [they] meet the minimum standards, but additional premium will be paid at a rate of $750 per $1M of estimated maximum value, plus an unspecified CAT surcharge if applicable.
>
> Note that we will still need the actual values in storage, and we need to agree to a penalty for non-compliance, but the policy will not be rated off these values.
>
> See attached spreadsheet. All fields in yellow need to be addressed.

Ex. 14.

**RESPONSE: Undisputed that Factor's March 19 email contained the quoted language.  *But see* response to SOF 50.**

50.  The German Warehouse was not on the schedule attached to Mr. Factor's e-mail of March 19, 2013. Ex. 14.

**RESPONSE: Undisputed that the Frankfurt warehouse was not on the attached schedule provided by Mr. Factor, although he had been notified in February 2013 of Brightstar's intent to begin operations at the warehouse by the end of February and of Brightstar's desire for insurance coverage.  (Durbin Decl., Ex. 20.)  But disputed that the warehouse's absence meant that it was not "on file" with Starr at the time of the November loss.  Weeks before Factor sent the March 19 email, Brightstar's Kevin O'Brien had notified Starr's Peter Scrobe about the Frankfurt warehouse.  (*Id.*)  Scrobe relayed that notification via email to Factor and ordered Factor to survey the warehouse.  (*Id.*, Ex. 21.)  As Factor admitted, emails are part of Starr's "file."  (*Id.*, Ex. 2 at 66:4-68:4.)  Also, on February 26, 2013, AJG's Robin Thompson emailed Brightstar's Kevin O'Brien a spreadsheet that included the Frankfurt warehouse (*id.*, Ex. 34 (FILED UNDER SEAL)), and on March 23, 2013, Brightstar's Enrique Rodriguez sent Thompson a schedule that updated the inventory values for the Frankfurt warehouse (*id.*, Ex. 35 (FILED UNDER SEAL)).**

15

>**According to AJG's Lisa Rodriguez, the only reason Starr itself did not possess an updated copy of the master spreadsheet is because in early 2013 Factor instructed AJG to stop sending that document. (*Id.*, Ex. 4 at 248:25-253:2, Ex. 36.) Further, on November 5, AJG sent Factor an SOV that contained the Frankfurt warehouse. (*Id.*, Ex. 38; Dkt. #1, Compl. ¶ 75.) And regardless it is disputed whether Starr is estopped from denying coverage given its failure to add the Frankfurt warehouse to the file, failure to order a site survey, and failure to gather more information (to the extent any was needed) from AJG or Brightstar.**

51. Mr. Factor sent a revised quote for the annual adjustment effective March 26, 2013 to Gallagher on March 21, 2013 that attached a sample quarterly SOV spreadsheet with the filename "Brightstar 2013-2014 Quarterly SOV." Ex. 16.

>**RESPONSE: Undisputed, *but see* response to SOF 50.**

52. The sample quarterly SOV spreadsheet attached to Mr. Factor's e-mail of March 21, 2013 identified numerous locations but did not include the German Warehouse. Ex. 16.

>**RESPONSE: Undisputed. But disputed that the Frankfurt warehouse's absence from a spreadsheet meant that it was not "on file" with Starr at the time of the November loss. *See also* response to SOF 50.**

53. Gallagher sent an e-mail to Mr. Factor on March 25, 2013 stating: "Please bind the insured's renewal [ ] coverage as per your revised quote dated 3/21/13 ...." Ex. 17 at STARR 4753.

>**RESPONSE: Undisputed.**

54. Gallagher did not advise Starr in its March 25, 2013 e-mail that the German Warehouse needed to be added as a scheduled location. Ex. 17 at STARR 4753; Ex. 39 at STARR CL00004.

>**RESPONSE: Disputed to the extent it implies that AJG had any obligation to "advise" Starr of Factor's omission of the Germany Warehouse from his schedules, or that there was any need for the Germany Warehouse to be "added as a scheduled**

16

location," given that it was on file and given that under the Policy effective March 26, 2013, there was no longer any need to add locations to any schedule in the Policy. *See* response to SOF 50.

55. Mr. Factor sent an e-mail to Gallagher on March 26, 2013 stating: "Thank you once again for the order to bind. Please see our binder attached." The binder contained, among other things, the agreed terms and conditions of the warehouse coverage effective March 26, 2013. Ex. 17 at STARR 4750 & STARR 4757 - STARR 4765.

**RESPONSE: Undisputed that Factor sent an email to AJG on March 26, 2013, with the quoted language. It is disputed, however, that this email meant that the Frankfurt warehouse was not "on file" with Starr. As noted, weeks before this email, on February 20, 2013, Brightstar's Kevin O'Brien had notified Starr's Peter Scrobe about the Frankfurt warehouse, and Scrobe relayed this notification via email to Factor. (Durbin Decl., Ex. 21, Ex. 20, Ex. 2 at 66:4-68:4.) Also, on February 26, 2013, AJG's Robin Thompson emailed Brightstar's Kevin O'Brien a spreadsheet that included the Frankfurt warehouse (*id*., Ex. 34), and on March 23, 2013, Brightstar's Enrique Rodriguez sent Thompson a schedule that updated inventory values for the Frankfurt warehouse (*id*., Ex. 35). It is disputed whether AJG acted as Starr's agent for purposes of receiving notice of new locations. Further, it is undisputed that on November 5—which was before the loss—AJG provided Starr with a revised SOV that included the Frankfurt warehouse. (*Id*., Ex. 38; Dkt. #1, Compl. ¶ 75). It is also disputed whether the Frankfurt warehouse met Endorsement 40's "minimum standards." *See also* response to SOF 32.**

56. There was no provision in Endorsement No. 40 for adding a new location to the "schedule on file" with Starr. Ex. 3 at STARR 15701-04; Ex. 47 at 365-70.

**RESPONSE: Undisputed that there was no such provision in the Endorsement 40. However, the parties dispute what the term "schedule on file" means.**

57. There was no provision in the Policy for adding a new location to the "schedule on file" with Starr. Ex. 3; Ex. 47 at 365-70.

**RESPONSE: Undisputed that there was no such provision in the Policy. However, the parties dispute what the term "schedule on file" means. *See also* response to SOF 56.**

17

58. If Starr accepted the new location, it would confirm its acceptance in writing and an additional premium would be charged if the location had an inventory value in excess of $3 million. Ex. 23A, B & C; Ex. 24A &B; Ex. 26A & B; Ex. 27; Ex. 28; Ex. 52 at 117-19, 173-75 & 205; Ex. 40 at STARR 12702.

> **RESPONSE: Disputed.  Neither the Policy nor Endorsement 40 say anything about Starr "accept[ing] the new location," "confirm[ing] its acceptance in writing," or charging "an additional premium."  (*See* O'Malley Decl., Ex. 3.)  SOF 58 is therefore immaterial.  (*Id*.)  Also, Starr's cited documents do not support its contention that any "acceptance" was required after Starr was notified of new locations in 2013.  For example, Exhibit 23C highlights an email from Starr's Jeff Factor to AJG's Robin Thompson saying, "For warehouse additions, there is no need to endorse the policy."  Also, Exhibit 23A contains an email from AJG to Starr's Factor saying, "Attached please find information on new warehouse in Sri Lanka for your file."  And Exhibit 23B refers to an "endorsement/invoice," but there is no endorsement to the 2013 Starr Policy for Sri Lanka, or any other new location.  (*See id*.)  That is because in the 2013 Starr Policy $25 million in coverage was provided for "all locations as per schedule on file."  (*Id*., Ex. 3, End. 40.)**

59. Starr never accepted the German Warehouse in writing or otherwise or agreed to add the German Warehouse to the "schedule on file" with Starr under Endorsement No. 40. Ex. 39 at STARR CL00004.

> **RESPONSE: Disputed.  Starr assented to and accepted the addition of the German warehouse to the Policy through at least the following actions:  Starr charged and was paid a premium for coverage that was based on and included the revenues from the German warehouse after being notified on February 20, 2013 of Brightstar's desire for coverage for the German location (*See* O'Malley Decl., Ex. 3, End. 36; Durbin Decl., Ex 20; *id*., Ex. 2 at 266:8-267:16; Edwards Decl., Ex. 14 at 8); Starr's internal acknowledgement of that request and internal direction to take further action as required by the Policy (Durbin Decl., Ex. 21; O'Malley Decl., Ex. 3, End. 17); and Starr's receipt of the schedule of revenues that included Germany on which Starr based the premium (Durbin Decl., Ex. 37 (FILED UNDER SEAL)).  In addition, at no point did Starr ever affirmatively reject or refuse to provide coverage after receiving Brightstar's request for coverage and never sought further information from Brightstar regarding the location prior to the Loss.  (Durbin Decl., Ex. 2 at 257:13-24, 260:10-15.)  Furthermore, there is no language in Endorsement No. 40 requiring assent. (O'Malley Decl., Ex. 3, End. 40.)  And even if**

18

**such language existed, Starr would be estopped or would have waived any right to require such assent based on its conduct.** *See* **response to SOF 55.**

60. There is no evidence that Starr ever assented to the German Warehouse being added to the "schedule on file." Ex. 39 at STARR CL00004.

**RESPONSE: Disputed.** *See* **responses to SOF 55 & 59.**

61. The Policy contains an Errors and Omissions clause that states:

> This policy shall not be vitiated by any unintentional delay, error, omission or oversight in making any declaration that is required to be made under any provision contained in or endorsed on this policy provided a correct declaration is communicated to This Insurer as soon as practicable after the delay, error, omission or oversight becomes known to The Insured's corporate risk manager or equivalent, and premium paid, if required by This Insurer.

Ex. 3 at STARR 15577, cl. 11.

**RESPONSE: Undisputed.**

62. Brightstar has admitted that its wireless communication devices were misappropriated by getgoods.de Vertriebs GmbH. ECF Doc. 123; Ex. 2 (Counterclaim) ¶ 51.

**RESPONSE: Undisputed. However, to clarify, Brightstar has admitted that its wireless communications devices were misappropriated not by Getgoods itself but by Getgoods' CEO.**

63. Each of the warehouse endorsements in the Policy contains the following provision:

> 3. Notwithstanding anything contained elsewhere herein to the contrary, this policy shall not pay for loss of or damage to the goods and merchandise while covered under this endorsement caused by or resulting from:
>
> * * *
>
> b. Misappropriation, secretion, conversion, infidelity or any dishonest act done by or at the instigation of the Assured at any time during the currency of this coverage, or by the Assured or

19

>
> other party of interest, his or their employees or agents while insured merchandise is stored in warehouses or stores, owned, leased or controlled by the Assured.

Ex. 3 at STARR 15604, 15638 & 15701.

> **RESPONSE:** Undisputed that Endorsements 2, 17, and 40 contain the quoted language.

Date: June 22, 2018                            **BARNES & THORNBURG LLP**

*/s/ Mark L. Durbin*
Mark L. Durbin
One North Wacker Drive, Suite 4400
Chicago, IL 60606
mdurbin@btlaw.com

Charles P. Edwards
11 South Meridian Street
Indianapolis, IN 46204
cedwards@btlaw.com

Kara Cleary
3475 Piedmont Road, N.E., Suite 1700
Atlanta, GA 30341
kcleary@btlaw.com

**ANDERSON KILL P.C.**
Dennis Nolan
Vivian Costandy Michael
John Leonard
1251 Avenue of the Americas
New York, NY 10020
dnolan@andersonkill.com
vmichael@andersonkill.com
jleonard@andersonkill.com

**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**
Valerie Jackson
9300 S. Dadeland Blvd., 4th Floor
Miami, FL 33156
valerie.jackson@qpwblaw.com

*Attorneys for Brightstar*

DMS 12675248v1