**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

STARR INDEMNITY & LIABILITY
COMPANY,

       Plaintiff,

v.

BRIGHTSTAR CORP., and
BRIGHTSTAR GERMANY GmbH

       Defendants.

Case No. 1:13-cv-08580-GHW-GWG

---

## BRIGHTSTAR CORP. & BRIGHTSTAR GERMANY GmbH'S COUNTERSTATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, Defendants Brightstar Corp. and Brightstar Germany GmbH (collectively, "Brightstar") set forth the following counterstatement of material facts of record that, in addition to those set forth in Brightstar's response to Starr's Statement of Material Facts, establish that there exist material issues of fact to be tried. Brightstar submits this Counterstatement in opposition to Starr's Motion for Partial Summary Judgment. To the extent the Counterstatement cites exhibits already submitted by Starr, it cites to Starr's Declaration of Kevin J.B. O'Malley. Otherwise, the Counterstatement cites exhibits attached to the May 25, 2018 Declaration of Charlie P. Edwards and exhibits attached to the June 22, 2018 Declaration of Mark L. Durbin.

Brightstar hereby incorporates by reference as if fully set forth herein its Statement of Undisputed Facts dated May 25, 2018 (Dkt. #132), submitted in support of its Motion for Partial Summary Judgment filed on the same day.

## I.      Brightstar's Loss.

1.      Brightstar is a global distributor of mobile phones.  (*See* Deposition of Oscar Fumagali, at 87:10-15, copy attached as Ex. 1 to the Declaration of Charles P. Edwards ("Edwards Decl.").)

2.      In January 2013, Brightstar Germany GmbH entered into a Master Agreement for Performance of Logistics Services ("Logistics Agreement") with a third-party provider, getgoods.de Vertriebs GmbH AG ("Getgoods"), to store Brightstar phones in a warehouse operated by Getgoods and located in Frankfurt, Germany.  (*See* Edwards Decl., Ex. 2.)

3.      Then in March 2013, Brightstar began storing phones in the Frankfurt warehouse. (Edwards Decl., Ex. 3 at 63:16-19.)

4.      On October 30, 2013, representatives from Brightstar and Getgoods inspected Brightstar's inventory in the Frankfurt warehouse.  (Edwards Decl., Ex. 4 at 117:10-118:13, 130:19-132:21.)

5.      The representatives inspected two rooms containing Brightstar's stock; one room contained approximately 70 pallets and the other contained approximately 100 pallets.  (*Id*. at 121:13-15, Deposition of Mark Arme, at 138:6-10, copy attached as Ex. 1 to the Declaration of Mark L. Durbin ("Durbin Decl.").)

6.      The inspectors cut open the black shrink wrap on several of the pallets and confirmed they contained boxes of phones.  (*Id*. at 119:13-123:22.)

7.      A full inspection was scheduled for the following week.  (Edwards Decl., Ex. 3 at 192:3-21.)

8.      But on November 7, 2013, Getgoods' CEO informed Brightstar that Brightstar's inventory of mobile phones at the Frankfurt warehouse was gone (the "Loss").  (Edwards Decl., Ex. 1 at 130:20-131:24, Ex. 3 at 205:6-23.)

9.     Getgoods' CEO confessed to taking the phones and has been indicted for misappropriation by German authorities.  (*Id.*, Ex. 1 at 562:22-25)

10.     Starr and Brightstar have stipulated that Brightstar's Loss is greater than $35 million.  (Dkt. #123, Letter to the Court at 2.)

**II.     The Starr Policy.**

11.     Brightstar had a global marine cargo insurance program in effect at the time of the Loss covering phones stored in warehouses, like the Frankfurt warehouse.  Brightstar's insurance program consisted of three layers.  The first layer was provided by the Starr Policy and provided the first $25 million in coverage.  (Dkt. #1, Compl., ¶¶ 22, 25.)

12.     The second layer provided coverage between $25 million and $50 million under a policy issued by Certain Underwriters at Lloyd's of London (the "First Excess Layer").  (Civ. Action No. 5297, Dkt. #2, Compl., ¶ 38.)

13.     The third layer provided coverage between $50 million and $80 million under policies issued by Great American Insurance Company of New York, XL Specialty Insurance Company, Catlin Syndicate Limited, Montpelier at Lloyd's Limited, and Axis Specialty Europe SE (the "Second Excess Layer").  (Civ. Action No. 5062, Dkt. #2, Compl., ¶ 39.)

14.     The Starr Policy was first placed in March 2011, but it was renewed annually and separate warehouse endorsements were added to the Policy in 2012 and in 2013, respectively. (O'Malley Decl., Ex. 3, End. 2, 17, and 40.)

15.     Starr's underwriters and the broker who placed the coverage have referred to these annual events as "renewals."  (*See*, *e.g*., Edwards Decl., Exs. 6-7.)

A.    **The Warehouse Endorsements Before 2013 Listed the Covered Warehouses
and the Limits for Each Warehouse.**

16.    Until 2013, the warehouses covered by the Starr Policy were specifically listed in
the Policy with the limits for each warehouse also separately listed.  (O'Malley Decl., Ex. 3, End.
2 and 17.)

17.    This structure required Brightstar to notify Starr of any new warehouses added
during each year the Policy was in effect, so that Starr could issue an endorsement adding the
warehouse to the Policy.  (*See*, *e.g.*, *id.*, End. 7-14, 22, 24, 27, 29-34.)

18.    After Starr underwriter Jeff Factor was assigned to the Brightstar account, in
February 2012, Starr's head of Loss Control Services, Peter Scrobe, told Brightstar's Kevin
O'Brien to include Factor on emails between Brightstar and Starr.  (Durbin Decl., Ex. 9.)  Such
communications often involved the broker, which was AJG in 2012 and 2013.  (*E.g.* Durbin
Decl., Exs. 10, 11.)

19.    Starr's Mr. Factor testified that the Brightstar account "was a constantly changing
account, with constantly adding and deleting locations."  (Durbin Decl., Ex. 2 at 186:6-8.)

20.    Before 2013, warehouses to be added to the Starr Policy were eventually included
in endorsements to the Policy identifying the warehouses and the coverage limits for each
warehouse.  (O'Malley Decl., Ex. 3, End. 7-14, 22, 24, 27, 29-34.)  Starr, however, often did not
issue those endorsements for weeks, or even months, after it was notified of a location.  (*Id.*,
End. 7-14, 22, 24, 27, 29-34.)   Endorsement 27, for example, was executed by Factor on
September 5, 2012, but effective July 31, 2012.  (*Id.*, End. 27; *see also* Durbin Decl., Ex. 2 at
168:8-11.)

21.    Even though the 2012 warehouse coverage listed the warehouses that were to be
covered, Starr did not even know what those warehouses were when it issued the 2012 Policy.

(Durbin Decl., Ex. 2 at 166:10-169:20; *id*., Ex. 12 (email from broker to Factor noting that "We'll get back to you on the location scheduling and we'll also send updated spreadsheets, as insured [Brightstar] is still tweaking them.") (FILED UNDER SEAL).)

22.     On May 7, 2012, more than a month after the 2012 Policy's effective date, Starr's Mr. Factor sent an email to Robin Thompson at broker AJG enclosing a draft of the 2012 warehouse endorsement and asking, "Robin, can you please take a look at the warehouse endorsement I sent and let me know if all locations and limits are correct."  (*Id*., Ex. 13 (FILED UNDER SEAL).)

23.     Factor testified that as of June 13, 2012, nearly three months after the effective date of the 2012 Starr Policy, the parties were still finalizing the warehouse endorsement and other changes to the Policy.  (*Id*., Ex. 2 at 189:11-18.)

24.     The quotation for the 2012 renewal sent by Starr's Jeff Factor to AJG's Lisa Rodriguez on March 9, 2012, contained a list of warehouses.  (*Id*., Ex. 14 (FILED UNDER SEAL).)

25.     But, Ms. Rodriguez testified that this list was not intended to be a complete list of all warehouses covered by the Policy.  (*Id*., Ex. 4 at 168:14-169:21.)

26.     And in fact, the list of warehouses in the 2012 warehouse endorsement that was ultimately signed and issued by Starr on June 15, 2012, effective March 26, 2012, is different from the list in the quote Starr sent to AJG on March 9, 2012.  (*Compare* O'Malley Decl., Ex. 3, End. 17, *with* Durbin Decl., Ex. 14) (six locations listed on the quote were deleted and six new locations were added).

27.     Factor testified that Starr agreed to insure warehouse locations during the time before endorsements were issued formally adding them to the Policy, pursuant to an unwritten "held coverage agreement." (Durbin Decl., Ex. 2 at 168:24-169:20.)

28.     Factor admitted that pursuant to this informal agreement, all of the warehouses ultimately listed in the 2012 warehouse endorsement (O'Malley Decl., Ex. 3, End. 17) were covered from the date the policy incepted on March 26, 2012, until the date the endorsement was finally signed and added to the policy on June 15, 2012. (Durbin Decl., Ex. 2 at 198:18-199:15.)

29.     Ms. Rodriguez, the AJG representative who was responsible for the Brightstar account (*Id*., Ex. 4 at 17:15-23), testified that the list of warehouses to be covered by the Policy was "for informational purposes, not for quoting purposes." (*Id*. at 170:10-11.)

30.     Ms. Rodriguez testified that "the premium was rated 100 percent based on sales." (*Id*. at 170:17-18.)

### B.     In Early 2013, Starr Announced It Wanted to Change the Policy to Cover All Warehouses Without the Need to List Them in the Policy.

31.     In January 2013, Starr underwriter Jeff Factor proposed changing the way warehouses were covered under the Starr Policy. (*Id*., Ex. 15, Ex. 2 at 215:18-216:23.) Factor wanted to avoid the need to add or delete warehouses by endorsement and to provide a blanket limit (ultimately $25 million) for all warehouses "per location as per schedule on file with underwriters." (*Id*., Ex. 2 at 215:18-216:23.)

32.     During his deposition, Factor gave the following rationale for wanting this change:

> What I wanted to do was say every location has this 25 or $50 million limit, subject to quarterly reporting, which would show us what was actually in storage at that time, but they would have that full limit, so they didn't have the need to come back and say oh, we need to add this, we need to delete this, we need to amend this.

6

(*Id*. at 216:15-23.)

33.     Factor testified that he wanted "to streamline the process because we had an insured [Brightstar], who was a long-term partner, who was growing and who was constantly entering into and changing warehouses." (*Id.* at 217:2-11.)

34.     Factor also wanted to avoid the housekeeping of having to constantly add and delete Brightstar warehouse locations to the Policy by endorsement. (*Id*. at 244:19-245:6.)

35.      As part of this anticipated change, Starr also changed the warehouse information it was requesting from Brightstar. (*Id*., Ex. 4 at 248:25-249:25.)

36.     Until February 2013, Brightstar had been sending its master spreadsheet to AJG, and AJG had been sending it to Starr. (*Id*. at 251:9-252:9.)

37.     Brightstar's master spreadsheet listed all of its warehouses and certain additional information regarding those warehouses, often referred to as COPE information – an acronym for construction, occupancy, protection, and exposure. (*Id*. at 251:9-252:9.)

38.     AJG's Ms. Rodriguez testified that, in early 2013, Factor told AJG to stop sending Brightstar's master warehouse spreadsheet to Starr. (*Id*. at 248:25-253:2.)  Instead, Starr developed a new spreadsheet format. (*Id*. at 252:10-13.)  Factor denies he gave these instructions. (*Id*., Ex. 2 at 228:2-11.)

39.     However, on January 16, 2013, AJG sent Factor the current master spreadsheet (*Id*., Ex. 16), and Factor responded the same day in an email saying the master spreadsheet that was sent was "NOT what we are looking for" (Factor's emphasis) and enclosing a shorter "Statement of Values" or "SOV" Starr had prepared, which did not include COPE information. (*Id*., Ex. 36.)

40.     Starr maintained its own list of Brightstar locations.  (*Id*., Ex. 2 at 173:14-174:14, 180:20-22; *id*., Ex. 17 (FILED UNDER SEAL).)

41.     On January 25, 2013, Starr's Mr. Scrobe sent an email to Starr's Mr. Factor saying, "I spoke with [Brightstar's] Kevin O'Brien and advised him that I am involved with generating SOV [Statement of Values] details quarterly and require inventory values, for all locations in excess of 3 million, on the first of each quarter."  (*Id*., Ex. 18.)

42.     In a March 5, 2013 email, Factor reported to his boss:  "We are working on incorporating the SOV [Statement of Values] into loss control.  I believe that we will have a much better SOV through [Starr's] Pete Scrobe/[and Brightstar's] Kevin O'Brien."  (*Id*., Ex. 19 (FILED UNDER SEAL).)

## C.     Brightstar Notified Starr and the Broker of the Frankfurt Warehouse Before the 2013 Policy Period and Added It to the Master Schedule.

43.     On February 20, 2013, Brightstar's Kevin O'Brien and Starr's Peter Scrobe had a conversation about adding a German location, after which Mr. O'Brien sent an email to Mr. Scrobe saying: "You were right, it is in Frankfurt.  Here is the address to schedule the site survey & point of contact.  We are planning on beginning operations at the end of February, so we will have to move on this one."  (*Id*., Ex. 20.)

44.     The email gave the address as "Brightstar Germany, Werner-von-Siemens-Straube 6/Quinckestrabe 1, 15236 Frankfurt (Oder)" and the point of contact as Klaus Freese, along with Mr. Freese's contact info.  (*Id.)*

45.     Mr. O'Brien further stated:  "I will be going there in March to check out the facility but we will need [the] survey completed before that time."  (*Id.)*

46.     Under the Policy's warehouse endorsements in 2012 and 2013, Starr was required to conduct a survey "[u]pon notification of any new location."  (O'Malley Decl., Ex. 3, End. 17 and End. 40.)

47.     Starr's Mr. Scrobe forwarded the February 20 email from Brightstar's Mr. O'Brien's to Starr underwriter Jeff Factor with the following email and instruction:  "Jeff, please note comments, below, from Kevin O'Brien regarding new German operation.  Please arrange survey of the location through Maria.  Any questions let me know."  (Durbin Decl., Ex. 21.)

48.     Despite this clear instruction from Mr. Scrobe to order a survey, Factor did not order one.  (*Id*., Ex. 2 at 256:22-257:1, Ex. 3 at 164:16-18.)

49.     There is no evidence that Factor told anyone about his failure to survey the Frankfurt warehouse until after Brightstar's Loss, when his failure came to light.

50.     During his deposition as Starr's Rule 30(b)(6) representative, Factor claimed, "I believe I mentioned it verbally" to Mr. Scrobe.  (*Id*., Ex. 3 at 164:21-22.)

51.     However, when Mr. Scrobe was asked at his deposition whether Factor told him if Factor was going to order a survey, Scrobe answered "Not that I recall."  (*Id*., Ex. 5 at 174:1-6.)

52.     And, when Mr. Scrobe was asked whether he knew if Factor ever ordered a survey of the Frankfurt warehouse, Scrobe answered "I don't know."  (*Id*. at 172:4-6.)  Factor also testified that he "would most likely not tell the broker that we've decided not to survey it." (*Id*., Ex. 2 at 96:11-13.)

53.     Factor did not have a recollection at his deposition whether he had a standard practice of telling someone who asked him to prepare a survey, such as Mr. Scrobe, that he had decided not to order the survey, but Factor admitted that would be a good idea.  (*Id*. at 91:12-24.)

54.     At his deposition, Factor claimed he did not order a survey of the Frankfurt warehouse because he did not have enough information.  (*Id*. at 257:2-12.)

55.     Mr. O'Brien's email, however, gave all of the information needed for Factor to order a survey, including the address and contact information for the Frankfurt warehouse.  (*Id*., Ex. 20.)

56.     Yet, Factor did not contact the point of contact given in Mr. O'Brien's email (Mr. Freese), he did not contact Mr. O'Brien asking for more information, and he did not ask Mr. Scrobe for more information.  (*Id*., Ex. 2 at 257:13-24, 260:10-15.)

57.     Indeed, when asked at his deposition whether he sent an email to anyone asking for additional information, Factor answered "No."  (*Id*., at 257:21-24.)

58.     Factor contends he called either Lisa Rodriguez or Robin Thompson at AJG about the warehouse, but he cannot recall any details of any such call (including whether he talked to one of them or left a voicemail message) and he has no notes of any such call.  (*Id*. at 258:1-260:3.)

59.     Factor did not ask anyone to add the Frankfurt warehouse to the list of warehouses he maintained.  (*Id*. at 260:4-9.)

60.     When asked why he did not do more, Factor stated:

> Could I have asked specifically, are you in this location in Frankfurt, Germany, would that have helped, yes, it would have helped.

(*Id*. at 263:10-13.)

61.     Factor contended while testifying as Starr's Rule 30(b)(6) representative that an email he sent in August to AJG's Lisa Rodriguez was a follow-up email to his purported call about the Frankfurt warehouse.  (*Id*., Ex. 3 at 252:5-19.)

10

62.     Factor's August email says nothing about the Frankfurt warehouse; it simply asks, "Can you please provide us with an updated blueprint for European expansion and security." (*Id.*, Ex. 23.)

63.     On February 21, 2013, Robin Thompson at AJG sent a schedule of projected sales to Factor with projected sales that included Germany.  (*Id.*, Ex. 37 (FILED UNDER SEAL).)

64.     Specifically, the schedule showed $113.9 million in anticipated revenue from Germany over the remainder of 2013 (*id.*), which Factor used to calculate the premium shown on Endorsement 36 on September 9, 2013 – the same day he issued Endorsement 40.

65.     Factor used these sales figures (including Germany) to evaluate the 2013 premium.  (*Id.*, Ex. 2 at 266:8-267:16.)

66.     Even though Germany appeared on this schedule, neither Factor nor anyone else at Starr compared the list of sales by country to the list of warehouse locations Starr maintained for Brightstar.  (*Id.* at 282:11-20.)

67.     A comparison would have revealed the discrepancy between the sales report and Starr's list of Brightstar warehouses, because Brightstar had no operations in Germany at this time.  (*Id.*, Ex. 7 at 62:19-64:25, 118:25-119:8.)

68.     Brightstar incurred and paid a premium for sales source from the Frankfurt warehouse. (Edwards Decl., Ex. 14 at 8.)

69.     Factor also failed to follow up with either Brightstar's Mr. O'Brien or Starr's Mr. Scrobe regarding whether his schedule was complete, even though Mr. O'Brien and Mr. Scrobe were working on putting together a complete schedule.  (Durbin Decl., Ex. 2 at 293:22-294:2, 296:21-297:4.)

70.   Brightstar's Oscar Fumagali, testified that he did not know whether anyone looked at Factor's schedule, but that Mauricio Cabello updated the master schedule to include the Frankfurt warehouse and sent it to AJG.  (*Id*., Ex. 7 at 231:21-233:23.)

71.   Also, on February 26, 2013, AJG's Robin Thompson sent an email to Brightstar's Kevin O'Brien attaching a spreadsheet including the Frankfurt warehouse and certain COPE information (including, among other things, a maximum expected value of $40 million).  (*Id*., Ex. 34 (FILED UNDER SEAL).)

72.   On March 23, 2013, Enrique Rodriguez at Brightstar sent a schedule of values for the Germany warehouse to Ms. Thompson at AJG saying that there has been a recent agreement with a major customer and the inventory values expected have increased.  (*Id*., Ex. 35 (FILED UNDER SEAL).)

73.   Mr. Rodriguez attached a schedule for the Frankfurt warehouse location that included the new expected values (which had increased to $75 million) and COPE information. (*Id*.)

74.   As a matter of industry standards and practices, and consistent with the reasonable expectations of Brightstar, the Frankfurt warehouse was insured under the 2012 Starr Policy. (Edwards Decl., Ex. 15 at 12.)

**D.   The Endorsement Drafted by Starr Effective March 26, 2013 No Longer Required Warehouses to be Listed; It Covered All Warehouses "On File" With Starr.**

75.   Endorsement 40 no longer required warehouses to be listed; it covered all warehouses "on file" with Starr.  (O'Malley Decl., Ex. 3, End. 40.)

76.    Endorsement 40 was effective March 26, 2013, but Factor did not draft it and send it to AJG to be included in the Starr Policy until September 10, 2013. (*Id*.; Edwards Decl., Ex. 8; Durbin Decl., Ex. 2 at 320:22-321:6.)

77.    Endorsement 40 changed the warehouse coverage from the list of specific locations and individual limits in the prior warehouse endorsements to a new format of providing $25 million for all locations described as follows:

> $25,000,000 Limit per occurrence at all locations as per schedule on file with underwriters, subject to Quarterly Statement of Values Report with actual values in storage at each location.
>
> $25,000,000 Limit per occurrence for all newly locations [sic] (maximum 90 days to report) if they meet the minimum standards, as stated below.

(O'Malley Decl., Ex. 3, End. 40.)

78.    The Endorsement also provided $3 million "for any unnamed/unscheduled locations." (*Id*.)

79.    Endorsement 40 does not define "schedule on file with underwriters," nor is it defined elsewhere in the Starr Policy. (*Id*.)

80.    Starr's Factor testified that Starr does not have any file stamp or any other mechanism by which Starr identifies any "schedule on file:"

> Q.  Do you have a file stamp or something where you stamp the schedule that you contend is the one you want to use as the schedule on file?
>
> A.  We do not.

(Durbin Decl., Ex. 2 at 233:16-20.)

81.    Factor contends that he had a conversation with Lisa Rodriguez and "probably" Robin Thompson at AJG that the process would work as follows:  "I would confirm that we've

received this schedule.  There is, you know, 80 plus locations on it.  We agree that this is the schedule on file."  (*Id*. at 325:17-236:7.)

82.     Factor, however, could not recall whether this process ever happened.  (*Id*. at 325:17-236:7.)

83.     AJG's Lisa Rodriguez testified that Starr did not want an updated schedule of warehouses leading up to the March 26, 2013 renewal.  (*Id*., Ex. 4 at 256:15-257:20.)

84.     According to Ms. Rodriguez, the master list would have included the Frankfurt warehouse, but Starr's Factor had specifically instructed her not to send it to him.  (*Id*. at 256:15-257:20.)

85.     When Factor was asked at his deposition whether he asked for the master schedule at any time between February 11, 2013 – when AJG sent him a copy of Brightstar's existing master spreadsheet (*id*., Ex. 24) – and September 9, 2013 – when Factor signed and issued Endorsement 40 – Factor responded "I don't believe so."  (*Id*., Ex. 2 at 251:20-252:1.)

86.     Factor admitted that what was "on file" with Starr included emails. (*Id*. at 66:4-68:4.)

87.     Factor testified that he kept both a physical file and electronic files for each account.  (*Id*.)

88.     Specifically, Factor described Starr's filing process as follows:

Q.  When you say "filed in the file," what does that mean?

A.  So we actually kept a hard copy, a binder for six sections. One section was the policy. One section was maybe loss control reports. One section was for rating purposes. One section, if there was any reinsurance. **The other section would have been for e-mails.**

I don't know if it was that order though, but something like that.

Q.  So that was a physical file?

A.  Physical, hard copy file.

Q.  You said there is also an electronic file?

A.  Yes.

Q.  And is it identical to the physical file?

A.   No. So the electronic file, it would save the relevant documents, like the quotes and the binders. Any type of rating, I like to do my rating in Excel, some people did them by hand, but I would do it in Excel and save it there.

There was -- not a hard copy, an electronic copy of the file that claims had access to. I think that's it.  And possibly some other pertinent documents that needed to be saved there.

But e-mails would generally just be saved on my inbox or I had a separate folder where I saved my e-mails for each individual account.

**Q.  So in terms of your filing, it would either be in your e-mail folder that you created for the account, in the paper file or in the, what you described as the electronic file; is that right?**

**A.  Yes.**

(*Id*.) (emphasis added.)

89.    The Frankfurt warehouse was "on file" with Starr as a matter of industry custom and practice.  (*Id*., Ex. 25 at 9; Edwards Decl., Ex. 14 at 9; *id*., Ex. 15 at 13.)

### E.    The 2012 and 2013 Warehouse Endorsements Also Provided Full Coverage for Warehouses Meeting Certain Minimum Standards.

90.    The 2012 warehouse endorsement (End. 17) and the 2013 warehouse endorsement (End. 40) both also provided automatic coverage for warehouses that met certain "minimum standards" listed in the endorsements.  (O'Malley Decl., Ex. 3, End. 17 and 40.)

91.    Both endorsements provided up to $25 million in coverage for these warehouses. (*Id*.)

92.     The 2012 endorsement required "an affirmative representation of specific location minimum standards," but this requirement was dropped for 2013.  (*Compare id*., End. 17, *with id*., End. 40.)

93.     Starr's underwriter Jeff Factor admitted that if a warehouse met the minimum standards stated in the Policy, it automatically received $25 million in coverage under Endorsement 40.  (Durbin Decl., Ex. 2 at 326:16-327:7, 336:3-9.)

94.     Factor also admitted, testifying as Starr's Rule 30(b)(6) representative, that "the standards of care are not warranties.  They are suggestions, recommendations.  So they would not by themselves void coverage if they were not complied with."  (*Id*., Ex. 3 at 60:16-21.)

95.     Factor further admitted that "there were many locations that we [Starr] agreed to insure that did not meet minimum standards."  (*Id*. at 157:24-158:8.)

96.     Factor testified that "more often than not, new locations did not meet minimum standards."  (*Id*. at 158:20-23.)

97.     Factor explained the process for determining whether Starr would agree to insure a location that did not meet minimum standards:  "we would make sure that we would survey them, and if there is any recommendations or anything we were uncomfortable with we would make sure they complied."  (*Id*. at 160:5-8.)

## III.     Starr's Protocols Regarding Conducting Site Surveys and Adding Locations.

98.     The 2012 and 2013 warehouse endorsements in the Starr Policy required that, "[u]pon notification of any new location, Starr Marine will order a loss control survey and forward the resulting recommendations for compliance as soon as received."  (O'Malley Decl., Ex. 3, End. 17 and 40.)

16

99.     Starr also had a separate guideline for when surveys should be conducted. (Durbin Decl., Ex. 26, Ex. 3 at 51:12-52:13.)

100.     That guideline was in the form of a memo authored by Mr. Scrobe, head of Loss Control Services, stating that, "warehouse surveys should be done on any facility in excess of $1 million or more," and that "[a]ny exceptions must be approved in writing by Loss Control Services." (*Id*., Ex. 26.)

101.     The guideline also stated, "All international survey requests should be forwarded to Maria Roman with a copy to the undersigned (Scrobe) and the LCS person handling that particular branch." (*Id*.)

102.     Factor admits that he did not order the survey for the Frankfurt warehouse, as instructed by Scrobe and required by the Policy, and that he did not seek or obtain Scrobe's written permission not to survey the warehouse. (*Id*., Ex. 2 at 256:22-257:1, Ex. 3 at 164:16-22, Ex. 5 at 175:9-16.)

103.     Factor did not tell Mr. Scrobe in writing that he had not surveyed the warehouse. (*Id*., Ex. 2 at 256:22-257:1, Ex. 3 at 164:16-22, Ex. 5 at 174:1-6.)

104.     Nor did Scrobe follow up with Factor to see that his instruction to survey the Frankfurt warehouse was carried out by Factor, or otherwise confirm whether a survey had been performed. (*Id*., Ex. 5 at 172:4-14, 175:17-176:4.)

105.     Factor also did not ensure the Frankfurt warehouse was added to the list of Brightstar warehouses Starr maintained. (*Id*., Ex. 2 at 260:4-9.)

106.     In a March 5, 2013 email, for example, Factor reported to his boss: "We are working on incorporating the SOV [Statement of Values] into loss control. I believe that we will

have a much better SOV through [Starr's] Pete Scrobe/[and Brightstar's] Kevin O'Brien." (*Id.*, Ex. 19.)

107.   Yet, when Mr. O'Brien notified Mr. Scrobe of the Frankfurt warehouse and Brightstar's intent to begin operations at the end of the month and the need to "move on this one," and even though Mr. Scrobe forwarded that notification on to Factor and instructed him to arrange a survey, neither Factor nor Scrobe took any steps to ensure the warehouse was surveyed or specifically added to Starr's list of Brightstar warehouses. (*Id.*, Ex. 2 at 260:4-9, Ex. 5 at 172:4-14, 175:17-176:4.)

108.   Starr had a process in place for its underwriters to keep track of warehouses, which was included in a Process Guide for its underwriters. (*Id.*, Ex. 2 at 101:24-104:11; *id.*, Ex. 3 at 34:16-38:12; *id.*, Ex., 27 (FILED UNDER SEAL).)

109.   Factor testified as Starr's Rule 30(b)(6) representative that the Guide was a guideline Starr intended for its underwriters to follow. (*Id.*, Ex. 3 at 38:6-12.)

110.   The Guide required, among other things, that the underwriting assistants maintain a "warehouse line card file" and update the file each month. (*Id.*)

111.   Factor testified that the intent of this file was to keep track of warehouses. (*Id.* at 39:3-41:23.)

112.   Each account had its own warehouse line card. (*Id.* at 41:19-23.)

113.   Between 2011 and 2013, Starr migrated the line card information into a computer system called SRS. (*Id.* at 42:8-43:16.)

114.   Brightstar's warehouses insured by Starr were put into the line card file by Starr's underwriting assistants and that information was migrated to SRS in 2012. (*Id.*)

115.    The information was entered manually by underwriting assistants at Starr based on information provided by underwriters like Factor.  (*Id*. at 44:21-46:4.)

116.    Each underwriter had his or her own practices for entering warehouse information into SRS based on information received from insureds or brokers in emails and statements of values.  (*Id*. at 45:21-47:19.)

117.    Factor failed to follow the Guide and failed to make sure the Frankfurt warehouse was entered into Starr's tracking system.

## IV.    Brightstar Surveyed the Frankfurt Warehouse and Concluded It Met the Policy Minimum Standards.

118.    On March 7, 2013, Brightstar's Kevin O'Brien, Klaus Freese and Axel Grellhorst conducted an onsite security assessment of the Frankfurt warehouse.  (*Id*., Ex. 28.) The purpose of Mr. O'Brien's visit to the facility was to ensure that it complied with the minimum security standards required to obtain insurance coverage, along with additional security requirements imposed by Brightstar. (*Id*., Ex. 6. at 222:13-223:17; *see also id*. at 42:25-43:14, 179:17-20, 183:1-6.)

119.    On March 21, 2013, Mr. O'Brien completed a written Security Assessment.  (*Id*., Ex. 28.)

120.    Mr. O'Brien concluded that the security measures at the warehouse were acceptable.  (*Id*. at BSupp00491337.)  He specifically noted that the warehouse had an onsite 24/7 security guard operation supported by external alarm monitoring.  (*Id*.)  Mr. O'Brien explained that an alarm system that was monitored electronically or by a person who then notified police qualified as an alarm system with a direct line to the police.  (*Id*., Ex. 6 at 61:7-63:25.)  Mr. O'Brien also noted that the "CCTV system has excellent coverage at the access point and inside the storage/3PL area designated for Brightstar."  (*Id*., Ex. 28 at

BSupp00491337.)  Based on Mr. O'Brien's assessment, Brightstar determined that the Frankfurt warehouse met the minimum standards required by the Policy.  (*Id.*, Ex. 7 at 207:13-210:13, 214:15-215:18.)

**V.      Brightstar Inadvertently Omitted the Frankfurt Warehouse from The First and Second Quarterly Statement of Values, but Corrected the Omission Before the Loss.**

121.    Brightstar's first quarter statement of values was sent by AJG's Robin Thompson to Starr's Jeff Factor on July 19, 2013.  (*Id.*, Ex. 29.)

122.    The statement did not, however, include the Frankfurt warehouse.  (*Id.*)

123.    There is no evidence that AJG or Starr brought this omission to the attention of Brightstar.

124.    On October 22, 2013, AJG's Robin Thompson sent Brightstar's second quarter statement of values to Starr's Jeff Factor.  (*Id.*, Ex. 30.)

125.    The following day, October 23, 2013, AJG advised Brightstar that several locations, including Germany, had been omitted from Brightstar's quarterly report. (*Id.*, Ex. 31 (FILED UNDER SEAL).)

126.    Between October 23 and November 5, 2013, there were several exchanges between AJG and Brightstar seeking to correct the missing locations. (*Id.*)

127.    On November 5, 2013, AJG advised Brightstar that "Kevin was comparing your revised Starr Marine quarterly report against the master schedule and notes that line #100 for the UK and line #134 for Germany are not showing up on the quarterly report."  (*Id.*)

128.    On that same day, AJG sent a final revised second quarter statement of values to Starr's Jeff Factor with the Frankfurt and UK warehouse locations. (*Id.*, Ex. 38; Dkt. #1, Compl. ¶ 75.)

129.    Factor admitted as Starr's Rule 30(b)(6) representative that master schedules and quarterly SOVs are "declaration[s]" within the meaning of the Errors and Omissions clause. (*Id.*, Ex. 3 at 148:21-149:13.)

130.    As part of a move to a new computer system, Brightstar asked to inspect the Frankfurt warehouse in August.  (*Id.*, Ex. 8 at 98:7-99:3, Ex. 1 at 88:9-89:19, 219:7-15.)

131.    Representatives of Brightstar inspected the warehouse on October 30, 2013, and confirmed the pallets they were shown by Getgoods contained phones.  (Edwards Decl., Ex. 4 at 117:10-118:13, 119:13-123:22, 130:19-132:21; Durbin Decl., Ex. 1 at 138:6-10.)

132.    Brightstar did not become aware of the Loss until November 7, 2013, when Getgoods' CEO informed Brightstar that Brightstar's inventory of mobile phones at the Frankfurt warehouse was missing.  (Edwards Decl., Ex. 1 at 130:20-131:24, Ex. 3 at 205:6-23.)


Date: June 22, 2018                    **BARNES & THORNBURG LLP**


                                       */s/ Mark L. Durbin*
                                       Mark L. Durbin
                                       One North Wacker Drive, Suite 4400
                                       Chicago, IL 60606
                                       mdurbin@btlaw.com

                                       Charles P. Edwards
                                       11 South Meridian Street
                                       Indianapolis, IN 46204
                                       cedwards@btlaw.com

                                       Kara Cleary
                                       3475 Piedmont Road, N.E., Suite 1700
                                       Atlanta, GA 30341
                                       kcleary@btlaw.com

**ANDERSON KILL P.C.**
Dennis Nolan
Vivian Costandy Michael
John Leonard
1251 Avenue of the Americas
New York, NY 10020
dnolan@andersonkill.com
vmichael@andersonkill.com
jleonard@andersonkill.com

**QUINTAIROS, PRIETO, WOOD
& BOYER, P.A.**
Valerie Jackson
9300 S. Dadeland Blvd., 4th Floor
Miami, FL 33156
valerie.jackson@qpwblaw.com

*Attorneys for Brightstar*

DMS 12675205v1