UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
STARR INDEMNITY & LIABILITY COMPANY, :

                          Plaintiff,          :          OPINION AND ORDER

                  -v.-                        :
                                                         13 Civ. 8580 (GWG)
BRIGHTSTAR CORP., et al.,                     :

                          Defendants.         :
----------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

TABLE OF CONTENTS

I. BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    A.  The Policy  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    B.  Facts Relating to the Coverage of, and the Loss at, the German Warehouse . . . . . . . . 7

II. GOVERNING LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    A.  Standard for Summary Judgment Motions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    B.  Burden of Proof  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

III.  DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    A.  Choice of Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    B.  The Limit of Liability Applicable to the German Warehouse . . . . . . . . . . . . . . . . . . 27

        1.  New York Law Governing the Interpretation of Insurance Contracts . . . . . . . 27

        2.  Coverage Under Endorsement No. 17   . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            a.  Automatic Coverage Under Endorsement No. 17 . . . . . . . . . . . . . . 29

            b.  Whether Starr Extended Coverage to the German Warehouse During
            the Term of Endorsement No. 17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        3.  Coverage Under Endorsement No. 40  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        a. Automatic Coverage Under Endorsement No. 40 . . . . . . . . . . . . . . . 42

             i. No Evidence in the Record Suggests That the Two Disputed Minimum Standards Were Met . . . . . . . . . . . . . . . . . . . . . . . . 46

             ii. The Florida Anti-Technical Statute . . . . . . . . . . . . . . . . . . . 49

        b. Whether the German Warehouse Was Part of the "Schedule on File" 50

             i. The Meaning of the Phrase "Schedule on File With Underwriters" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

             ii. Incorporation by Reference . . . . . . . . . . . . . . . . . . . . . . . . . 54

             iii. Whether the German Warehouse Was Added to the Policy Under Endorsement No. 40 . . . . . . . . . . . . . . . . . . . . . . . . . 57

        c. The German Warehouse Was an Unnamed Location Under Endorsement No. 40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

    4. Waiver and Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

        a. Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

        b. Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

  C. The Scope of the Errors and Omissions Clause . . . . . . . . . . . . . . . . . . . . . . . . 80

  D. The Misappropriation Exclusion Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

    1. The Agreements Between Brightstar and getgoods . . . . . . . . . . . . . . . . . . . 84

    2. Whether the German Warehouse was "Controlled by the Assured" . . . . . . . 86

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
STARR INDEMNITY & LIABILITY COMPANY, :

                         Plaintiff,        :          OPINION AND ORDER

                -v.-                  :
                                                13 Civ. 8580 (GWG)
BRIGHTSTAR CORP., et al.,               :

                       Defendants.     :
-----------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Starr Indemnity & Liability Company ("Starr") brings this action seeking a

declaratory judgment that defendants Brightstar Corp. and Brightstar Germany GmbH

(collectively the "defendants" or "Brightstar") are not entitled to coverage under an insurance

policy (the "Policy") for the claimed loss of wireless communication devices (the "Loss") at a

warehouse in Germany ("the German Warehouse") in November 2013.  Defendants have

counterclaimed, alleging that Starr has breached the insurance policy by refusing coverage, and

seek a declaratory judgment that the insurance policy covers the Loss.  Both parties move for

partial summary judgment.[1]

-------------------------------------

[1]  See Plaintiff's Notice of Motion for Partial Summary Judgment, filed May 25, 2018 (Docket
# 127) ("Pl. Not. Mot."); Plaintiff's Statement of Undisputed Material Facts Pursuant to Local
Civil Rule 56.1(a), filed May 25, 2018 (Docket # 128); Declaration of Kevin J.B. O'Malley in
Support of Plaintiff's Motion for Partial Summary Judgment, dated May 25, 2018 (Docket
# 129) ("O'Malley Decl."); Memorandum of Law in Support of Plaintiff's Motion for Partial
Summary Judgment, filed May 25, 2018 (Docket # 130) ("Pl. Mem."); Brightstar Corp. &
Brightstar Germany GmbH's Notice of Motion for Partial Summary Judgment, filed May 25,
2018 (Docket # 131) ("Def. Not. Mot."); Brightstar Corp. & Brightstar Germany GmbH's Local
Rule 56.1 Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment,
filed May 25, 2018 (Docket # 132) ("Def. 56.1 Statement"); Brightstar Corp. & Brightstar
Germany GmbH's Memorandum of Law in Support of Motion for Partial Summary Judgment,
filed May 25, 2018 (Docket # 133) ("Def. Mem."); Declaration of Charles P. Edwards, Esq., In

-1-

Starr moves for partial summary judgment on the following issues: (1) that, to the extent there is a conflict between New York and Florida law, New York law applies to this dispute; (2) that a $3 million limit of liability applies to the German Warehouse; (3) that the Policy's Errors and Omissions Clause only applies to insured risks, and cannot be construed to add or extend

_____

Support of Brightstar Corp. & Brightstar Germany GmbH's Notice of Motion for Partial Summary Judgment, filed May 25, 2018 (Docket # 134) ("Edwards Decl."); Declaration of Kevin J.B. O'Malley in Opposition to Defendants' Motion for Partial Summary Judgment, filed June 22, 2018 (Docket # 138) ("O'Malley Opp. Decl."); Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment, filed June 22, 2018 (Docket # 139) ("Pl. Opp. 56.1 Statement"); Declaration of Mark L. Durbin, Esq., In Support of Brightstar Corp. & Brightstar Germany GmbH's Opposition to Plaintiff's Motion for Partial Summary Judgment, filed June 22, 2018 (Docket # 140) ("Durbin Decl."); Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment, filed June 22, 2018 (Docket # 141) ("Pl. Opp. Mem."); Brightstar Corp. & Brightstar Germany GmbH's Response to Starr's Statement of Purportedly Undisputed Material Facts, filed June 22, 2018 (Docket # 142) ("Def. Reply to Pl. 56.1"); Brightstar Corp. & Brightstar Germany GmbH's Counterstatement of Additional Material Facts, filed June 22, 2018 (Docket # 143); Brightstar Corp. & Brightstar Germany GmbH's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment, filed June 22, 2018 (Docket # 144) ("Def. Opp. Mem."); Brightstar Corp. & Brightstar Germany GmbH's Reply in Support of Motion for Partial Summary Judgment, filed June 26, 2019 (Docket # 175) (originally filed July 24, 2018, as Docket # 148) ("Edwards Reply Decl."); Declaration of Charles P. Edwards, Esq., Regarding Brightstar Corp. & Brightstar Germany GmbH's Reply in Support of Motion for Partial Summary Judgment, filed July 24, 2018 (Docket # 149) ("Edwards Reply Decl."); Reply Declaration of Kevin J.B. O'Malley in Suppport of Plaintiff's Motion for Partial Summary Judgment, filed July 24, 2018 (Docket # 150) ("O'Malley Reply Decl."); Plaintiff's Reply to Brightstar Corp. and Brightstar Germany GmbH's Counterstatement of Additional Material Facts, filed June 21, 2019 (Docket # 169) (originally filed under seal on July 24, 2018, as Docket # 151); Reply Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment, filed June 21, 2019 (Docket # 170) (originally filed on July 24, 2018, as Docket # 152) ("Pl. Reply Mem."), Declaration of Kevin J.B. O'Malley in Opposition to Defendants' Motion for Partial Summary Judgment, filed June 22, 2019 (Docket # 171) ("O'Malley Supp. Opp. Decl."); Reply Declaration of Kevin J.B. O'Malley in Support of Plaintiff's Motion for Partial Summary Judgment, filed June 21, 2019 (Docket # 172) ("O'Malley Supp. Reply Decl."); Declaration of Charles P. Edwards, Esq. In Support of Brightstar Corp. & Brightstar Germany GmbH's Notice of Motion for Partial Summary Judgment, filed June 26, 2019 (Docket # 173) ("Edwards Supp. Decl."); Declaration of Mark L. Durbin, Esq., In Support of Brightstar Corp. & Brightstar Germany GmbH's Opposition to Plaintiff's Motion for Partial Summary Judgment, filed June 26, 2019 (Docket # 174) ("Durbin Supp. Decl.").

coverage not already agreed to by Starr; and (4) that Starr's interpretation of terms contained in the Policy's "Misappropriation Exclusion Clause" is correct.  In its motion, Brightstar seeks a ruling that the Misappropriation Exclusion Clause is inapplicable to the Loss.

For the following reasons, this Court finds that there is no conflict between New York and Florida law as to any issue in this case and thus it will apply New York law, grants plaintiff summary judgment on the question of whether the German Warehouse was an "unnamed location" with a $3 million limit of liability, and rules that the Policy's Errors and Omissions Clause only applies to already-insured risks.  The Court also grants defendants' motion for partial summary judgment, ruling that the Misappropriation Exclusion Clause is inapplicable to the Loss at the German Warehouse.

I.  BACKGROUND

The following facts are undisputed unless otherwise noted.

A.  The Policy

Brightstar Corp. is incorporated in the state of Delaware and maintains its headquarters in Miami, Florida.  Complaint, filed Dec. 13, 2013 (Docket # 1) ("Compl."), ¶ 3; Amended Answer, Affirmative Defenses, and Counterclaim, filed May 28, 2014 (Docket # 26) ("Am. Answer and Countercl."), Am. Answer ¶ 3.  Brightstar describes itself as "the world's largest specialized wireless distributor," and has "over 200 wireless communications operators, 100 manufacturers and 30,000 retailers as global customers."  Compl. ¶¶ 13-14; see Am. Answer and Countercl., Am. Answer ¶¶ 13-14.  Brightstar Germany GmbH is a German subsidiary of Brightstar Corp. and operates solely in Germany.  See Am. Answer and Countercl., Countercl.

¶¶ 86-87.  Starr is an insurance company that is incorporated in Texas and maintains its principal place of business in New York.  Compl. ¶ 2.[2]

Since 2002, Brightstar has been a client of Starr.  See Excerpts of Videotaped Deposition of Peter Scrobe, dated Nov. 4, 2016 (annexed as Ex. 5 to Durbin Decl.) ("Scrobe Dep."), 53.  In 2011, Starr issued a marine cargo insurance policy to Brightstar.  See Brightstar Corporation Marine Cargo Insurance Policy, effective as of Mar. 26, 2011 (annexed as Ex. 3 to O'Malley Decl. and as Ex. 5 to Edwards Decl.) (the "Policy"), at 6, STARR 15574.  Marsh USA acted as Brightstar's insurance broker in connection with the 2011 issuance of the Policy.  See Declaration of Jeffrey Factor in Support of Plaintiffs' Joint Motion to Compel Defendants (annexed as Ex. 46 to O'Malley Decl.) ("Factor Decl."), ¶ 8.

The Policy provided that it was "continuous and cover[ed] all shipments of goods and/or merchandise and/or property made on/or and after 12:00 A.M. March 26, 2011 and on all goods and/or merchandise and/or property at locations on and after said time and date."  Policy at 6, STARR 15574.  The Policy did not contain a termination date, but was rather continuous unless cancelled.  See id.  Also, it contained no choice of law or forum selection clause.

The Policy contained a clause regarding the insurance of goods stored in warehouses in "Endorsement No. 2," which is annexed to the Policy and shares its March 26, 2011, effective date.  Policy at 36, STARR 15604.  Endorsement No. 2 covered "goods and merchandise which are owned by or held by the Assured in trust . . . while temporarily detained in stores or

---

[2]  Brightstar denies that Starr's principal place of business is New York, see Am. Answer and Countercl., Am. Answer ¶ 1, and asserts instead that its principal place of business is in Dallas, Texas, id. at Countercl. ¶ 6.  However, Brightstar does not rely on, or even mention, this assertion in its briefing with respect to choice of law, see Def. Opp. Mem. at 29-32, and it is not relevant to our decision.

warehouses, at any location worldwide." Id.  Clause 9 of Endorsement No. 2 stated:  "The stores

or warehouses to which these Assurers hereby extend approval and the limits of liability at each

location are as follows. . . . ."  Id. at 37, STARR 15605.  Following this clause was a nine-page

chart listing the names and addresses of particular warehouses, with individual corresponding

limits of liability.  See id. at 38-47, STARR 15605-15.  The German Warehouse was not

included in this chart.  Endorsement No. 2's Clause 11 stated "[t]he un-named location limit of

$3,000,000 is provided without prior approval."  Id. at 38, STARR 15606.

As to the adding of new locations, Endorsement No. 2 provided for "[a]utomatic

coverage up to $25,000,000 . . . for new locations upon an affirmative representation by

Brightstar to Marsh of specific location minimum standards noted below," and listed those

"minimum standards" in a bullet-point list.  Id. at 47, STARR 15615 (emphasis omitted).

Included in the "minimum standards" list was the clause: "Submission to Marsh for review and

notification to This Company."  Id.  Endorsement No. 2 also included a requirement that stated

"[u]pon notification by the Insured and/or Marsh, Starr Marine will immediately order a location

loss control survey and forward resulting recommendations for compliance as soon as received."

Id. at 48, STARR 15616.  During the term of Endorsement No. 2, additional warehouses were

added to the Policy by separate endorsements.  See Endorsements Nos. 7-14, Policy at STARR

15628-35.

After Starr issued the Policy, certain of its terms and conditions were adjusted on an

annual basis.  See Compl. ¶ 23; Am. Ans. and Counterclaim, Am. Ans. ¶ 23.  As part of this

annual adjustment, new warehouse endorsements were issued, beginning one year after March

26, 2011, which was the effective date of Endorsement No. 2.  See Endorsement No. 17, Policy

at STARR 15638-44 ("Endorsement No. 17"); Endorsement No. 40, Policy at STARR 15701-04

("Endorsement No. 40").  Arthur J. Gallagher ("Gallagher") replaced Marsh as Brightstar's

insurance broker as of January 10, 2012, and negotiated Endorsements Nos. 17 and 40.  See Def.

Reply to Pl. 56.1 ¶¶ 14, 20.

Endorsement No. 17 was signed by Starr on June 15, 2012, Policy at STARR 15644, but

states that it is "EFFECTIVE: MARCH 26, 2012," id. at STARR 15638.  Endorsement No. 17

listed individual warehouses it insured in a schedule contained in its Clause 11.  See id. at

STARR 15639-43.  The German Warehouse is not among them.  See id.  Similar to

Endorsement No. 2, Endorsement No. 17 stated: "[a]utomatic coverage up to $25,000,000 . . . is

provided for new locations upon an affirmative representation of specific location minimum

standards noted below, subject to receipt of quarterly statement of values."  Id. at STARR 15643.

Once again, those "minimum standards" were contained in a bullet-point list.  Id. at STARR

15643-44.  Warehouses added during the term of Endorsement No. 17 were listed in separate

endorsements amending Clause 11 of Endorsement 17, as were warehouses whose limits were

increased during the course of Endorsement No. 17.   See Endorsements Nos. 22, 24, 26, 27, 29-

34, Policy at STARR 15653-57, 15659-62, 15665-66, 15667-70, 15677-95.  Endorsement No. 17

also contained a clause stating that "[u]pon notification of any new location, Starr Marine will

order a loss control survey and forward the resulting recommendations for compliance as soon as

received."  Id. at STARR 15644.

Endorsement No. 40 was signed by Starr Marine on September 9, 2013, id. at STARR

15704, but states that it is "EFFECTIVE: March 26, 2013," id. at STARR 15701.  Unlike

Endorsements Nos. 2 and 17, rather than listing all of the warehouses insured in a schedule

contained in the Policy, Endorsement No. 40 states that it provides a "25,000,000 Limit per

occurrence at all locations as per schedule on file with underwriters, subject to Quarterly

Statement of Values Report with actual values in storage at each location." Id. at STARR 15702.  As to new locations, Endorsement No. 40 stated the following: "$25,000,000 Limit per occurrence for all newly [sic] locations (maximum 90 days to report) if they meet the minimum standards, as stated below."  Id.  As in Endorsements Nos. 2 and 17, a number of requirements were listed in bullet points under the heading "Minimum Standards."  Id. at STARR 15703.  As was true for Endosrement No. 17, Endorsement No. 40 contained a clause providing that "[u]pon notification of any new location, Starr Marine will order a loss control survey and forward the resulting recommendations for compliance as soon as received."  Id.

All three endorsements, No. 2, No. 17, and No. 40, provided that any "unnamed" or "unscheduled" location would be insured up to $3,000,000.  Id. at STARR 15606, 15639, 15702.

In addition to the Policy, Brightstar maintained two excess insurance policies, the first of which was issued by Certain Underwriters at Lloyd's, London, and the second of which was issued by Great American Insurance Company of New York, XL Specialty Insurance Company, Catlin Syndicate Limited, Montpelier at Lloyd's Limited, and Axis Specialty Europe SE (collectively the "Excess Insurers").  See Complaint, Great Am. Ins. Co. of N.Y. v. Brightstar Corp., No. 14 Civ. 5062 (S.D.N.Y. July 7, 2014) (Docket # 2) ("Great Am. Ins. Co. of N.Y. Compl."), ¶ 39(c); Complaint, Certain Underwriters at Lloyd's London Subscribing to Policy Number B1262SM0131613 v. Brightstar Corp., No. 14 Civ. 5297 (S.D.N.Y. July 15, 2014) (Docket # 2) ("Certain Underwriters' Compl."), ¶¶ 7, 38, 40-41.  These policies covered losses that exceeded the $25,000,000 covered by the Policy for named/scheduled locations.  See Great Am. Ins. Co. of N.Y. Compl. ¶ 39; Certain Underwriters' Compl. ¶¶ 40-41.

     B. Facts Relating to the Coverage of, and the Loss at, the German Warehouse

A central issue in this case is whether Brightstar ever obtained $25 million in coverage under the Policy for the German Warehouse or whether the German Warehouse was instead an "unnamed" location. Starr argues that it never agreed to extend $25 million in coverage to the German Warehouse, under either Endorsement No. 17 or Endorsement No. 40, that the German Warehouse was not covered by the automatic coverage provisions of either endorsement, and that the German Warehouse was accordingly an "unnamed location" entitled to only $3 million in coverage, subject to applicable exclusions. Brightstar asserts that, under a number of different theories, a reasonable jury could find that it did obtain $25 million in coverage for the German Warehouse under the Policy. To evaluate each side's arguments, we first provide an overview of the facts relating to actions and discussions regarding the German Warehouse among the parties and Brightstar's insurance broker, Gallagher.

The first reference to the German Warehouse in the record occurs during the term of Endorsement No. 17. It is contained in an email dated February 20, 2013, from Kevin O'Brien, Brightstar's Director of Global Security and Loss Prevention, to Peter Scrobe, Starr's Head of Loss Control Services. Email from Kevin O'Brien to Peter Scrobe, dated Feb. 20, 2013 (annexed as Ex. 20 to Durbin Decl.) ("O'Brien Feb. 20, 2013, Email"). In the email, O'Brien states the following:

> Pete,
>
> You were right, it is in Frankfurt. Here is the address to schedule the site survey & point of contact. We are planning on beginning operations at the end of February, so we will have to move on this one.

Id.  The email then provides the address of the German Warehouse and contact information for Klaus Freese, a Brightstar Germany employee who O'Brien identifies as the point of contact for the German Warehouse.  Id.[3]

Several hours after receiving the email from O'Brien, Scrobe forwarded the email to Jeffrey Factor, the underwriter with Starr responsible for the Brightstar account, with copies to two other Starr employees, Maria Roman and Matthew Davis, and with the importance level marked to "high."  Email from Peter Scrobe to Jeffrey Factor, dated Feb. 20, 2013 (annexed as Ex. 21 to Durbin Decl.) ("Scrobe Feb. 20, 2013, Email").  In the email, Scrobe writes:

> Jeff, please note comments below, from Kevin O'Brien regarding new German operation.  Please arrange survey of the location through Maria.  Any questions let me know.

Id.  It is undisputed that there was no written follow-up to this email, and that Factor never arranged a survey of the German Warehouse.  See Excerpts of Videotaped Deposition of Jeffrey Factor, dated Nov. 3, 2016 ("Factor Dep."), 256-58.[4]

There is no record of any further communication between Starr and Brightstar about the German Warehouse during this period, though a few days later, Brightstar and its broker, Gallagher, exchanged emails about the German Warehouse.  On February 25, 2013, Brightstar's Kevin O'Brien sent an email to Lisa Rodriguez, the Area Vice President with Gallagher's Miami office, with the subject line "visit to new Brightstar Germany site," which stated, in relevant part:

---

[3]  While this email references a previous discussion between O'Brien and Scrobe about the German Warehouse, see id., in his deposition testimony Scrobe stated that he could not recall having this conversation with O'Brien, see Scrobe Dep. at 169.

[4]  Excerpts of the deposition of Jeffrey Factor are annexed as Ex. 47 to the O'Malley Decl., Ex. 42 to the Edwards Decl., Ex. 2 to the Durbin Decl., Ex. A to the Edwards Reply Decl., and as Ex. 98 to the O'Malley Reply Decl.

Lisa,

As discussed, I will be on-site with the management there on Wednesday, 6
March. . . .

What we can do is you can email me any specific questions you have for them &
I can ask, or we could try a conference call with you once I terminate my visit.
Just tell me what you would like.

Email from Kevin O'Brien to Lisa Rodriguez, dated Feb. 25, 2013 (annexed as part of Ex. 9 to

Durbin Supp. Decl. and originally filed under seal as Ex. 34 to Durbin Decl.) ("O'Brien Feb. 25,

2013, Email").  The following day, Robin Thompson, an Executive Account Manager at

Gallagher, responded to O'Brien's email, which seems to have been forwarded to her.  See

Email from Robin Thompson to Kevin O'Brien, dated Feb. 26, 2013 (annexed as part of Ex. 9 to

Durbin Supp. Decl. and originally filed under seal as part of Ex. 34 to Durbin Decl.).  In the

email, Thompson notes that Gallagher was "missing the information requested in the Property

and Casualty sections of the attached spreadsheet" and asks O'Brien to assist in obtaining that

information.  See id.  The attached spreadsheet contains columns for information regarding the

value of the goods held and shipped, the number of employees and information about their

payment and travel, information about the physical building structure, and information about

safety features of the building, among other information.  See id.

Brightstar began storing wireless devices at the German Warehouse on approximately

March 1, 2013.  See Compl. ¶ 31; Am. Answer and Countercl., Am. Answer ¶ 31.  Shortly

thereafter, on March 7, 2013, Brightstar's Kevin O'Brien and two Brightstar Germany

employees, Klaus Freese and Axel Grelhorst, visited the German Warehouse and conducted a

security assessment.  See Security Assessment: Brightstar 3PL Operation Germany (annexed as

part of Ex. 28 to Durbin Decl.) ("Brightstar Security Assessment"), 1.  No Starr employees

accompanied them.  See id.  Brightstar produced a document reporting the findings of its

security assessment, see id., but Brightstar has not pointed to any evidence suggesting that it ever

sent this report to Starr, or even to its broker, Gallagher.  See Def. Opp. Mem. at 26 (noting that

"O'Brien completed a written Security Assessment, and concluded that the security measures at

the Frankfurt warehouse were acceptable" but not stating to whom, if anyone, the report was

sent).

      Before even the first reference to the German Warehouse, starting at least in January

2013, Jeffrey Factor, the underwriter at Starr assigned to the Brightstar account, was in the midst

of negotiating the annual adjustment of the Policy with Gallagher, Brightstar's broker.  While in

previous years all of the insured warehouses had been listed in a chart contained in the relevant

endorsement, see Endorsement No. 2; Endorsement No. 17, this time Factor wanted to handle

things differently.  In the past, the amount of insurance coverage for each warehouse had been

based on the amount of value in storage; if the amount of value increased, the limit would have

to be changed through the issuance of a formal endorsement to the Policy.  See Factor Dep. at

217.  Factor "wanted to try to streamline the process" and wanted "to cut down on the

requirement for issuing endorsements," because, as Factor put it, Brightstar was "a long-term

partner, who was growing and who was constantly entering into and changing warehouses."  Id.

Instead of listing all warehouses in a schedule contained in the warehouse endorsement and

reporting limit change requests as the amount of value stored changed, Factor wanted Starr to

insure each warehouse up to a limit of $25 or $50 million, "subject to quarterly reporting,"

which "would show [Starr] what was actually in storage at that time."  Id. at 216; Email from

Jeffrey Factor to Matthew Davis, dated Jan. 15, 2013 (annexed as Ex. 15 to Durbin Decl.)

("Factor Jan 15, 2013, Email").  While Factor could not recall the specifics of the conversation

or who was involved, he did recall discussing the new approach with Gallagher, and believed

that Lisa Rodriguez at Gallagher was involved.  Factor Dep. at 217.  An email Factor sent to

Matthew Davis, Vice President and Regional Manager at Starr, indicates that he planned to call

Rodriguez to discuss the matter.  See Factor Jan 15, 2013, Email.

On February 11, 2013, Robin Thompson at Gallagher sent Factor an email, attaching a

document referred to as Brightstar's "Master Exposure Spreadsheet," which Thompson indicated

was the "information [Gallagher] ha[d] received to date for the renewal."  See Email from Robin

Thompson to Jeffrey Factor, dated Feb. 11, 2013 (annexed as Ex. 10 to O'Malley Decl.)

("Thompson Feb. 11, 2013, Email").  She noted that she was sending the information per

Factor's conversation with Lisa Rodriguez.  See id.  The attached spreadsheet was approximately

44 pages long, listing dozens of locations, and providing for each location dozens of categories

of information, including ownership, age, alarm system information, "Watchmen" information,

frequency of watchman rounds, and whether there was a sprinkler system.  Id.  Some of these

categories appear under a heading titled "COPE," id., which stands for "Construction

Occupancy, Protection, and Exposure," — a term that refers to information used by an insurer

when evaluating the risks involved in insuring property, see Def. Opp. Mem. at 13; Factor Dep.

at 165.  The spreadsheet did not include the German Warehouse — though of course it was sent

prior to the February 20, 2013, email exchange between Scrobe and O'Brien regarding the

German Warehouse.  See Thompson Feb. 11, 2013, Email.  That same day, Jose Fernandez, a

Client Services Representative with Gallagher, sent Factor "the most up to date SOV" (statement

of values) for Brightstar, which also did not include the German Warehouse.  Email from Jose

Fernandez to Jeffrey Factor, dated Feb. 11, 2013 (annexed as Ex. 11 to O'Malley Decl.)

("Fernandez February 11, 2013, Email").

The next email in the record regarding the annual adjustment is dated March 19, 2013 —
that is, long after the email about the German Warehouse sent by O'Brien on February 20, 2013,
— and is from Factor to Lisa Rodriguez at Gallagher, with copies to others at both Starr and
Gallagher.  See Email from Jeffrey Factor to Lisa Rodriguez, dated Mar. 19, 2013 (annexed as
Ex. 14 to O'Malley Decl.) ("Factor March 19, 2013, Email").  The email, which references an
earlier conversation between Factor and Rodriguez, reads, in relevant part:

> Lisa,
> As we discussed, we can agree to a FLAT warehouse premium of $1,750,000.
> All locations currently listed with values (see attached schedule which I took
> from your SOV) have a $25M limit (please confirm that all locations are listed).
> All new locations will have a $25M limit if the [sic] meet the minimum standards,
> but additional premium will be paid at a rate of $750 per $1M of estimated
> maximum value . . . .
>
> Note that we will still need the actual values in storage, and we need to agree to a
> penalty for non-compliance, but the policy will not be rated off these values.
>
> See attached spreadsheet.  All fields in yellow need to be addressed.

Id. (emphasis added).  The attached spreadsheet did not include the German Warehouse, though
this email was sent after February 20, 2013, the date Peter Scrobe had emailed Factor about the
German Warehouse.[5]  Rodriguez forwarded Factor's email to Oscar Fumagali, CEO of
Brightstar, see Email from Lisa Rodriguez to Oscar Fumagali, dated Mar. 19, 2013 (annexed as
Ex. 15 to O'Malley Decl.).  Brightstar employee Mauricio Cabello was assigned to verify that all
locations were listed on the spreadsheet as had been required by Factor in his email.  See

_____

[5]  In his email, Factor states that the schedule was taken from Gallagher's "SOV," and the last
SOV that Gallagher sent to Starr was sent on February 11, 2013.  See Fernandez February 11,
2013, Email.

-13-

Excerpts of Videotaped Deposition of Oscar Fumagali, dated Oct. 20, 2016 ("Fumagali Dep."),[6] at 232.

On March 21, 2013, Factor sent an email with a revised quote to Lisa Rodriguez and Robin Thompson at Gallagher.  See Email from Jeffrey Factor to Lisa Rodriguez, Robin Thompson, dated Mar. 21, 2013 (annexed as part of Ex. 17 to O'Malley Decl.).  In the email, Factor included an "attached revised quote," and highlighted several changes that had been made to this version of the quote, and asked whether Brightstar would be interested in three optional coverages still contained in the quote.  See id.  Factor asked Rodriguez and Thompson to "[p]lease confirm if you wish to bind coverage and which of the three optional coverages above you would like to have included."  Id.

Two days later, on Saturday, March 23, 2013, Enrique Rodriguez, an employee at Brightstar, forwarded an email from Klaus Freese of Brightstar Germany to Robin Thompson and others at Gallagher.  See Email from Enrique Rodriguez to Robin Thompson, Wendy Aguayo, and Jose M. Fernandez, dated Mar. 23, 2013 (annexed as Ex. 10 to Durbin Supp. Decl. and originally filed under seal as Ex. 35 to Durbin Decl.) ("Rodriguez German Warehouse Email").  In the email, Rodriguez notes that "[t]here has been a recent agreement with a major customer and the inventory values expected have increased."  Id.  Rodriguez also instructs the recipients to "[p]lease update accordingly."  Id.  The forwarded email from Klaus Freese attached an appendix with new "COPE" information for the German Warehouse.  See id.  In the email from Freese that Rodriguez forwarded, Freese notes that Brightstar had "changed the max. stock per month and the average stock per month," and instructs the other Brightstar employees

---

[6]  Excerpts of the deposition of Oscar Fumagali are annexed as Ex. 50 to the O'Malley Decl, Ex. 1 to the Edwards Decl., Ex. 60 to the O'Malley Opp. Decl., and as Ex. 7 to the Durbin Decl.

he emailed to "[p]lease adjust the insurance."  Id.  Despite Rodriguez's instruction to Thompson

and others at Gallagher to "[p]lease update accordingly," there is no evidence that this

information was sent by Gallagher to Starr until after the Loss at the German Warehouse.

On March 25, 2013, Thompson at Gallagher responded to Factor's March 21, 2013,

email with the "revised quote" stating, in relevant part, "Jeff, Please bind the insured's renewal

STP coverage per your revised quote dated 3/21/13 including the Vietnam and Colombia Retail

for annual premium of $3,725,000. . . . Please confirm that coverage is bound and provide policy

number as soon as possible."  Email from Robin Thompson to Jeffrey Fatcor and Lisa

Rodriguez, dated Mar. 25, 2013 (annexed as part of Ex. 17 to O'Malley Decl.).  Thompson's

email made no mention of the German Warehouse.  Several minutes later, Matthew Davis at

Starr responded to the email as Factor was on a call, thanking Gallagher for the confirmation and

noting that Factor would "issue the formal binder."  See Email from Matthew D. Davis to Robin

Thompson, Jeffrey Factor, and Lisa Rodriguez, dated Mar. 25, 2013 (annexed as part of Ex. 17

to O'Malley Decl.).  Davis also asked whether Brightstar accepted "Tria" coverage, see id.,

which presumably refers to insurance related to the Terrorism Risk Insurance Act of 2002.

Factor wrote back less than an hour later, stating that "we are confirmed bound," and that he

would issue the binder once he heard from Gallagher regarding "TRIA and the final commission

figure."  Email from Jeffrey Factor to Matthew Davis, Robin Thompson, and Lisa Rodriguez,

dated Mar. 25, 2013 (annexed as part of Ex. 17 to O'Malley Decl.).  The next day, Thompson

wrote to Factor providing a commission rate, stating that Brightstar rejected TRIA coverage, and

asking for the insurance binder to be forwarded as soon as possible.  Email from Robin

Thompson to Jeffrey Factor, Matthew Davis, and Lisa Rodriguez, dated Mar. 26, 2013 (annexed

as part of Ex. 17 to O'Malley Decl.).  Later that day, Factor sent on the binder via email, which

was titled "Cargo Binder."  See Email from Jeffrey Factor to Robin Thompson, dated Mar. 26, 2013 (annexed as part of Ex. 17 to O'Malley Decl.); Cargo Binder (annexed as part of Ex. 17 to O'Malley Decl.) ("Cargo Binder").  The Binder contained a section titled "Warehouse Coverage," which provided a "25,000,000 Limit per occurrence at all locations as per schedule on file with underwriters, subject to Quarterly Statement of Values Report with actual values in storage at each location," a "$25,000,000 Limit per occurrence for all newly [sic] locations (maximum 90 days to report) if they meet the minimum standards, as stated below," and a "$3,000,000 Limit for any unnamed/unscheduled location."  See Cargo Binder at 5, STARR 4761.  The Binder itself did not include a listing of covered warehouses.  See id.

On July 19, 2013, Gallagher sent Brightstar's first quarterly SOV to Starr.  See Email from Robin Thompson to Jeffrey Factor (and attachment), dated July 19, 2013 (annexed as Ex. 20 to O'Malley Decl.).  The spreadsheet annexed to the email Gallagher sent did not include the German Warehouse.  See id.  On October 22, 2013, Gallagher sent Starr a second quarterly SOV for Brightstar, which also did not include the German Warehouse.  See Email from Robin Thompson to Jeffrey Factor, dated Oct. 22, 2013 (annexed as Ex. 29 to O'Malley Decl.).

The day after Gallagher sent Brightstar's second quarterly SOV, Thompson at Gallagher emailed Mauricio Cabello, an employee at Brightstar who had apparently sent her the SOV to forward to Starr.  See Email from Robin Thompson to Mauricio Cabello, dated Oct. 23, 2013 (annexed as part of Ex. 8 to Durbin Supp. Decl. and filed originally under seal as Ex. 31 to Durbin Decl.).  Thompson stated that she "compared the quarterly report for September to [Gallagher's] Master and . . . note[d] that there are several locations that are not shown on [Brightstar's] quarterly report that are highlighted in yellow on the master."  Id.  Cabello at Brightstar sent Thompson a revised quarterly report the next day, October 24, 2013, purporting

-16-

to include the missing locations, see Email from Mauricio Cabello to Robin Thompson, dated Oct. 24, 2013 (annexed as part of Ex. 8 to Durbin Supp. Decl. and filed originally under seal as part of Ex. 31 to Durbin Decl.), but another Gallagher employee noticed that several locations were still missing from Brightstar's SOV, see Email from Kevin Halawy to Robin Thompson, dated Oct. 28, 2013 (annexed as part of Ex. 8 to Durbin Supp. Decl. and filed originally under seal as part of Ex. 31 to Durbin Decl.).  Thompson informed Cabello of this on November 5, 2013, noting that "line #100 for the UK and line #134 for Germany are not showing up on the quarterly report."  Email from Robin Thompson to Mauricio Cabello, dated Nov. 5, 2013 (annexed as part of Ex. 8 to Durbin Supp. Decl. and originally filed under seal as part of Ex. 31 to Durbin Decl.).  Cabello corrected the error, adding the German Warehouse, and sent the updated spreadsheet to Thompson about half an hour later, see Email from Mauricio Cabello to Robin Thompson, dated Nov. 5, 2013 (annexed as part of Ex. 8 to Durbin Supp. Decl. and originally filed under seal as part of Ex. 31 to Durbin Decl.); see id. at AJG003456 (spreadsheet attachment with entry for the German Warehouse).  Thompson promptly sent the revised version to Factor at Starr, see Email from Robin Thompson to Jeffrey Factor, dated Nov. 5, 2013 (annxed as Ex. 38 to Durbin Decl.).  The quarterly SOV spreadsheet included information such as the amount of value in storage, the maximum amount that could be in storage, and the address of the warehouse location, among other similar information, but it did not include COPE information such as security details and information about the physical specifications of the warehouses.  See id.

At about this same time, that is, in late October 2013,[7] employees at Brightstar were

beginning to grow concerned about operations at the German Warehouse, where Brightstar's

goods were being stored under a contractual arrangement with getgoods.de Vertriebs GmbH AG

("getgoods"), the company that operated the German Warehouse, see Pl. Opp. 56.1 Statement

¶ 2.  That arrangement required getgoods to both store Brightstar's goods and also to fulfill

orders from Brightstar by delivering the goods stored at the German Warehouse to Brightstar's

customers.  See infra Section III.D.1.  Arturo Osorio, a Brightstar employee, testified during his

deposition that, around this time, he "became suspicious" that getgoods was in bad financial

shape because Brightstar's stock takes from the German Warehouse were constantly delayed,

and he suspected that getgoods might be inappropriately using Brightstar's inventory as

collateral to finance its operations.  See Videotaped Deposition of Arturo Osorio, dated Sept. 15,

2016 ("Osorio Dep."),[8] at 107-08, 135-36.  Osorio was also concerned because getgoods had

repeatedly cancelled Brightstar's requests to inspect its inventory and would not allow Brightstar

to conduct an inspection prior to October 31, 2013, as requested.  See id. at 137.  A series of

emails sent between Brightstar and Brightstar Germany employees reflect increasing concern

about getgoods, Brightstar's attempts to inspect its inventory, and discussions of pulling all of

Brightstar's inventory from the German Warehouse because of these concerns.  See Email from

Arturo Osorio to Norman Bean, Con Limogiannis, and Max Caballero, dated Oct. 28, 2013

(annexed as Ex. 30 to O'Malley Decl.) (forwarding an email from the CEO of getgoods and

---

[7]  In its memorandum of law, Starr states these concerns began in "late August 2013," but based
on the material cited for this proposition, this appears to be a typo.  See Pl. Mem. at 16-17.

[8]  Excerpts of the deposition of Arturo Osorio are annexed as Ex. 54 to the O'Malley Decl., part
of Ex. 2 to the Edwards Decl., Ex. 63 to the O'Malley Opp. Decl., Ex. 8 to the Durbin Decl., and
Ex. 101 to the O'Malley Reply Decl.

stating "[w]e need to talk" because "the timing of this sale and our stock take is very strange");
Email from Arturo Osorio to Axel Grellhorst, dated Oct. 30, 2013 (annexed as Ex. 31 to
O'Malley Decl.) (statement from Osorio stating "we will pull our inventory out next week"
because "I dont [sic] trust or like what is going [on]," in response to forwarded email from
getgoods delaying an inventory inspection that had been scheduled for October 31, 2013, for the
second time); Email from Kevin O'Brien to Arturo Osorio, dated Oct. 30, 2013 (annexed as Ex.
32 to O'Malley Decl.) (stating "[a]s discussed, I believe there are advantages to getting your own
people to Brightstar Germany to start looking at their inventory, as soon as possible"); Email
from Norman Bean to Con Limogiannis, dated Oct. 30, 2013 (annexed as Ex. 33 to O'Malley
Decl.) (noting that "[w]ord is spreading" and asking whether getgoods was supposed to do any
"cycle counts" and whether, if so, Brightstar received copies of reports); Email from Axel
Grellhorst to Arturo Osorio, dated Oct 30. 2013 (annexed as Ex. 34 to O'Malley Decl.)
(reporting that after a phone call, the CEO of getgoods was "pissed" and "asked me if we think
he is a criminal [p]erson," and suggesting that he and others "drive to Frankfurt promptly to
make sure that we still have" stock at the German Warehouse); Email from Thomas Seifert to
Norman Bean, dated Nov. 1, 2013 (annexed as Ex. 35 to O'Malley Decl.) (stating "Arturo asked
IA to fly to Germany ASAP because he is more than concerned").  On October 30, 2013, several
Brightstar employees showed up at the German Warehouse seeking to inspect Brightstar's
inventory.  See Videotaped Deposition of Mark Arme, dated Mar. 8, 2017 (annexed as Ex. 4 to
Edwards Decl. and as Ex. 62 to O'Malley Opp. Decl.) ("Arme Dep."), at 114-18.  getgoods
informed Brightstar's representatives that they would not be able to do a full count of their
inventory as it was a legal holiday and getgoods' employees were prohibited from working, see
id. at 117; see also Email from Markus Rockstadt-Mies to Axel Grellhorst, dated Oct. 30, 2013

(annexed as part of Ex. 31 to O'Malley Decl.), but Brightstar employees were able to observe several rooms containing pallets of wireless devices, see Arme Dep. at 117-25.  While the Brightstar representatives did not open the cartons of goods to inspect what was inside, they were able to remove layers of black shrink-wrap to confirm that the cartons on the pallets appeared to contain wireless devices.  See id.  Brightstar planned on doing a full inspection of its stock the following week.  See Osorio Dep. at 192.

On November 6, 2013, getgoods' CEO informed the co-managing director of Brightstar Germany that 193,000 of Brightstar's wireless devices had been reported missing from the German Warehouse, and Brightstar CEO Oscar Fumagali was informed of the Loss the following day.  See Fumagali Dep. at 130-31.  Brightstar alleges that the Loss occurred sometime between when its representatives observed its inventory at the German Warehouse on October 30, 2013, and when Brightstar was told on November 7, 2013, by getgoods' CEO that the devices were gone.  Am. Answer and Countercl., Countercl. ¶¶ 49-51.  Starr states in its briefing that "[t]he date(s) on which the Loss occurred has not been established."  Pl. Mem. at 17.

On November 8, 2013, Brightstar informed Gallagher of the Loss, see Email from Catherine Smith to Lisa Rodriguez, dated Nov. 8, 2013 (annexed as part of Ex. 38 to O'Malley Decl.), and Gallagher notified Starr and the Excess Insurers of the Loss and submitted claims to them, see Affidavit of Oscar Fumagali in Support of Defendant's Opposition to Plaintiffs' Joint Motion to Compel (annexed as Ex. 4 to Declaration of Mark L. Durbin, Esq., in Further Support of Brightstar Corp. & Brightstar Germany GmbH's Notice of Motion to Transfer, filed Apr. 4, 2018 (Docket # 114) ("Durbin Decl. in Support of Mot. to Trans.")), ¶ 15; see also Email from Lisa Rodriguez to Peter Scrobe et al., dated Nov. 8, 2013 (annexed as Ex. 4 to Declaration of

Kevin J.B. O'Malley in Opposition to Motion to Transfer, filed Apr. 23, 2018 (Docket # 115)

("O'Malley Decl. in Opp. of Mot. to Trans.")).

On November 11, 2013 — after Brightstar, Gallagher, and Starr had all been made

aware of the Loss — Factor responded to Thompson's email of November 5, 2013, which had

attached Brightstar's revised second quarterly SOV, and which had included the German

Warehouse.  See Email from Jeffrey Factor to Robin Thompson, dated Nov. 11, 2013 (annexed

as part of Ex. 41 to O'Malley Decl.).  In the email, Factor stated: "Thanks for providing the

revised SOV-Q2 adding Germany and UK, do you recall when these locations were added?  Did

you ever send us COPE for these new locations, and did we quote to add them?  UK is under the

unnamed limit, so this really only pertains to the Germany location."  Id.  Jessica Azucena, a

Client Service Representative at Gallagher responded as Thompson was out of the office,

explaining that "Germany should have been included in the renewal submission," and that "i[t]

was added around the time of renewal."  Email from Jessica Azucena to Jeffrey Factor, dated

Nov. 11, 2013 (annexed as part of Ex. 41 to O'Malley Decl.).  Shortly after, Lisa Rodriguez

responded to the thread, explaining that "Germany was actually on the expiring policy," and that

in early April 2013 the limits had been increased.  Email from Lisa Rodriguez to Jeffrey Factor,

dated Nov. 11, 2013 (annexed as part of Ex. 41 to O'Malley Decl.).

On November 19, 2013, Starr informed Brightstar and Gallagher representatives,

including Lisa Rodriguez, that the claim submitted in connection with the Loss was being

investigated "under a full Reservation of Rights."  See Email from Mary M. Ranno to Lisa

Rodriguez, Bart Douglas, and Kevin O'Brien, dated Nov. 19, 2013 (annexed as Ex. 6 to

O'Malley Decl. in Opp. of Mot. to Trans.); see also Email from Frank P. Reilly to Thomas

Connelly, dated Nov. 20, 2013 (annexed as Ex. 7 to O'Malley Decl. in Opp. of Mot. to Trans.) (noting that Gallagher was "a little taken back by the [Reservation of Rights]").

The next day, Lisa Rodriguez wrote to Jeffrey Factor, in response to the email thread in which he had asked about when the German Warehouse had been added to the Policy. The email read:

> Hi Jeff:
>
> Robin and I realized today that we had not yet responded to the questions in your email below. We have attached the Client's Master Spreadsheet (SOV and Locations) which contain the COPE information you need. Please note that the exposure listed on the revised Q2 SOV we sent you on 11/5/13 showing $93,674,253.00 in Brightstar Inventory Balance (First Party) is correct. Please let us know the corresponding additional premium for this location from policy inception.

Email from Lisa Rodriguez to Jeffrey Factor, dated Nov. 20, 2013 (annexed as part of Ex. 41 to O'Malley Decl.) ("Rodriguez Nov. 20, 2013, Email").

Factor responded with the following email, in relevant part:

> Dear Lisa and Robin:
>
> We acknowledge receipt of your email of November 20 and your inquiry concerning the additional premium to be charged for the Brightstar German location, which is the location involved in the recently received large notice of claim.
>
> This loss is presently being investigated under a reservation of rights. It is our understanding that a more extensive and detailed reservation of rights letter will be sent by our claims department in the next week if not sooner. So, we are presently unable to quote or accept any premium for this location.

Email from Jeffrey Factor to Lisa Rodriguez, dated Nov. 26, 2013 (annexed as part of Ex. 41 to O'Malley Decl.).

On December 2, 2013, Starr's Vice President of Claims, Thomas Connelly, sent a letter by email to Rodriguez stating that "Starr respectfully reserves its rights concerning the claimed

loss" and noting that "there is a possibility that the claimed loss is not covered under the Policy." Email from Thomas Connelly to Lisa Rodriguez and Attached Reservation of Rights Letter, dated Dec. 2, 2013 (annexed as Ex. 7 to Durbin Decl. in Support of Mot. to Trans.), at 1, 7.  On December 3, 2013 — the next day — Starr filed this action seeking a declaratory judgment that the Loss was not covered under the Policy.  See Compl.  The CEO of getgoods was ultimately indicted for misappropriation by the German authorities.  See Fumagali Dep. at 562.

## II.  GOVERNING LAW

### A.  Standard for Summary Judgment Motions

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)); accord Beard v. Banks, 548 U.S. 521, 529 (2006) (citing Celotex, 447 U.S. at 323).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."  Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997); see also Fed. R. Civ. P. 56(c)(4) (parties shall "set out facts that would be admissible in evidence").

In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving party.  Anderson, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must

-23-

come forward with 'specific facts showing that there is a <u>genuine issue for trial</u>,'" <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor," <u>Anderson</u>, 477 U.S. at 256, and "[a] party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory," <u>Major League Baseball Props., Inc. v. Salvino, Inc.</u>, 542 F.3d 290, 310 (2d Cir. 2008). "Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment should be granted." <u>FDIC v. Great Am. Ins. Co.</u>, 607 F.3d 288, 292 (2d Cir. 2010) (quoting <u>Gallo v. Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994)).

    B. <u>Burden of Proof</u>

    "It is well established under New York law that a policyholder bears the burden of showing that the insurance contract covers the loss." <u>Morgan Stanley Grp. Inc. v. New England Ins. Co.</u>, 225 F.3d 270, 276 (2d Cir. 2000) (citing, <u>inter alia</u>, <u>Chase Manhattan Bank, N.A. v. Travelers Group, Inc.</u>, 269 A.D.2d 107 (1st Dep't 2000), and <u>Munzer v. St. Paul Fire & Marine Ins. Co.</u>, 145 A.D.2d 193 (3d Dep't 1989)). This burden does not shift to the insurer where, as here, the insurer moves first for declaratory judgment. <u>See</u> <u>Preferred Acc. Ins. Co. of N.Y. v. Grasso</u>, 186 F.2d 987, 991 (2d Cir. 1951); <u>accord</u> <u>Chevron Corp. v. Salazar</u>, 2011 WL 3628843, at *7 (S.D.N.Y. Aug. 17, 2011) ("[T]he declaratory judgment remedy is no more than a procedural mechanism that permits judicial resolution of an actual controversy before any party commences a traditional action for coercive relief. The party asserting a right (Party A) against

-24-

another has whatever burdens that it would have if it sued for coercive relief notwithstanding

that it is a defendant in an action for a declaration by another party (Party B) that Party A has no

such right."); Schoeps v. Museum of Modern Art, 594 F. Supp. 2d 461, 463 (S.D.N.Y. 2009)

("In an action for declaratory judgment, the burden of proof rests on the party who would bear it

if the action were brought in due course as a claim for non-declaratory relief.") (citing Preferred

Acc. Ins. Co., 186 F.2d at 991, and Wright, Miller & Kane, Federal Practice and Procedure: Civil

3d § 2770).

## III.  DISCUSSION

### A.  Choice of Law

The parties dispute whether, in the event of a conflict, New York or Florida law applies.

"Federal courts sitting in diversity look to the choice-of-law rules of the forum state." Int'l Bus.

Machines Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004) (citing Curley v.

AMR Corp., 153 F.3d 5, 12 (2d Cir.1998)); accord Klaxon Co. v. Stentor Elec. Mfg. Co., 313

U.S. 487, 496-97 (1941).  "In New York, choice-of-law determinations are made on an issue-by-

issue basis." Christians of Cal., Inc. v. Clive Christian N.Y., LLP, 2015 WL 468833, at *3

(S.D.N.Y. Feb. 3, 2015) (citations omitted); accord Babcock v. Jackson, 12 N.Y.2d 473, 483-84

(1963).  Under New York law, a court need not undertake a choice-of-law analysis "unless the

laws of the competing jurisdictions are actually in conflict."  Int'l Bus. Machines Corp., 363

F.3d at 143 (citing In re Allstate Ins. Co. ("Stolarz"), 81 N.Y.2d 219, 223 (1993)).  "Laws are in

conflict '[w]here the applicable law from each jurisdiction provides different substantive rules.'"

Id. (quoting Curley, 153 F.3d at 12).  "In the absence of substantive difference, however, a New

York court will dispense with choice of law analysis; and if New York law is among the relevant

choices, New York courts are free to apply it."  Id. (citing J. Aron & Co. v. Chown, 231 A.D. 2d

426 (1st Dep't 1996), and Tronlone v. Lac d'Amiante Du Quebec, 297 A.D.2d 528, 528 (1st

Dep't 2002), aff'd 99 N.Y.2d 647 (2003)).

   Under both New York and Florida law, unambiguous terms in insurance contracts are to

be given their plain and ordinary meaning.  See, e.g., Universal Am. Corp. v. Nat'l Union Fire

Ins. Co. of Pittsburgh, Pa., 25 N.Y.3d 675, 680 (2015) ("An insurance agreement is subject to

principles of contract interpretation.  As with the construction of contracts generally,

unambiguous provisions of an insurance contract must be given their plain and ordinary

meaning, and the interpretation of such provisions is a question of law for the court.") (internal

quotation marks and citations omitted); State Farm Mut. Auto. Ins. Co. v. Menendez, 70 So. 3d

566, 569-70 (Fla. 2011) ("'If the language used in an insurance policy is plain and unambiguous,

a court must interpret the policy in accordance with the plain meaning of the language used so as

to give effect to the policy as it was written.'") (quoting Travelers Indem. Co. v. PCR Inc., 889

So. 2d 779, 785 (Fla. 2004)).  Neither party asserts that there is a conflict between New York and

Florida law when it comes to the interpretation of an unambiguous contract provision, and

Brightstar does not argue that Florida law should be applied absent a conflict.  See Def. Opp.

Mem. at 29.

   Brightstar asserts that "[o]ne issue where Florida and New York law potentially conflict

is in the consideration of extrinsic evidence for purposes of interpreting insurance policy

language." Id. at 32.  Brightstar argues that "[t]he laws of New York and Florida both construe

ambiguities in insurance policies against the insurance company and in favor of coverage," id. at

29, but that they differ as to whether extrinsic evidence can first be considered, id. at 32.  Citing

Washington Nat. Ins. Corp. v. Ruderman, 117 So. 3d 943 (Fla. 2013), Brightstar asserts that

"[u]nder Florida law, ambiguous insurance policies 'must' be construed in favor of coverage

'without resort to consideration of extrinsic evidence.'"  Def. Opp. Mem. at 32 (quoting

Ruderman, 117 So. 3d at 945, 952).  Brightstar asserts that under New York law, by contrast, a

"court may consider extrinsic evidence 'to assist in determining [the parties] actual intent,'" and

should only "resort to other rules of construction, including resolving any ambiguities in favor of

the insured" where any extrinsic evidence "'does not yield a conclusive answer as to the parties'

intent.'"  Id.  (alteration added) (quoting McCostis v. Home Ins. Co. of Indiana, 31 F.3d 110, 113

(2d Cir. 1994)).  However, for the reasons stated below, we do not find any provision in the

Policy to be ambiguous.  Because there is no conflict in the laws of Florida and New York

regarding the interpretation of unambiguous insurance contract provisions, we need not engage

in a choice-of-law analysis and apply New York law to the interpretation of the Policy.

  B. The Limit of Liability Applicable to the German Warehouse

    1. New York Law Governing the Interpretation of Insurance Contracts

  Under New York law, "[a]n insurance agreement is subject to principles of contract

interpretation."  Universal Am. Corp., 25 N.Y.3d at 680.  "'As with the construction of contracts

generally, unambiguous provisions of an insurance contract must be given their plain and

ordinary meaning, and the interpretation of such provisions is a question of law for the court.'"

Id. (quoting Vigilant Ins. Co. v. Bear Stearns Cos., Inc., 10 N.Y.3d 170, 177 (2008)) (some

quotation marks and citations omitted).  "'Ambiguity in a contract arises when the contract, read

as a whole, fails to disclose its purpose and the parties' intent,'" id. (quoting Ellington v. EMI

Music, Inc., 24 N.Y.3d 239, 244 (2014)) (some citations omitted), "or where its terms are subject

to more than one reasonable interpretation," id. (internal citations omitted).  As the Second

Circuit has stated while construing New York law:

> An ambiguity exists where the terms of an insurance contract could suggest "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997) (citation and internal quotation marks omitted). Once a court concludes that an insurance provision is ambiguous, "the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." Alexander & Alexander [Servs. Inc., v. These Certain Underwriters at Lloyd's, London, England], 136 F.3d [82,] 86 [(2d Cir. 1998)]; accord Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 428-29 (2d Cir. 1992). "If the extrinsic evidence does not yield a conclusive answer as to the parties' intent," a court may apply other rules of contract construction, including the rule of contra proferentem, which generally provides that where an insurer drafts a policy "any ambiguity in [the] . . . policy should be resolved in favor of the insured." McCostis v. Home Ins. Co., 31 F.3d 110, 113 (2d Cir. 1994).

Morgan Stanley Group Inc. v. New Eng. Ins. Co., 225 F.3d 270, 275-76 (2d Cir. 2000). Thus, where the extrinsic evidence conclusively resolves the ambiguity, "it is not necessary to resort to the rule" of contra proferentem. Am. Com. Lines, LLC v. Water Quality Ins. Syndicate, 2018 WL 6332908, at *14 (S.D.N.Y. Nov. 7, 2018). Nonetheless, "[i]f the court concludes that an insurance policy is ambiguous, then the burden shifts to the insurer to prove that its interpretation is correct: if extrinsic evidence is available but inconclusive, the burden shifts at the trial stage." Morgan Stanley Group Inc. 225 F.3d at 276 (citing Union Ins. Soc'y v. William Gluckin & Co., 353 F.2d 946, 951-52 (2d Cir. 1965)). "[I]n the absence of extrinsic evidence, the burden shifts at the summary judgment stage." Id. (citation omitted).

### 2. Coverage Under Endorsement No. 17

Starr moves for summary judgment on several grounds related to Endorsement No. 17. First, Starr argues that Endorsement No. 17 did not provide automatic coverage of up to $25,000,000 to the German Warehouse because there is no evidence that the German Warehouse met several minimum standards, and because there is no evidence in the record to suggest that

-28-

Brightstar made a required "affirmative representation" to Starr or Gallagher stating that the
minimum standards were satisfied.  Pl. Mem. at 24-25.  Next, Starr argues that it never agreed to
extend coverage to the German Warehouse during the term of Endorsement No. 17, and that
accordingly the German Warehouse was an "unnamed location" under Endorsement No. 17.
See id. at 25-27.  Brightstar responds that during Kevin O'Brien's March 7, 2013, security
assessment trip, he determined that the German Warehouse did meet the Policy's minimum
standards.  Def. Opp. Mem. at 26.  Brightstar also points to the opinions of one of its experts to
suggest that a reasonable jury could conclude that the German Warehouse was covered by the
Policy during the term of Endorsement No. 17.  See id. at 17.  Brightstar also argues that a
reasonable jury could find that the German Warehouse was covered during the term of
Endorsement No. 17 pursuant to what the parties have called an informal "held coverage
agreement."  See id. at 10-11, 35-36.

### a. Automatic Coverage Under Endorsement No. 17

Clause 12 of Endorsement No. 17 of the Policy states: "[a]utomtaic coverage up to
$25,000,000 . . . is provided for new locations upon an affirmative representation of specific
location minimum standards noted below, subject to quarterly statement of values."  Policy at
STARR 15643.  Included in the bullet-point list of minimum standards are the following
requirements:

> • Facility equipped with central station alarm — hot wired to local police and
> alarm company with line security

> • Facility protected by guards 24/7 with call in times to a central station
> every hour — after hours, weekends, and holidays

Id. at STARR 15644.

-29-

As described above in Section I.B, though Brightstar conducted a security assessment of the German Warehouse and produced a report with its findings, there is no evidence in the record that anyone at Brightstar sent this report or otherwise communicated its findings to Starr, either directly or through Gallagher.  The unambiguous language of Clause 12, however, requires that for "[a]utomatic coverage" to attach, there must be an "affirmative representation of specific location minimum standards noted below," i.e., in the listing of "Minimum standards." See Policy at STARR 15643.  Under Endorsement No. 17, making an affirmative representation of compliance was a condition precedent to coverage.  A condition precedent "is an event, not certain to occur, which must occur, unless its non-performance is excused, before performance under a contract becomes due."  See Restatement (Second) of Contracts § 224 (Am. Law Inst. 1981); accord IDT Corp. v. Tyco Grp., 13 N.Y.3d 209, 214 (2009); Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 690 (1995).  While "no particular words are necessary to create a condition, the words 'if' or 'provided,' as well as the phrases 'provided that,' 'on condition that,' 'in the event that' . . . usually connote an intent for a condition rather than a promise."  13 Samuel Williston & Richard A. Lord, Williston on Contracts § 38:16 (4th ed. 1990, updated 2019); accord MHR Capital Partners LP v. Presstek, Inc., 12 N.Y.3d 640, 645 (2009) ("We have recognized that the use of terms such as 'if,' 'unless' and 'until' constitutes 'unmistakable language of condition.'"); Oppenheimer & Co., 86 N.Y.2d at 691.  Here, the Policy gave automatic coverage to "new locations . . . upon an affirmative representation of specific location minimum standards."  That language reflects that the automatic coverage attaches if, and only if, such an affirmative representation is made.

Indeed, Brightstar does not argue that Endorsement No. 17 could be interpreted to provide automatic coverage without an affirmative representation that minimum standards were

met.  Nor does Brightstar argue that any affirmative representation was made.  Rather, Brightstar

simply ignores this requirement and argues that it determined that the German Warehouse met

the minimum standards, see Pl. Opp. Mem. at 39-41, and that Starr cannot deny coverage even if

the German Warehouse did not meet minimum standards for a variety of reasons including

waiver and estoppel, see id. at 45-47, which we address further in Sections III.B.3.a.ii and III.B.4

below.  Because the unambiguous language of Endorsement No. 17's automatic coverage

provision required an affirmative representation of compliance, and there is no evidence of such

a representation in the record, no reasonable jury could find that the German Warehouse was

covered under the automatic coverage provision of Endorsement No. 17 absent the application of

some other doctrine.

  b.  Whether Starr Extended Coverage to the German Warehouse During the Term of
      Endorsement No. 17

Starr argues that Brightstar cannot prove, based on evidence in the record, that Starr ever

assented to provide coverage to the German Warehouse during the term of Endorsement No. 17,

and that Brightstar bears the burden of proving that the Policy was modified to extend coverage

to the German Warehouse.  See Pl. Mem. at 25-26 (citing, inter alia, Shipsview Corp. v. Beeche

Sys. Corp., 125 F.3d 844 (2d Cir. 1997)).  Starr notes that during the term of Endorsement No.

17, covered warehouses were listed in Clause 11 of Endorsement No. 17, and warehouses added

to the Policy during the term of Endorsement No. 17 were invariably included in separate

endorsements to the Policy.  See Pl. Mem. at 25.  The German Warehouse was not included in

either Clause 11 or as a separate endorsement to the Policy.  Though Starr acknowledges that

there was no provision in Endorsement No. 17 or elsewhere in the Policy for adding a new

warehouse location to the Policy, id. at 25, Starr argues that Brightstar and Gallagher understood

that Starr required particular information to add a new warehouse location to the Policy, id. at

27.  This information consisted of the full name, complete address, COPE details, limit required,

and current value of inventory for the new warehouse.  Id.  Starr argues that it had informed

Gallagher of this requirement in July 2012, and that Brightstar had received similar information

from both Gallagher and its prior broker, Marsh, in the past.  Id.  Starr argues that this

information was also required before a warehouse could be covered under the parties informal

"held coverage" agreement, whereby warehouses would be insured before a formal endorsement

to the Policy was issued.  See Pl. Reply Mem. at 8.  While this procedure was not written into the

Policy, Starr argues, in essence, that the parties' communications and course of performance

under the Policy supplemented the Policy to add these requirements.

Brightstar focuses most of its argument in opposition by arguing that a reasonable jury

could find that the German Warehouse was part of the schedule "on file" under Endorsement No.

40 (discussed in Section III.B.3.b below), but also appears to argue that the German Warehouse

was covered under Endorsement No. 17.  Brightstar states that its "expert Michael Fitzgerald,

who has more than forty years of experience in the marine industry . . . , opines that the

Frankfurt Warehouse was insured under the 2012 Starr Policy as a matter of industry standards

and practices and the reasonable expectations of an insured like Brightstar."  Def. Opp. Mem. at

17.  Brightstar also suggests that this Court should find that the warehouse was covered pursuant

to the informal "held coverage" arrangement at some point during the period when Endorsement

No. 17 was in effect, suggesting that the "held coverage" agreement at some point applied to all

of Brightstar's warehouses that were not yet listed in an official endorsement to the Policy.  See

Def. Opp. Mem. at 10-11 (arguing that in 2012, "Starr agreed to insure warehouses before

issuing formal endorsements, and without knowing precisely what warehouses were covered").

To summarize, the parties acknowledge that the German Warehouse was not insured at the inception of Endorsement No. 17, and that there was no method outlined in the Policy for the addition of new warehouses.  See Pl. Mem. at 25; Def. Opp. Mem. at 35.  They also agree that warehouses were added during the term of Endorsement No. 17.  See Pl. Mem. at 25; Def. Opp. Mem. at 35.  In order to determine whether a reasonable jury could find that the German Warehouse was added to the Policy during the term of Endorsement No. 17, this Court must determine what the parties' agreement was relating to the addition of warehouses — in essence to supply the "omitted term" as to the method by which new locations were added.

"When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."  Restatement (Second) of Contracts § 204 (Am. Law Inst. 1981); accord De Graff v. McKesson & Robbins, Inc., 31 N.Y.2d 862, 869 (1972) (quoting this provision of the Restatement and applying the principle to determine a reasonable fee for the compensation of services rendered); see also Haines v. City of New York, 41 N.Y.2d 769, 772 (1977) ("In the absence of an express term fixing the duration of a contract, the courts may inquire into the intent of the parties and supply the missing term if a duration may be fairly and reasonably fixed by the surrounding circumstances and the parties' intent."). "Sometimes it is said that the search is for the term the parties would have agreed to if the question had been brought to their attention."  Restatement (Second) of Contracts § 204, cmt. d (Am. Law Inst. 1981).  "A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct," id. § 223(1), and it "may guide the court in supplying an omitted term," id. cmt. b.  While under New York law "[a]n

-33-

omission . . . in a contract does not constitute an ambiguity," Schmidt v. Magnetic Head Corp.,

97 A.D.2d 151, 157 (2d Dep't 1983), "[t]here is no requirement that an agreement be ambiguous

before evidence of a course of dealing can be shown," Restatement (Second) of Contracts § 223,

cmt. b (Am. Law Inst. 1981).  Course of performance can also be used to fill in gaps in a contract

under New York Law.  See Carol B. v. Sanford B., 54 A.D.3d 653, 654 (1st Dep't 2008) ("The

parties' course of conduct under a contract is persuasive evidence of their agreed intention.");

accord Old Colony Tr. Co. v. City of Omaha, 230 U.S. 100, 118 (1913) ("Generally speaking,

the practical interpretation of a contract by the parties to it for any considerable period of time

before it comes to be the subject of controversy is deemed of great, if not controlling,

influence."); Fed. Ins. Co. v. Americas Ins. Co., 691 N.Y.S.2d 508, 512 (1st Dep't 1999) ("the

parties' course of performance under the contract is considered to be the most persuasive

evidence of the agreed intention of the parties") (internal quotation marks and citation omitted).

Here, both sides acknowledge that while there was no provision in Endorsement No. 17

for adding new warehouses, they did have a practice under which new warehouses could be

added during the term of the endorsement.  Starr argues that "[t]he practice for adding a new

named location was for Brightstar to provide the required information to Gallagher, and

Gallagher would then provide the information to Starr's underwriters for consideration and

approval."  Pl. Mem. at 25.  According to Starr, this "required information" included "full name,

complete address, COPE details, limit required and current value of inventory" for each new

warehouse.  Id. at 27.   Starr would then "confirm its agreement to add a new named location by

issuing an endorsement amending Clause 11 in Endorsement No. 17."  Id. at 25.  Starr also

argues that Gallagher was required to send Starr the required information before a warehouse

could be insured pursuant to the informal "held coverage" arrangement that was in place to cover

warehouses whose coverage was being negotiated before a formal warehouse endorsement was issued.  See Pl. Reply Mem. at 52; see also Factor Dep. at 169.

The evidence in the record of the parties' course of performance under Endorsement No. 17 supports Starr's position.  An email sent from Jeffrey Factor at Starr to Robin Thompson at Gallagher on July 23, 2012, confirms that Starr did in fact state to Gallagher that it required certain information — including "COPE Details" — "[b]efore we can add a location to the schedule."  See Email from Jeffrey Factor to Robin Thompson, dated July 23, 2012 (annexed as Ex. 8 to O'Malley Decl.) (emphasis added).  The record also reflects that Gallagher communicated these requirements to Brightstar during the term of Endorsement No. 17.  Thus, on January 21, 2013, in response to an email from a Brightstar employee asking what information Gallagher would need to provide to obtain coverage for additional retail locations (which were covered under Endorsement No. 17 in addition to warehouses), Lisa Rodriguez at Gallagher responded: "We need the same underwriting information we usually request for all your locations.  You can use the same spreadsheet you have in the past.  This includes: values per location, type of construction, type of security measures, area in meters or square feet at the location, etc."  See Email from Lisa Rodriguez to Enrique Rodriguez, dated Jan. 21, 2013 (annexed as part of Ex. 9 to O'Malley Decl.).  Emails in the record also indicate that Brightstar's previous broker, Marsh, required similar information each time Brightstar sought to add a new warehouse location to the Policy.  See, e.g., Email from Jason Wilson to Dario Guerra, dated June 17, 2011 (annexed as Ex. 6 to O'Malley Decl.) ("Not able to proceed in placing additional cover at this location, until we receive the below requested information.  As of right now, the un-named location limit would apply, per policy terms and conditions.").  Indeed, Brightstar's Kevin O'Brien, who sent the February 20, 2013, email about the German Warehouse, is copied

-35-

on the email chain from Marsh regarding the information required to add a new warehouse to the Policy.  See id.  In the end, there is simply no evidence that any location was ever added to the Policy as a scheduled location without COPE or security information first being supplied.

While it is ultimately not necessary to our decision, we note that Starr is also correct that any requests for changes in coverage under the Policy came from Gallagher, rather than directly from Brightstar.  Other than the February 20, 2013, email from O'Brien — which is at the heart of this dispute — there is no record of any request to Starr to add a location from anyone at Brightstar itself.  Also, during her deposition, Lisa Rodriguez recalled that during the course of the Policy, either she or Robin Thompson would receive information from Brightstar to transmit to Starr, and that "[i]f there was going to be, for example, a change in the coverage required by the information being transmitted, [Brightstar] would probably come to me, so that we could add coverage, tweak coverage."  Videotaped Deposition Testimony of Lisabet Rodriguez, dated Sept. 9, 2016,[9] ("Rodriguez Dep."), at 117-19.  Rodriguez explained that when Brightstar required a change in the scope of its coverage, she "would be talking to Starr and working with them" to configure the specific wording to cover the specific exposure involved.  See id. at 119.  Emails sent from Rodriguez's email address contained a disclaimer below the signature block, which stated: "Please remember that coverage will not be bound, altered or changed bound until confirmation is provided in writing by this office."  See, e.g., Email from Lisa Rodriguez to Michael J. Mahoney et al., dated Oct. 18, 2013 (annexed as Ex. 92A to O'Malley Reply Decl.).  Emails from Robin Thompson's email address contained the disclaimer "Please note that coverage cannot be bound, altered or cancelled via email.  Coverages and changes are effective

---

[9]  Excerpts of the deposition of Lisabet Rodriguez are annexed as Ex. 52 to the O'Malley Decl., Ex. 4 to the Durbin Decl., and as Ex. 201 to the O'Malley Reply Decl.

-36-

once confirmed in writing by the carrier." See, e.g., Exhibits 92 B, C, D and E to O'Malley Reply Decl.

With respect to its position on the "held coverage" arrangement, Brightstar points to a single sentence in Factor's deposition in which he discusses whether there was coverage prior to a formal endorsement being issued. See Def. Opp. Mem. at 11, 17 (citing Factor Dep. at 168-69). The testimony is confusing but appears to refer to the period that occurs "days" or "weeks" "after binding," inasmuch as this is how the question was put to Factor. See Factor Dep. at 167-69.[10] Given that Brightstar points to no other information on what the "held coverage" arrangement meant, or any other practice or written or oral understanding between the parties, we do not believe that a reasonable jury could conclude that Factor's testimony demonstrates the existence of some new or different method of adding a warehouse beyond the repeated practices of the parties just discussed. As already explained, the record shows that Gallagher had conveyed to Brightstar that "values per location, type of construction, type of security measures, area in meters or square feet at the location, etc," was the information necessary for underwriting.

Indeed, it appears that during the term of Endorsement No. 17, Brightstar did its part to follow this protocol with the respect to the German Warehouse by providing the information to Gallagher, but that Gallagher, for whatever reason, failed to forward the information to Starr. See Rodriguez German Warehouse Email. As described in Section I.B above, on March 23, 2013, Enrique Rodriguez at Brightstar forwarded an email with COPE information for the

---

[10]  Factor testified that there was a period when there would be coverage after he was provided with a "location schedule" and before the warehouses were put in the "warehouse endorsement." See id. at 168. He states that a warehouse would be "covered, but we also reserve the right to still look at those locations and you can't just put anything on there. We still have the right to underwrite it." Id. at 169.

German Warehouse to Thompson and others at Gallagher, and stated "Please update accordingly." Id. This request, however, was never transmitted to Starr.

With respect to the "held coverage" arrangement, Brightstar does not point to any evidence in the record to suggest that there was some course of conduct or prior agreement under which it could obtain coverage by directly notifying Starr about a new warehouse without providing COPE details. Thus, the evidence in the record does not support Brightstar's contention that "Starr agreed to insure warehouses before issuing formal endorsements . . . without knowing precisely what warehouses were covered," Def. Opp. Mem. at 10 — that is, that the "held coverage" arrangement covered all warehouses that were ultimately added to the Policy before Starr had basic information or notice of those warehouses.

In support of its position, Brightstar states that "the list of warehouses in the 2012 warehouse endorsement that was ultimately signed and issued by Starr on June 15, 2012, effective March 26, 2012," — that is, those included in Endorsement No. 17 — "is different from the list in the quote Starr sent to AJG on March 9, 2012." Def. Opp. Mem. at 11 (citing Endorsement No. 17 and Email from Jeffrey Factor to Lisa Rodriguez and Robin Thompson, dated Mar. 9, 2012 (annexed as Ex. 3 to Durbin Decl. and originally filed under seal as Ex. 14 to Durbin Decl.). However, as Starr points out in its briefing, see Pl. Reply Mem. at 6-7, several days after Gallagher sent its first email to Starr with an attached schedule of locations, Gallagher sent on a revised schedule of locations, see Email Chain (annexed as Ex. 76 to O'Malley Supp. Reply Decl. and originally filed under seal as Ex. 76 to O'Malley Reply Decl.), which ultimately became the list of locations included in Endorsement No. 17, except that Gallagher and Starr ultimately agreed to omit all locations with values under $500,000, compare Cargo Quote (annexed as part of Ex. 76 to O'Malley Reply Decl.), at STARR 28995-99, with Policy at

-38-

STARR 15640-43.  A look at this entire chain of correspondence shows that while Endorsement

No. 17 was not issued until July 2013, Starr had notice of information for all of the warehouses

included in Clause 11 of Endorsement No. 17 before the endorsement's effective date of March

26, 2012.

        In the end, Brightstar does not point to any course of performance, course of dealing, or

other evidence of interactions between Starr and Brightstar that would allow a jury to find an

agreement under which coverage could be extended to a warehouse under Endorsement No. 17

simply by Brightstar sending an email, such as the O'Brien February 20, 2013, Email, to Starr.

Rather, Brightstar relies on its expert, Michael Fitzgerald, whom they cite as concluding that

"the Frankfurt warehouse was insured under the 2012 Starr Policy as a matter of industry

standards and practices and the reasonable expectations of an insured like Brightstar."  Def. Opp.

Mem. at 17.  In the portion of his report cited by Brightstar, see Expert Report of Michael T.

Fitzgerald, dated Mar. 14, 2018 (annexed as Exs. 15A and 15B to Edwards Decl.) ("Fitzgerald

Report"), at 12, Fitzgerald states this conclusion, but it is not based on any explanation of

industry standards that illuminate the arrangement the parties had reached.  Rather, as

Brightstar's brief concedes, it relies on Fiztgerald's view that, "'[a]s a matter of industry custom

and practice, had Starr complied with its own policy provisions, Brightstar's warehouse location

in Germany would have been scheduled and insured under the Policy starting February 2013.'"

Def. Opp. Mem. at 17 (quoting Fitzgerald Report at 12).  This statement refers to the fact that

Starr never ordered a loss control survey following receipt of O'Brien's February 20, 2013,

email as was contemplated by the new location clause of Endorsement No. 17.  Thus, Fitzgerald

seems to be asserting that this Court should engraft a provision into the Policy which states that

in the event that Starr fails to order a survey upon notification (in any form) of a new location,

then Starr should be responsible for any loss that occurs at that location, because the failure to

formally schedule the location is Starr's fault.  However, Fitzgerald never opines that there is an

industry standard or practice with regard to the failure to perform a site survey when contractual

language contemplates one — let alone one that would govern in the face of the contractual

language here and the previous course of dealing between the parties.

Case law, too, shows the flaw in Brightstar's argument.  To the extent Brightstar argues

that industry custom should supply a term omitted from the contract, "[g]enerally, evidence of

industry custom is probative only if both parties to the pertinent contractual dealings knew or

had reason to know of it."  Ward v. Nat'l Geographic Soc., 208 F. Supp. 2d 429, 438 (S.D.N.Y.

2002) (citing Restatement (Second) of Contracts §§ 19, 220, 221 (Am. Law Inst. 1979)); see also

Restatement (Second) of Contracts § 221 (Am. Law Inst. 1981) ("An agreement is supplemented

or qualified by a reasonable usage with respect to agreements of the same type if each party

knows or has reason to know of the usage and neither party knows or has reason to know that the

other party has an intention inconsistent with the usage.") (emphasis added).  "The more general

and well-established a usage is, the stronger is the inference that a party knew or had reason to

know of it."  Id. cmt. b.  Here, Fitzgerald provides no assertion that there is a "well-established"

custom or usage regarding the failure to conduct a loss control survey.  Instead, he offers

essentially his own view of how this Court should rule based on the parties' dealings.

But all of the evidence concerning the parties' course of performance and course of

dealing shows that in order to begin the process of adding a warehouse to the Policy under

Endorsement No. 17, Gallagher was to forward COPE and other required information from

Brightstar to Starr.  There is no evidence in the record to suggest that prior to or during the

course of Endorsement No. 17, coverage for a new warehouse could be obtained simply by

emailing Starr that Brightstar had a new warehouse.  Indeed, such an interpretation would seem to render Endorsement No. 17's "un-named location" clause — which provided $3 million in coverage for any Brightstar location "without prior approval," see Policy at STARR 15639 — superfluous, and accordingly should be disfavored, see Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.") (internal quotation marks and citations omitted); accord Law Debenture Tr. Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 468 (2d Cir. 2010); Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 86 (2d Cir. 2002); Lawyers' Fund for Client Prot. of State of N.Y. v. Bank Leumi Tr. Co. of New York, 94 N.Y.2d 398, 404 (2000).  Such a term would also be inconsistent with basic principles of insurance contract modification.  See Steven Pitt et al., 2 Couch on Ins. § 25:17 (3d ed., 2019 update) ("A modification which will bind the parties must be based on all the elements required to initially make a binding contract of insurance, and no revision or alteration of an existing contract of insurance can be regarded as effective where the parties have not agreed thereto prior to the loss.").  In fact, Brightstar attempted to follow the process Starr asserts governed with respect to the German Warehouse, but Gallagher inexplicably failed to send the necessary information on to Starr.  Because there is no evidence in the record suggesting that COPE and other required information was sent to Starr during the course of Endorsement No. 17, or that Starr agreed to insure the German Warehouse during the term of Endorsement No. 17, we find that no reasonable jury could find that the German Warehouse was covered by Endorsement No. 17, and that the German Warehouse was accordingly an "unnamed" location during the term of Endorsement No. 17.

       3.  Coverage Under Endorsement No. 40

Starr next moves for summary judgment with respect to several questions related to coverage under Endorsement No. 40.  First, Starr argues that no reasonable jury could find that the German Warehouse qualified for automatic coverage under Endorsement No. 40 because there is no evidence in the record that it met two of the required minimum standards.  Pl. Mem. at 28.  Next, Starr argues that the German Warehouse was not "on the schedule on file" with Starr, but rather was an "unnamed location," and thus was not entitled to $25 million in coverage under the Policy.  Id. at 28-31.

Brightstar opposes Starr's request for summary judgment regarding coverage under Endorsement No. 40 on several grounds.  First, Brightstar argues that there is at least a question of fact as to whether the German Warehouse met the minimum standards based on the conclusions Kevin O'Brien made after conducting his security assessment.  Def. Opp. Mem. at 39-40.  Brightstar also argues that even if the German Warehouse did not meet minimum standards, the Florida "anti-technical" statute would result in coverage because the minimum standards that were purportedly not met would not have increased the hazard of a loss.  See id. at 41.  Brightstar also argues that under a variety of theories, a reasonable jury could find that the German Warehouse was "on file" with Starr at the time of the loss and thus was covered up to $25 million.  Finally, Brightstar argues that even if the German Warehouse did not meet minimum standards and was not "on file" with Starr, Starr should be deemed to have waived these requirements, or should be estopped from arguing that the Warehouse does not qualify for $25 million in coverage, because it failed to order a survey and add the German Warehouse to its schedule despite the February 20, 2013, email from O'Brien.  See id. at 45-46.  We address these arguments next.

a.  Automatic Coverage Under Endorsement No. 40

Endorsement No. 40, which was effective March 26, 2013, contained the following

provision:

> 8.  Notwithstanding anything else stated in the policy or other endorsements
> thereto, the most This Company agrees to pay of a claim made under this
> endorsement are those limits of liability in the schedule below:
>
> . . .
>
> $25,000,000 Limit per occurrence for all newly [sic] locations (maximum 90 days
> to report) if they meet the minimum standards, as stated below.
>
> Upon notification of any new location, Starr Marine will order a loss control
> survey and forward the resulting recommendations for compliance as soon as
> received.
>
> $3,000,000 Limit per occurrence for any unnamed/unscheduled location.

Policy, at STARR 15702.  The minimum standards listed contained a number of requirements,

including security requirements as discussed further below.[11]

---

[11]   The "minimum standards" listed were as follows:

• Building less than 40 years of age;
• Construction Concrete/Brick - construction - non combustible materials or better- We will
propose a standard that broadly encompasses ISO Construction Class 3 as a reasonable,
commercial definition.
• No highly flammable/combustible materials stored at facility;
• Adequate Fire Extinguishers rated against all hazards; - We will propose an ISO or NFPA
standard as a reasonable, commercial definition.
• Brightstar product palletized and segregated in a secured (caged, monitored) area;
• Facility equipped with Central Station Alarm - hot wired to local police and Alarm Company
with line security; We will propose an Underwriters Laboratories standard that is consistent
with its CPVX standard with line integrity as a reasonable, commercial standard.  Certain
mandatory TAPA (Technology Asset Protection Association) requirements cited in the
TAPA FSR 2005, 10 Sept. 04 Final Revision - Section 2 Specifications - Supplier
Facility/Truck Freight Security Requirements:
 • CCTV system, mandatory requirements
 • Access Control, mandatory requirements
 • Facility Dock/Warehouse, mandatory requirements
 • Security Systems, mandatory requirements
 • Security Procedures, mandatory requirements
• Facility protected by guards 24/7 (armed where permitted by law)*with call in times to a
central station every hour - after hours, weekends and holidays;

Thus, unlike in Endorsement No. 17, Endorsement No. 40 contained no requirement that an affirmative representation be made for automatic coverage to attach, but rather only required that the location be "report[ed]" within "90 days" — or, as the clause put it, "maximum 90 days to report."

Starr argues that no evidence in the record suggests that the following two minimum standards were met:

> • Facility equipped with Central Station Alarm - hot wired to local police and Alarm Company with line security

> • Facility protected by guards 24/7 . . . with call in times to a central station every hour - after hours, weekends, and holidays

Pl. Mem. at 28.[12]

Starr argues that meeting the minimum standards was a condition precedent to coverage, and that because the conditions precedent were not met, coverage could not attach.  Pl. Reply Mem. at 55-58.  As previously noted in Section III.B.2.a, a condition precedent "is an event, not certain to occur, which must occur, unless its non-performance is excused, before performance

---

• Submission to AJ Gallagher for review and notification to This Company.

In event that:
 – Brightstar product can not be segregated in a secured area;
 – Facility not protected by armed guards;
 – Facility not protected by Central Station Alarm;

> Then Brightstar will employ two guards (armed where allowed by law) to physically monitor their goods at each specific area or new location (if more than one) 24 hours per day - 7 days per week - guards to be equipped with panic buttons and follow hourly call-in procedures outlined.

Policy, at STARR 15703.

[12]  Neither party briefs the question of whether Brightstar appropriately "reported" the German Warehouse, nor whether there was "notification" to Starr per the minimum standard requiring "[s]ubmission to AJ Gallagher for review and notification to This Company."

-44-

under a contract becomes due."  Restatement (Second) of Contracts § 224 (Am. Law Inst. 1981);

accord Oppenheimer & Co., 86 N.Y.2d at 690 ("A condition precedent is an act or event, other

than a lapse of time, which, unless the condition is excused, must occur before a duty to perform

a promise in the agreement arises.") (internal quotation marks and citations omitted).

"Conditions can be express or implied.  Express conditions are those agreed to and imposed by

the parties themselves," Oppenheimer, 86 N.Y.2d at 690, and "must be literally performed," id.

"In determining whether a particular agreement makes an event a condition[,] courts will

interpret doubtful language as embodying a promise or constructive condition rather than an

express condition."  Id.  However, this interpretive preference cannot be employed where the

language is unmistakably clear, such as when the parties "employ[] the unmistakable language

of condition," using terms such as "if," or "unless and until."  See id. at 691.

> Nonetheless, the nonoccurrence of the condition may yet be excused by waiver,
> breach or forfeiture.  The Restatement posits that "[t]o the extent that the non-
> occurrence of a condition would cause disproportionate forfeiture, a court may
> excuse the non-occurrence of that condition unless its occurrence was a material
> part of the agreed exchange."

 Id. (quoting Restatement (Second) of Contracts § 229).

Here, the automatic coverage provision of Endorsement No. 40 uses "the unmistakable

language of condition," stating "$25,000,000 Limit per occurrence for all newly [sic] locations

(maximum 90 days to report) if they meet the minimum standards, as stated below."  Policy at

STARR 15702 (emphasis added).  Automatic coverage up to $25 million is expressly

conditioned upon the location meeting minimum standards.  Brightstar contends in its briefing

that statements made by Jeffrey Factor during his 30(b)(6) deposition testimony on behalf of

Starr show that compliance with minimum standards was not required for automatic coverage.

See Def. Opp. Mem. at 40.  However, the quote that Brightstar includes in its briefing does not

refer to minimum standards at all.  See id.  Rather, in the quote, Factor states that "the standards of care are not warranties.  They are suggestions, recommendations.  So they would not by themselves void coverage if they were not complied with."  Id. (quoting Videotaped Deposition of Jeffrey Factor on Behalf of Defendants, dated Feb. 22, 2017[13] ("Starr 30(b)(6) Dep."), at 60).  A heading titled "Loss Control Standards of Care (Recommendations)" is included elsewhere in the Policy, see Policy at STARR 15581, and the Policy clearly states that "Coverage is not affected by compliance or lack of compliance with these same 'standards of care.'"  Id. at STARR 15582 (emphasis in original).  These "standards of care" are unrelated to minimum standards in Endorsement No. 40.  Accordingly, unless compliance with the conditions can be excused, to defeat summary judgment Brightstar must point to evidence that would allow a reasonable jury to find that the German Warehouse met the minimum standards.

### i. No Evidence in the Record Suggests That the Two Disputed Minimum Standards Were Met

Starr argues that there is no evidence that the German Warehouse met the following minimum standards:

- Facility equipped with Central Station Alarm – hot wired to local police and Alarm Company with line security

- Facility protected by guards 24/7 . . . with call in times to a central station every hour – after hours, weekends and holidays

See Pl. Mem. at 28; Pl. Reply Mem. at 52-54.  In response, Brightstar points to the security assessment report that Kevin O'Brien of Brightstar produced during his visit to the German Warehouse, O'Brien's deposition testimony, and Brightstar CEO Oscar Fumagali's deposition

---

[13]  Excerpts of the Factor's 30(b)(6) deposition testimony on behalf of Starr are annexed as part of Ex. 10 to the Edwards Decl., Ex. 59 to the O'Malley Opp. Decl., Ex. 3 to the Durbin Decl., and as Ex. 91 to the O'Malley Supp. Reply Decl. (originally filed under seal as Ex. 91 to the O'Malley Reply Decl.).

-46-

testimony, as evidence of the German Warehouse's compliance with minimum standards.  See Def. Opp. Mem. at 39-40.

Brightstar highlights a portion of O'Brien's deposition testimony in which he explains that he would understand the first minimum standard to be satisfied by a security system in which an alarm notifies the alarm company, which in turn notifies law enforcement that the alarm has been triggered.  Def. Opp. Mem. at 40 (citing Videotaped Deposition of Kevin O'Brien, annexed as Ex. 6 to Durbin Decl. and as Ex. 104 to O'Malley Reply Decl.) ("O'Brien Dep."), at 60-63).  However, Brightstar does not point to any portion of O'Brien's deposition testimony in which he states that such a system was in place at the German Warehouse.  Nor does Brightstar point to any provision in the Security Assessment that suggests that the German Warehouse had such a system in place.  Brightstar notes, with respect to the second minimum standard, that the Security Assessment does state that the warehouse "had an onsite 24/7 security guard operation supported by external alarm monitoring."  Def. Opp. Mem. at 40 (citing Security Assessment at 1).  While this is true, Brightstar does not point to any provision in the Security Assessment indicating that the guards at the German Warehouse had "call in times to a central station every hour — after hours, weekends, and holidays," and there is no indication in the Security Assessment that this part of the minimum standard was met.

Brightstar cites a portion of Oscar Fumagali's deposition testimony in which he states that O'Brien specifically determined, during his March 7, 2013, visit, that the German Warehouse complied with the minimum standards in Endorsements Nos. 17 and 40.  See Def. Opp. Mem. at 40 (citing Fumagali Dep. at 207-10, 214-15).  During his deposition testimony, Fumagali affirms that Brightstar's position is that the German Warehouse complied with minimum standards, id. at 207, and states that Brightstar made this determination based on the

-47-

security assessment that O'Brien conducted in March 2013, id. at 208.  In response to the

question of how Brightstar determined that the minimum standards were met, Fumagali testified

that "we are very familiar with the security requirements and standards set by C.V. Starr," as

Brightstar had "been operating with C.V. Starr for a number of years, and with Peter Scrobe."

Id.  In response to the question of whether O'Brien's report represented that the German

Warehouse met minimum standards, Fumagali explained that O'Brien "represented to everyone,

including Arthur Gallagher, and myself, and our operations people, that it did meet the

requirements, and we could start operations there."  Id. at 210.  When asked whether O'Brien

took the minimum standards off the policy and checked off, one by one, whether the German

Warehouse met each of the minimum standards, Fumagali stated that he did not know.  See id. at

213-14.  Fumagali explained that if "Mr. O'Brien, who was a director in the company, and a

professional security person who had significant credibility with [Starr's] Peter Scrobe . . . said

that the location, after his inspection, met the requirements, it met the requirements."  See id. at

214-15.

        In his own deposition testimony, O'Brien states that he never used actual "insurance

binders" — that is, documents containing the minimum standards in the Endorsements — for the

purpose of "security practices."  See O'Brien Dep. at 59.  O'Brien affirmed that it was his job to

ensure that all of Brightstar's warehouses met the "minimum standards of care" contained in the

marine cargo policy, id. at 222, and that he performed this function by visiting warehouses and

ensuring that requirements contained in "the appendixes" and the required "warranties" were

met.  Id. at 223.

        In light of the above, Brightstar has not pointed to any evidence that would allow a

reasonable jury to find that either of the disputed minimum standards were met.  While O'Brien

-48-

testified that it was his job to ensure that Brightstar's warehouses met minimum standards, see O'Brien Dep. at 222, Brightstar does not point to any portion of O'Brien's testimony in which he states that the German Warehouse's alarm system was "hot wired" to law enforcement, or that its guards had "call in times to a central station every hour — after hours, weekends and holidays." Brightstar provides an excerpt of O'Brien's testimony in which he discusses his understanding of the meaning of having a "direct line to a police station," see Def. Opp. Mem. at 40, but does not point to any testimony as to whether O'Brien knew such a system to be in place at the German Warehouse. Fumagali's conclusory statements, unsupported by any personal knowledge, that the German Warehouse met minimum standards are clearly insufficient to support a jury finding that the minimum standards were met. Accordingly, because there is no evidence that these conditions precedent to coverage were satisfied, no reasonable jury could find that coverage attached pursuant to the automatic coverage provision of Endorsement No. 40 unless compliance with these conditions can be deemed to be excused. See Oppenheimer, 86 N.Y.2d at 691 ("the nonoccurrence of the condition may yet be excused by waiver, breach or forfeiture").

### ii.  The Florida Anti-Technical Statute

Brightstar argues that even if the German Warehouse did not comply with minimum standards, Starr is "estopped from denying coverage for the Frankfurt warehouse, even if it was not 'on file' with Starr or even if it did not comply with the minimum standards in the Starr Policy . . . for three independent reasons." Def. Opp. Mem. at 45. One of those "reasons" relates only to compliance with minimum standards, so we consider it in this section. We consider Brightstar's other two arguments (waiver and estoppel) in Section III.B.4.

Brightstar argues that even if the minimum standards were not met, Florida's "anti-

technical" statute, Fla. Stat. § 627.409(2), should prevent Starr from avoiding coverage. <u>See</u> Def. Opp. Mem. at 41, 45. The statute provides, in relevant part: "A breach or violation by the insured of a warranty, condition, or provision of a wet marine or transportation insurance policy, contract of insurance, endorsement, or application does not void the policy or contract, or constitute a defense to a loss thereon, unless such breach or violation increased the hazard by any means within the control of the insured." Fla. Stat. § 627.409(2). "The statute is designed to prevent the insurer from avoiding coverage on a technical omission playing no part in the loss." <u>Pickett v. Woods</u>, 404 So. 2d 1152, 1153 (Fla. 5th Dist. Ct. App. 1981). Assuming <u>arguendo</u> that the Florida statute governs the Policy, the statute does not apply. The statute states that it applies only to insurance policies or contracts involving "wet marine" insurance or "transportation" insurance. <u>See</u> <u>Indep. Fire Ins. Co. v. Paulekas</u>, 633 So. 2d 1111, 1113 (Fla. 3d Dist. App. 1994) ("This statute, by its very terms, only applies to '<u>wet marine</u>' and '<u>transportation</u>' insurance policies.") (emphasis in original); <u>see also</u> Fla. Stat. § 624.607(2)(d) (defining "wet marine and transportation insurance"). Brightstar does not explain how it could be found that the Policy falls into either of these categories.

b.  <u>Whether the German Warehouse Was Part of the "Schedule on File"</u>

Endorsement No. 40 provided a "$25,000,000 Limit per occurrence at all locations as per schedule on file with underwriters, subject to Quarterly Statement of Values Report with actual values in storage at each location." Policy at STARR 15702. Starr argues that no reasonable jury could find that the German Warehouse was part of the "schedule on file" with Starr at the time of the Loss, and accordingly that the Court must find that German Warehouse was, barring any exclusion for the Loss, an "unnamed location" which would entitle Brightstar to only up to $3 million in coverage. Pl. Mem. at 28-31. Starr's position is that the "schedule on file with

-50-

underwriters" referenced in Endorsement No. 40 is the spreadsheet attached to Jeffrey Factor's March 19, 2013, email sent to Gallagher, Pl. Reply Mem. at 34; see Pl. Mem. at 29, Factor March 19, 2013, Email, which could later be amended by additional locations with over $3 million in value sent by Gallagher to Starr with required information, including COPE information, Pl. Mem. at 30.  Starr argues that this spreadsheet was incorporated by reference into the Policy.  See Pl. Reply Mem. at 31-33.  Because the German Warehouse was not on the spreadsheet attached to the March 19, 2013, email, and because Gallagher did not send Starr the required information prior to the Loss and confirm that coverage was bound, Starr argues that the German Warehouse was not part of the "schedule on file" prior to the Loss.  See Pl. Mem. at 28-31.

Brightstar does not directly discuss how it believes this Court should interpret the phrase "schedule on file with underwriters."  Rather, Brightstar advances several theories according to which the German Warehouse could be found to be "on file" with Starr.  Brightstar first contends that a reasonable jury could find that the German Warehouse was "on file" with Starr because Starr made a number of changes in Endorsement No. 40: specifically, Starr no longer required Brightstar's "master spreadsheet" but rather insured all warehouses that were "on file"; Starr did not have to approve the addition of new warehouses to the Policy; and, because the premium charged to Brightstar was based on sales and revenue generated by sales — including sales associated with the German Warehouse —  no additional premium for the German Warehouse was required.  See Def. Opp. Mem. at 33-36.  Second, Brightstar points to its expert reports to argue that the O'Brien February 20, 2013, Email to Scrobe "was sufficient to amend the schedule on file with Starr as a matter of industry custom and practice and the reasonable expectations of insureds like Brightstar."  Id. at 36.  Third, Brightstar argues that Gallagher could

be considered Starr's agent, and accordingly a jury could find that notice to Gallagher can be imputed to Starr.  See id. at 37-38.  Finally, Brightstar argues that a reasonable jury could find that Starr's receipt on November 5, 2013, of Brightstar's updated quarterly SOV, including the German Warehouse, operated to add the German Warehouse to the schedule on file.  Id. at 39.

Brightstar also opposes Starr's application for summary judgment on the question of whether the German Warehouse was an unnamed location, asserting that "[n]o reasonable finder of fact could conclude that the Frankfurt location was an unnamed location."  Id. at 42-43.

We next address these arguments.

i.  The Meaning of the Phrase "Schedule on File With Underwriters"

In order to determine whether the German Warehouse was part of the "schedule on file with underwriters," we must first determine the meaning of that phrase.  To elucidate the meaning of "schedule on file with underwriters" in Endorsement No. 40, we begin by looking at other provisions of the Policy that refer to a "schedule" because "a Court 'may presume that the same words used in different parts of a writing have the same meaning.'"  Eastman Kodak Co. v. Altek Corp., 936 F. Supp. 2d 342, 351 (S.D.N.Y. 2013) (quoting Finest Investments v. Sec. Trust Co. of Rochester, 96 A.D.2d 227, 230 (4th Dep't 1983)); accord Johnson & Johnson v. Guidant Corp., 2014 WL 3728598, at *15 (S.D.N.Y. July 22, 2014) ("[T]he general rule of contract construction presum[es] that words have the same meaning throughout the contract.") (alterations in original) (citations omitted); see generally Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011) ("Ambiguity is determined by looking within the four corners of the document, not to outside sources.") (citation and internal quotation marks omitted).  The lists of all warehouse locations insured under the Policy at the inception of

-52-

Endorsement No. 2 and Endorsement No. 17, which are directly reproduced in those

Endorsements, see Policy at STARR 15606-15, 15640-43, are consistently referred to as

"schedules" of locations throughout the Policy.[14]  See Endorsement No. 7, Policy at STARR

15628 (adding a location to the "schedule of Named locations featured in Endorsement No. 2");

Endorsement No. 8, Policy at STARR 15629 (same); Endorsement No. 9, Policy at STARR

15630 (same); Endorsement No. 10, Policy at STARR 15631 (same); Endorsement No. 11,

Policy at STARR 15632 (same); Endorsement No. 13, Policy at STARR 15634 (same);

Endorsement No. 14, Policy at STARR 15635 (same); Endorsement No 17, cl. 11, Policy at

STARR 14639-43 (referring to a list of warehouse locations comprised of spreadsheet cells

including each location's country, entity name, address, and limit of liability, as "the schedule

below"); Endorsement No. 29, Policy at STARR 15677-80 (amending "Clause No. 11 of the

Warehouse Endorsement attached to this policy" to include the "limits of liability in the schedule

below," and providing of a list of additional warehouse locations); Endorsement No. 30, Policy

at STARR 15681-83 (same); Endorsement No. 31, Policy at STARR 15684-86 (same);

Endorsement No. 32, Policy at STARR 15687-89 (same); Endorsement No. 33, Policy at

STARR 15690-92 (same); Endorsement No. 34, Policy at 15693-95 (same).  Taking these

provisions into account, the only reasonable interpretation of a "schedule on file with

---

[14]   In several other instances, the word "schedule" is used to describe another type of finite list
of items.  See Endorsement No. 40, cl. 8, Policy at STARR 15702 (referring to a list of the
amount of coverage provided to different types of locations as "the schedule below"); see also
Endorsement No. 28, Policy at STARR 15671, 15673 (providing a "vehicle schedule" which is a
bullet-point list providing the types of vehicles that must accompany transit shipments,
depending on the amount of value being transported); Endorsement No. 43, Policy at STARR
15707, 15708-09 (same).  This is consistent with the pertinent dictionary definition of
"schedule."  See Random House Webster's College Dictionary (1999) (def. 4: "a written or
printed statement of details, often in tabular form"); Merriam-Webster Dictionary Online (def. 2:
"a written or printed list, catalog, or inventory").

underwriters" of "all locations" which receive a "$25,000,000 Limit per occurrence," is that the "schedule on file with underwriters" is an exhaustive list of all warehouse locations that are insured above the unnamed/unscheduled location limit under the renewal endorsement, analogous to the schedules actually contained in Endorsement No. 2 and Endorsement No. 17.

Brightstar implicitly argues that the phrase "schedule on file with underwriters" means every location of which Starr had notice, regardless of whether the location was included in a list or simply in the email account of a Starr underwriter.  See Def. Opp. Mem. at 33.  Brightstar argues that the parties' intention to move from insuring specific warehouses listed in schedules to insuring all warehouses that were "on file" — in any manner — with Starr is evidenced by the language of Endorsement 40.  See id.  But this position is unsupportable.  In advancing its position, Brightstar repeatedly ignores the word "schedule," asserting that warehouses that were somehow "on file" with Starr were insured up to a $25 million limit.  See id. at 32-33, 34, 36, 39, 43, 44, 45, 46, 47.  But the clear language of Endorsement No. 40 provided $25 million in coverage for all locations that were part of the "schedule on file" with underwriters.  If the parties had wanted eschew the use of an actual list of warehouse locations, they would not have used the word "schedule," which, as noted above, is used consistently throughout the Policy to refer to an actual list.  Indeed, Brightstar, by ignoring the word "schedule" in its argument, implicitly acknowledges that its argument does not apply if the enhanced coverage in Endorsement No. 40 applies to warehouses on a "schedule."

### ii.  Incorporation by Reference

Though the $25 million limit applied to "all locations as per schedule on file with underwriters, subject to Quarterly Statement of Values Report with actual values in storage at each location," no "schedule" was listed in Endorsement No. 40, as had been the case with

Endorsement No. 2 and Endorsement No. 17.  Nor was a schedule attached to the Policy.  Starr argues that Endorsement No. 40 incorporates by reference a spreadsheet attached to an email sent by Jeffrey Factor to Gallagher on March 19, 2013.  Pl. Reply Mem. at 34.

 "Under New York law, 'a paper referred to in a written instrument and sufficiently described may be made a part of the instrument as if incorporated into the body of it.'" PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1201 (2d Cir. 1996) (citing Jones v. Cunard S.S. Co., 238 A.D. 172, 173 (2d Dep't 1933); accord In re Bd. of Comm'rs of Washington Park, 52 N.Y. 131, 131 (N.Y. 1873).  "At common law, '[i]n order to uphold the validity of terms incorporated by reference it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'"  PaineWebber, 81 F.3d at 1201 (citing Lamb v. Emhart Corp., 47 F.3d 551, 558 (2d Cir. 1995)).  "New York follows that common law rule by 'requir[ing] that the paper to be incorporated into a written instrument by reference must be so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt.'" Id. (citing Chiacchia v. National Westminster Bank USA, 124 A.D. 2d 626, 628 (2d Dep't 1986)) (emphasis omitted).  To incorporate a document by reference, "[n]o particular mode of reference is necessary for that purpose; any language which indicates the intent that the two shall make one instrument, or a physical annexing of the one to the other, in a manner or under circumstances showing clearly such intent, is sufficient."  In re Bd. of Comm'rs, 52 N.Y. at 131.[15]

---

[15]  We note that the law of Florida with respect to incorporation by reference does not differ from that of New York in any material way.  See OBS Co. v. Pace Const. Corp., 558 So. 2d 404, 406 (Fla. 1990) ("It is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing."); BGT Grp., Inc. v. Tradewinds Engine Servs., LLC, 62 So. 3d 1192, 1194 (Fla. 4th Dist. Ct. App. 2011) ("To incorporate by reference a collateral document, the incorporating document must (1) specifically provide that it is subject to

Here, the text of Endorsement No. 40 clearly indicates the parties' intent to incorporate the "schedule on file with underwriters" of "all locations" that are to receive the $25 million limit into the Policy.  As discussed above, it is clear that Endorsement No. 40 is referencing in particular a comprehensive list of all warehouses above the named location limit, analogous to those schedules contained in Clause 12 of Endorsement No. 2 and Clause 11 of Endorsement No. 17.  Brightstar offers no comprehensive list of warehouses that could qualify as the "schedule on file" that is unmistakably incorporated by Endorsement No. 40.

For its part, Starr has offered the only document that could qualify as the "schedule on file" — that is, the spreadsheet attached to Factor's March 19, 2013, email.  In other words, this is not a case where there are "multiple" candidates for the document referenced as the "schedule on file."  See Laureate Educ., Inc. v. Ins. Co. of the State of Pennsylvania, 2014 WL 1345888, at *7 (S.D.N.Y. Mar. 31, 2014).  Rather, there is only one candidate.  Thus, and as was true in Laureate Educ., Inc., 2014 WL 1345888, we conclude that this one candidate is the "schedule on file" unmistakably referenced in Endorsement No. 40.  See also McDermott v. Great Am. All. Ins. Co., 2005 WL 2437020, at *3 (N.D.N.Y. Sept. 30, 2005) (finding that phrase "[a]s per Statement of Values on file" incorporated by reference a particular statement of values); see also Warwick Corp. v. Turetsky, 227 So. 3d 621,623 (Fla. 4th Dist. Ct. App. 2017) (finding that phrase in insurance contract that read "100% of the individually stated value for each scheduled item of property insured at the location which had the loss as shown on the latest Statement of

_____

the incorporated [collateral] document and (2) the collateral document to be incorporated must be sufficiently described or referred to in the incorporating agreement so that the intent of the parties may be ascertained.") (internal quotation marks and citations omitted).

-56-

Values on file with this Company" incorporated by reference a document titled "Property Spreadsheet," where "the agents, brokers, and [insurer] all agreed the spreadsheet was a statement of values").[16]

It is undisputed that the German Warehouse was not included in the spreadsheet that was attached to Factor's March 19, 2013, Email.  Accordingly, unless Brightstar can show that the German Warehouse was added in some manner as a location covered by the $25 million clause at a later date or in some other manner agreed to by the parties, the German Warehouse cannot come within the term "schedule on file."

The language of Endorsement No. 40 (and the Cargo Binder) did not describe a mechanism for adding new locations.  Nonetheless, it contemplated adding such locations as reflected in two clauses:

> $25,000,000 Limit per occurrence for all newly [sic] locations (maximum 90 days to report) if they meet the minimum standards, as stated below.

> Upon notification of any new location, Starr Marine will order a loss control survey and forward the resulting recommendations for compliance as soon as received.

Policy at STARR 15702.  We next turn to the question of whether the German Warehouse was added to the Policy pursuant to whatever mechanism was agreed to by the parties for adding new locations under Endorsement No. 40.

> iii.  Whether the German Warehouse Was Added to the Policy Under Endorsement No. 40

---

[16]  Because the phrase "schedule on file with underwriters" is not ambiguous and incorporates the spreadsheet annexed to Factor's March 19, 2013, email by reference, we do not look to extrinsic evidence.  We note, though, that the text of the Factor March 19, 2013, Email and Gallagher's follow-up emails confirm our finding.  Factor's email describes the attached spreadsheet as a "schedule" of "[a]ll locations currently listed" that will have a "$25M limit," which would be covered by the agreed-upon flat warehouse premium.  See Factor March 19, 2013, Email.

The evidence is uncontroverted that, following the issuance of the Cargo Binder in March 2013, Brightstar continued to seek to add locations by providing certain required information to Gallagher, incluing "COPE" information, which Gallagher would then transmit to Starr for approval, and which Starr would then approve along with stating a revised premium amount based on the addition of the new location. This was essentially the same process that had occurred with previous policy periods, see infra Section III.B.2.b, except that under Endorsement No. 40, no new endorsement was generated.

For example, in a series of emails, several warehouses in Sri Lanka were added to the Policy while Endorsement No. 40 was in effect. Brightstar first sent an Excel file containing information, including COPE information, and the amount in value for the new warehouse to Gallagher, and stated that additional contact information was needed for Starr to arrange an inspection would be sent as well. See Email from Mauricio Cabello to Robin Thompson and Jessica Azucena, dated Sept. 9, 2013 (annexed as part of Ex. 23A to O'Malley Decl.). Gallagher then forwarded the information to Factor at Starr. See Email from Robin Thompson to Jeffrey Factor, dated Sept. 9, 2013 (annexed as part of Ex. 23A to O'Malley Decl.). The following day, Brightstar sent an updated spreadsheet for the Sri Lankan warehouse to Gallagher, see Email from Mauricio Cabello to Robin Thompson and Jessica Azucena, dated Sept. 10, 2013 (annexed as part of Ex. 23B to O'Malley Decl.), which Thompson at Gallagher then forwarded to Factor at Starr, along with contact information for an individual who would help arrange for a visit and inspection of the new location, see Email from Robin Thompson to Jeffrey Factor, dated Sept. 10, 2013 (annexed as part of Ex. 23B to O'Malley Decl.). In response to these emails, Factor stated "we can agree to add this location subject to a flat additional premium of $2,034 subject to all terms and conditions of the policy. Please confirm if we should bind coverage." Email from

-58-

Jeffrey Factor to Robin Thompson, dated Sept. 10, 2013 (annexed as part of Ex. 23B to

O'Malley Decl.).  After several emails back-and-forth with Brightstar confirming that coverage

should be bound, Thompson asked Factor to "[p]lease process endorsement/invoice for Sri

Lanka."  Email from Robin Thompson to Jeffrey Factor, dated Sept. 12, 2013 (annexed as part of

Ex. 23B to O'Malley Decl.).  In response, Factor reminded Thompson that "[f]or warehouse

additions, there is no need to endorse the policy."  Email from Jeffrey Factor to Robin

Thompson, dated Sept. 16, 2013 (annexed as part of Ex. 23B to O'Malley Decl.).  He explained

that "[l]ike Venezuela, we have an agreed rate for new locations and they receive the policy

limit."  Id.  He then provided a list of "additional premiums booked for the current year," which

included the name of several additional warehouses, the date on which coverage had been bound,

and the additional premium paid.  See id.  He asked Thompson to let him know if any locations

were missing.  See id.

    The record contains emails showing that the parties followed the same procedure for

adding warehouses in Argentina, South Africa, and Dubai during the period of Endorsement No.

40.  See Email from Robin Thompson to Jeffrey Factor, dated Sept. 10, 2013 (annexed as Ex.

24A to O'Malley Decl.) (sending on COPE information for Argentinian warehouses and asking

him to "process endorsement" and to send an invoice for additional premium for another

Argentinian location located at "155 Mosconi"); Email from Robin Thompson to Jeffrey Factor,

dated Aug. 13, 2013 (annexed as Ex. 24B to O'Malley Decl.) (forwarding COPE and other

information from Brightstar to Starr for two new warehouse locations in Argentina "to be added

to the policy effective today"); see also Email from Jessica Azucena to Jeffrey Factor, dated Oct.

11, 2013 (annexed as Ex. 28 to O'Malley Decl.) (email chain between Starr and Gallagher in

which Starr charges additional premium, per Gallagher's request, for a warehouse in Dubai

whose value in storage recently had surpassed the unnamed location limit of $3 million).  To give another example, in October 2013, there is an email chain in which Brightstar sends a spreadsheet with COPE and other information for two new warehouses in South Africa to Gallagher, who then sends the information to Factor at Starr.  See Email from Jessica Azucena to Jeffrey Factor, dated Sept. 30, 2013 (annexed as part of Ex. 26B to O'Malley Decl.).  Factor then asks series of questions about the locations which Gallagher answers, Factor and Gallagher discuss an inspection of the warehouse, and Factor states that he will order the inspection after Gallagher confirms that Starr can insure the location for additional premium of $2,330, which Gallagher confirms.  Email from Jessica Azucena to Jeffrey Factor, dated Oct. 3, 2013 (annexed as part of Ex. 26B to O'Malley Decl.).

        The parties' course of performance consistently shows that to add a new warehouse location to the Policy, Brightstar would supply information for the new location, including COPE information, to Gallagher, who would then forward the information to Starr, and Starr would then verify with Gallagher that Brightstar wanted coverage to be "bound" for a certain additional premium.  See generally Carol B, 54 A.D.3d at 654 ("The parties' course of conduct under a contract is persuasive evidence of their agreed intention.").  Brightstar points to nothing that suggests that the parties followed any other process for adding locations during this period.  And Brightstar does not suggest that it followed this process (or anything remotely resembling it) for the German Warehouse during the Endorsement No. 40 period.  Certainly, Starr never had an exchange in which it informed Brightstar or Gallagher of the additional premium for the German Warehouse and never confirmed with Brightstar or Gallagher that coverage would be "bound."

Brightstar's position is that the move to insuring all locations "as per schedule on file with underwriters" rather than listing each insured warehouse in an actual schedule, in the Policy was a "significant and dispositive change" that resulted in the German Warehouse being part of the "schedule on file" at the inception of Endorsement No. 40.  See Def. Opp. Mem. at 33.  In essence, Brightstar's argument is that while under Endorsement No. 17 the only "scheduled" locations were those locations actually listed in the Policy (or insured pursuant to the "held coverage" agreement before a formal endorsement was issued), under Endorsement No. 40 all locations of which Starr had any notice were considered scheduled locations because they were in some sense "on file" with Starr.  See id.  Brightstar thus attempts to argue that the German Warehouse was "on file" with Starr because the warehouse had been referenced in the O'Brien February 20, 2013, Email.

It is of course telling that Brightstar repeatedly makes the argument that the German Warehouse was "on file," see, e.g., Def. Opp. Mem. at 7, 17, 19-20, 26, 32-33, 43, without referring to the actual language of Endorsement No. 40 itself, which is "schedule on file." Using the more amorphous —  and ultimately irrelevant — concept of whether the German Warehouse was somehow "on file," Brightstar points to several different types of extrinsic evidence to support its position.  In its most simplistic argument, Brightstar argues that the German Warehouse was "on file" with Starr, because Factor at one point in his deposition stated that Starr sometimes kept hard copies of emails "filed in the file" for a particular account.  See Def. Opp. Mem. at 33 (citing Factor Dep. at 66).  Specifically, Starr kept hard copy binders for each client account, which included six sections, one of which would contain emails.  See Factor Dep. at 66.  Factor also testified that Starr maintained an electronic file for each client which would contain "relevant documents, like the quotes and the binders," as well as ratings contained

in Excel spreadsheets.  See id. at 67.  Factor explained that he would usually just file emails in relevant folders in his email system, rather than include them in his electronic or paper file for each client.  See id. at 67-68.  This portion of Factor's deposition testimony makes no reference to any "schedule on file."  Rather, Factor appears to be explaining Starr's filing system for organizing various documents related to client accounts, as well as his personal method of organizing his emails.  No reasonable jury could find this deposition testimony to provide any support for Brightstar's contention that because of this practice, the O'Brien February 20, 2013, Email constituted part of "the schedule on file with underwriters."

 Brightstar tries to counter the evidence regarding the consistent practice of how new locations were added to the Policy under Endorsement 40 by arguing that the email exchange concerning the addition of the Sri Lankan warehouses "do[es] not support [Starr's] contention that any 'approval' was required after Starr was notified of new locations in 2013."  Def. Opp. Mem. at 34.  Brightstar implies that an email from Gallagher to Starr stating "Attached please find information on new warehouses in Sri Lanka for your file" shows that notification was enough to bind coverage.  See id.  Brightstar also points out that while Gallagher's email referred to an "endorsement/invoice," no endorsement for Sri Lanka was made to the Policy.  See id.  Similarly, Brightstar references Factor's email in which he states that "[f]or warehouse additions, there is no need to endorse the policy," and instructs Gallagher to ensure that the new locations are included in the next quarterly SOV.  See id.  These arguments, however, ignore the fact that, as described above, the email chain includes COPE information for the new locations, includes an email from Factor quoting additional premium of $2,034 for the locations and asking Gallagher to "confirm if [Starr] should bind coverage, and includes an email from Factor providing a finite list of new locations, with corresponding dates of coverage and additional

premium charged.  The lack of any need to "endorse" the policy is simply Factor reminding

Thompson that Endorsement No. 40 did not contemplate a need to issue a formal endorsement.

No reasonable jury could find this email exchange to indicate that Starr's approval was no longer

required for new locations.

In support of its contention that the German Warehouse was part of the "schedule on file"

with Starr, Brightstar also argues that premium was paid for the German Warehouse.  See Def.

Opp. Mem. at 34.  Brightstar points to deposition testimony of Gallagher's Lisa Rodriguez, in

which she states that "the premium was rated 100 percent based on sales," see id. at 12 (citing

Rodriguez Dep. at 170), and notes that "in 2013, those sales included sales for Germany

associated with the Frankfurt Warehouse," id.  There is certainly some confusion as to what

degree Brightstar's total sales figured into the premium that was charged at the time of the

renewal in 2013.  In her deposition testimony, Rodriguez explains that "the policy has

traditionally been rated 100 percent based on sales and not on exposures at risk in warehouses."

Rodriguez Dep. at 170.  However, Rodriguez explained that before the 2013 adjustment, Starr

"took the rate that they had provided, which is the same rate that the policy had from its

inception, and they split the rate and backed into a flat premium for the static" — that, is for the

warehouses.  See id. at 170-71.  Rodriguez ultimately testified that the premium rate for 2013

was based on the "rate that [Starr] had provided, which [was] the same rate the policy had from

its inception," and that rate was used to "back[] into a flat premium for the static."  See id.  This

is consistent with Factor's deposition testimony and the report of Brightstar's expert Jeffrey

Posner, which both state that the premium for the 2013 adjustment was based largely on what

Brightstar was willing to pay.  See Factor Dep. at 269-70 (stating that "[w]e basically knew from

the broker, what Brightstar was willing to pay," and explaining how Starr considered the amount

-63-

of value in storage to arrive at a premium number for warehouses that was "commensurate with the risk" that Brightstar would be willing to pay, and noting that sales were used to calculate the transit premium); Expert Report of Jeffrey M. Posner, dated Mar. 14, 2018, annexed as Ex. 25 to Durbin Decl. ("Posner Report"), at 8 ("Starr [did not] use any statement of values to calculate the 2013 policy year.  The underwriter, Jeffrey Factor, testified that the premium was based on his discussions with AJG regarding what premium would be acceptable to Brightstar.").  In his March 19, 2013, email, Factor states that "we can agree to a FLAT warehouse premium of $1,750,000," for "[a]ll locations currently listed" in the annexed spreadsheet, which did not include the German Warehouse.  Factor March 19, 2013, Email.  In the end, Brightstar has not pointed to evidence that would allow a jury to find that the premium actually would have been less had sales from the German Warehouse not been included in information provided to Starr.

In any event, this issue is a red herring for two reasons.  First, even if revenue from the German Warehouse had been included in the calculation of the premium, this would be consistent with the fact that the German Warehouse was still covered under the Policy as an unnamed location and would not prove that it was part of the "schedule on file."  Second, when new locations were added during the Endorsement No. 40 period through the process already described, an additional premium was always charged.  See Rodriguez Dep. at 173 (answering "[y]es" to the question "[i]sn't it also true that if any new warehouses were added after the inception of the 2013-2014 policy, there would be an additional premium charged?"); see, e.g., Email from Jeffrey Factor to Jessica Azucena, dated Oct. 11, 2013 (annexed as part of Ex. 28 to O'Malley Decl.).  That Gallagher was well aware of this was further demonstrated by the fact that Gallagher sought to pay additional premium retroactively to cover the German Warehouse after the Loss occurred.  See Rodriguez Nov. 20, 2013, Email.

-64-

Brightstar also points to the reports of its experts, who opine that the German Warehouse was added to the schedule on file prior to the loss.  See Def. Opp. Mem. at 36 (citing Posner Report at 9; Expert Witness Report of Douglas D Parks, annexed as Ex. 14 to Edwards Decl. ("Parks Report"), at 9; Fitzgerald Report, at 13).  An expert cannot simply testify, however, as to his or her interpretation of a contract.  See, e.g., Sigmon for Hindin v. Goldman Sachs Mortg. Co., 2018 WL 1517189, at *4 n.4 (S.D.N.Y. Mar. 26, 2018) ("[I]t is well-settled that contract interpretation is not a proper subject of expert testimony.").  The reports of Douglas Parks and Michael Fitzgerald however, essentially consist of the experts' own views on the interpretation of the contract, and thus they could not assist any finder of fact in addressing any issues in this case.  See Parks Report at 9 (stating that "Brightstar's February 20 notification of the new Getgoods location effectively amended Starr's schedule on file even if Starr elected to not actually endorse the policy," and concluding that "[b]ecause the Getgoods location formed part of the named warehouse schedule at the conclusion of the March 26, 2012-13 policy period, the Getgoods warehouse was included in the schedule on file for the March 26, 2013-13 policy period with a $25,000,000 limit"); Fitzgerald Report at 13-14 (stating that "[i]t is my further opinion that the Germany warehouse was part of the 'schedule on file with underwriters' under Endorsement No. 40," recounting the facts of the parties' and Gallagher's communications at the warehouse, but not providing further explanation for his opinion).

Certainly, an expert is permitted to testify about the "custom and usage" of terms in a particular industry.  Restivo v. Hessemann, 846 F.3d 547, 580 (2d Cir. 2017), cert. denied, 138 S. Ct. 644 (2018).  However,

> [u]nder New York law, evidence of custom and usage must establish that (1) the term in question has a fixed and invariable usage and (2) that the party sought to

be bound was aware of the custom, or that the custom's existence was so
notorious that it should have been aware of it.

SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC, 467 F.3d 107, 134 (2d Cir. 2006)

(quotation marks and citation omitted).  "The trade usage must be so well settled, so uniformly

acted upon, and so long continued as to raise a fair presumption that it was known to both

contracting parties and that they contracted in reference thereto."  Id. at 84 (quotation marks and

citation omitted).  "The burden of proving a trade usage has generally been placed on the party

benefitting from its existence."  Id. (quotation marks and citation omitted).

Of the three expert reports submitted by Brightstar, only the report of Jeffrey M. Posner

purports to speak to the meaning of the phrase "schedule on file" with respect to the customs of

the insurance industry.  In his report, Posner explains that

> [t]he phrase "schedule on file with underwriters" is used frequently in first party
> insurance policies, such as property insurance policies and marine cargo
> insurance policies.  Insurance companies use the phrase "statement of values on
> file with underwriters" to convey the same concept — that the insurer has been
> provided with notice of the locations to be insured.

Posner Report at 7-8.  While stating that the term conveys the "concept" that an insurer has been

provided notice of a location, Posner nowhere suggests that the term "schedule on file with

underwriters" has a "fixed and invariable meaning" or is "notorious" in the industry and thus

applies to its usage in any contract.  Instead he talks about how the phrase is used "frequently" in

a certain manner.  Id.  This is insufficient to allow a trier of fact to conclude that the phrase

"schedule on file" had such a meaning that would require the finder of fact to ignore the

evidence in the record as to its meaning in Endorsement No. 40.  Posner goes on to speak

vaguely of "custom, practices, and/or standards" of the insurance industry regarding notification

of a new location, see id. at 9, but without providing specifics as to their prevalence or

-66-

application, let alone their invariability or notoriousness.  For example, with respect to amending

the "schedule on file with underwriters," Posner talks in vague terms about what a policyholder

will "typically" do to notify an underwriter of additions, deletions, or material changes in values

at locations.  See id.  Ultimately, even Posner concludes as follows:

> When notifying an underwriter of changes during the course of the year, a
> policyholder may not actually change the initial or current statement of values (or
> schedule depending upon how one refers to it) but may do it by sending an email,
> which includes the required information such as the location address, the
> estimated values and possibly COPE information if that is required.

Id. (emphasis added).  In other words, Posner does not provide support for Brightstar's

contention that the "schedule on file" necessarily means every warehouse of which an insurer

has any notice irrespective of the terms of the policy.  Rather, his report suggests that the

"schedule on file" generally constitutes a list that is updated when the insured provides "required

information" about new locations to the underwriter during the term of the Policy.  Neither in

this paragraph or elsewhere in his report does Posner qualify his statement about the need for the

insured to provide "required" information to update the initial schedule on file.  He also does not

grapple at all with whether any custom and practice would still apply where the insurer requires

the insured to verify the completeness of a schedule prior to binding coverage and no change is

made to that schedule.  Nor does he address the situation where a consistent course of

performance was undertaken to add new locations.  In the end, a reasonable jury could not use

Posner's report to find that the "schedule on file with underwriters" means any warehouse of

which Starr was given notice.

Brightstar also argues that Gallagher is Starr's agent, and accordingly Gallagher's receipt

of the required information for the German Warehouse in March 2013 should be imputed to

Starr.  See Def. Opp. Mem. at 36-38.  As noted, Brightstar in fact forwarded the required

information for the German Warehouse to Gallagher in March 2013, see Rodriguez German

Warehouse Email; Email from Robin Thompson to Kevin O'Brien, dated Feb. 26, 2013

(annexed as Ex. 9 to Durbin Supp. Decl. and originally filed under seal as Ex. 34 to Durbin

Decl.) (email from Thompson at Gallagher to O'Brien at Brightstar attaching a spreadsheet that

included the German Warehouse, with a maximum expected value of $40 million and certain

COPE information), but Gallagher failed to transmit it to Starr.[17]

      Brightstar points to authority stating that an insurance broker "may act in the dual

capacity of broker for the insured and agent for the insurer." Id. at 37 (citing, inter alia,

Restatement (Third) of Agency § 3.14, cmt. c (Am. Law Inst. 2006)).  Under New York law,

"[i]t is well-settled that the principal is bound by notice to or knowledge of his agent in all

matters within the scope of his agency although in fact the information may never actually have

been communicated to the principal."  Farr v. Newman, 14 N.Y.2d 183, 187 (1964) (citations

omitted).  But an insurance broker "is normally the agent of the insured and notice to the

ordinary insurance broker is not notice to the liability carrier."  Sec. Mut. Ins. Co. of New York

v. Acker-Fitzsimons Corp., 31 N.Y.2d 436, 442 n.3 (1972) (citations omitted).  "Notice to the

broker will constitute such notice, however, if it is established that the broker was acting as the

carrier's agent."  Bennion v. Allstate Ins. Co., 284 A.D.2d 924, 925 (4th Dep't 2001).  "To

establish that the broker was acting as the insurer's agent, '[t]here must be evidence of some

_____

[17]   In this section of its brief, Brightstar seems to argue that there is some significance to the fact
that Factor had previously told Gallagher in January 2013 that a particular master schedule that
included COPE information as to certain warehouses (though not the German warehouse) was
"NOT what we are looking for."  See Def. Opp. Mem. at 38 (citing, inter alia, Email from
Jeffrey Factor to Lisa Rodriguez, dated Jan. 16, 2013 (annexed Ex. 36 to Durbin Decl.)).  This
statement, however, cannot possibly be read as a direction not to provide any information
(including COPE information) required as to the German Warehouse.  Rather, reading the email
in context, it is clear that Factor was explaining the format and information that Starr was
requesting for Brightstar's quarterly statement of values, not for the addition of a new location.

action on the insurer's part, or facts from which a general authority to represent the insurer may be inferred.'" Id. (citing Kamyr, Inc. v. St. Paul Surplus Lines Ins. Co., 152 A.D.2d 62, 66 (3d Dep't 1989) (internal citation omitted)).

Brightstar does not marshal any evidence of action on Starr's part or any other facts that would show that Gallagher ever acted as Starr's agent.  Rather, Brightstar asserts only that "[i]n complex cases, such as this one, the question of when the broker may be acting as an agent of the insurance company versus the insured may be a question of fact."  Def. Opp. Mem. at 37-38. But a party opposing a motion for summary judgment "must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co., Ltd., 475 U.S. at 587 (emphasis in original) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto, 143 F.3d at 114.  Here, Brightstar has not pointed to any "concrete evidence from which a reasonable juror could" find that Gallagher was acting as Starr's agent.  Anderson, 477 U.S. at 256.

Brightstar also argues that even if the O'Brien February 20, 2013, Email to Scrobe did not result in the German Warehouse becoming part of the "schedule on file" at the beginning of Endorsement No. 40's period, it was added to the "schedule on file" before the Loss when Gallagher sent Starr an updated SOV on November 5, 2013.  Def. Opp. Mem. at 39.  However, Brightstar does not point to any evidence to suggest that the parties had agreed that updating the SOV with a new location, without first providing the required security and other information and paying additional premium to Starr, would be sufficient to add a new warehouse to the schedule on file.

In sum, the phrase "schedule on file with underwriters" cannot be interpreted to mean all of the warehouses of which Starr had any notice, without the need for Starr to approve those

warehouses.  Such an interpretation would render the "unnamed location" provision of

Endorsement No. 40 superfluous, and, as Starr points out, see Pl. Mem. at 26, is contrary to basic

principles of contract modification, see Steven Pitt et al., 2 Couch on Ins. § 25:17 (3d ed., 2019

update) ("[N]o revision or alteration of an existing contract of insurance can be regarded as

effective where the parties have not agreed thereto prior to the loss."); see also id. § 25:19

("Silence on the part of the insurer's agent in response to the insured's request cannot be

construed as an expression of intention to modify the terms of the policy, especially where future

conversations are contemplated.").  Rather, the term "schedule on file with underwriters"

consists only of those warehouses contained in the spreadsheet attached to Factor's March 19,

2013, email, as updated by additional warehouses that Starr agreed to insure after receiving

required information from Gallagher and charging additional premium.  The parties' course of

performance under Endorsement No. 40, evidenced by numerous emails, shows a consistent

practice for adding new warehouses to the schedule, which was not followed for the German

Warehouse.  Accordingly, we grant summary judgment to Starr on this issue, holding that the

German Warehouse was not part of the "schedule on file" under Endorsement No. 40 and was

not otherwise added by the terms of Endorsement No. 40 to the "schedule on file."

      c.  The German Warehouse Was an Unnamed Location Under Endorsement
          No. 40

      Starr seeks a ruling that because the German Warehouse was not on "the 'schedule on

file' with Starr," it was "an unnamed location with a $3 million limit of liability, subject to

applicable exclusions" under Endorsement No. 40.  Pl. Mem. at 31.  Brightstar argues that "[n]o

reasonable finder of fact could conclude that the Frankfurt location was an unnamed location,"

given the notice that O'Brien provided to Starr in the O'Brien February 20, 2013, Email.  See

Def. Opp. Mem. at 42.  For the reasons discussed above in Section III.B.3.b.iii, we have already ruled that the O'Brien February 20, 2013, Email did not cause the German Warehouse to be included in the "schedule on file with underwriters."  Brightstar makes no argument that a location not included on the "schedule on file" would be anything other than an "unnamed" location.  Thus, Starr's motion is granted on this question.

### 4.  Waiver and Estoppel

Brightstar argues that Starr should be "estoped from denying coverage for the Frankfurt warehouse, even if it was not 'on file' with Starr or even if it did not comply with the minimum standards in the Starr Policy."[18]  Def. Opp. Mem. at 45.  Elsewhere in its briefing, Brightstar also implies that Factor and Scrobe's silence in response to Kevin O'Brien's February 20, 2013, Email could be a proper basis for waiver, estoppel, or agreement to insure the warehouse.  Def. Opp. Mem. at 35-36.  Essentially, Brightstar argues that Factor's failure to order a survey or otherwise follow up on the Scrobe February 20, 2013, Email should waive the requirements that the warehouse be part of the "schedule on file" or comply with the minimum standards, or should otherwise estop Starr from denying full coverage for the German Warehouse.  Brightstar argues that when Scrobe sent this email, he "made clear that [Brightsar] expected coverage for the location by providing an address for the specific purpose of Starr's 'site survey.'"  Id. at 45. Brightstar also argues that "Starr had the opportunity (and indeed the obligation) to survey the warehouse and notify Brightstar of any concerns before Brightstar began storing goods in the warehouse so Brightstar could ensure that it had coverage."  Id.  Because Factor chose not to order a survey, Brightstar maintains that "Starr waived any objection it had to the warehouse,

---

[18]  One of Brightstar's three arguments relates to the Florida anti-technical statute, which we have already ruled on in Section III.B.3.a.ii, above.

including any failure of the warehouse to comply with any of the minimum standards set forth in the Starr Policy." Id. at 46.

a. Waiver

"Waiver and estoppel are distinct in New York insurance law." Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 95 (2d Cir. 2002). "Waiver is the 'voluntary and intentional relinquishment of a known right.'" Id. (quoting Albert J. Schiff Assocs., Inc. v. Flack, 51 N.Y.2d 692, 698 (1980)). Generally, "where the issue is the existence or nonexistence of coverage (e.g., the insuring clause and exclusions), the doctrine of waiver is simply inapplicable." Albert J. Schiff Assocs., Inc., 51 N.Y.2d at 698-99 (internal citations omitted). This is because "for the insured to extend its coverage to more than it originally bargained, it would have had to enter into a supplemental contract expanding the insuring clause or contracting the exceptions." Id. at 698. "[T]his extension of coverage cannot be attained by waiver, which is a voluntary and intentional relinquishment of a known right." Id.

The dispute here arises from the provision in Endorsement No. 40 stating "[u]pon notification of any new location, Starr Marine will order a loss control survey and forward the resulting recommendations for compliance as soon as received." Policy at STARR 15702. Brightstar contends that this provision obligated Factor to order a survey of the German Warehouse upon receipt of the Scrobe February 20, 2013, Email, and that his failure to do so resulted in a waiver, see Def. Opp. Mem. at 45-46, while Starr argues that it did not conduct the survey because it was given insufficient information about the German Warehouse by Brightstar, see Pl. Reply Mem. at 64. Regardless of whether that provision created an obligation to conduct a survey, failure to comply could not constitute a waiver of any policy requirements under New York law. Factor's lack of a response to the February 20, 2013, email, including any failure to

-72-

conduct a survey, cannot be construed to be a "voluntary and intentional relinquishment" of Starr's right to either have the German Warehouse comply with minimum standards or to review underwriting information before agreeing to extend coverage to the Warehouse.

The two cases cited by Brightstar for the proposition that "conditions to coverage may be waived by the conduct of an insurer," Def. Opp. Mem. at 45, provide no support for its waiver argument. In Morrisania Towers Hous. Co. P'ship v. Lexington Ins. Co., 104 A.D.3d 591 (1st Dep't 2013), waiver was found where the insurer, despite having all the information it needed to disclaim coverage based on a late notice from the insured, failed to issue a disclaimer letter until thirteen months later and "offered no justification for the delay." Id. at 592. In Morrisania there was no dispute about whether the insurer had agreed to insure the risk at issue; the insurer simply waived its ability to object to the lateness of the insurded's notice of claim by failing to timely make its objection. In Reddick v. Globe Life & Acc. Ins. Co., 596 So. 2d 435 (Fla. 1992), the Supreme Court of Florida found that a letter issued by a life insurance company to an insured extended coverage under a policy until a later date than was originally covered under the policy. Id. at 437. While the policy, by its terms, should have expired by January 1, 1989, the insurer sent a letter on January 5, 1989, urging the insured to "PLEASE ACT NOW!" because her life insurance policy was "in danger of lapsing," and informing her that if she sent in her payment and notice, "the benefits of [her] policy [would] remain in full force" so long as the payment was received by January 20, 1989. Id. at 436-37. The Supreme Court of Florida found that this letter extended coverage under the policy through January 20, 1989, such that a death that occurred on January 17, 1989, was covered by the policy even though payment was not received until after January 20, 1989. Id. at 438. The court noted that "any course of conduct by an insurance company which leads the insured to believe that an extension has been granted for the payment

of a premium and that in the meantime the policy will not be forfeited is a waiver of contrary

provisions in the contract and the insurer is estopped to urge them." Id. at 437.  In Reddick,

the insurer made affirmative representations to the insured which could reasonably lead the insured

to believe her coverage had been extended; this is not a situation where coverage was created

through silence.  The facts of this case have no application here.  There was no course of conduct

by Starr that could have led Brightstar to believe the German warehouse was covered.

    b.  Estoppel

Brightstar also argues that Starr should be estopped from denying coverage because Starr

acted "in a manner inconsistent with a lack of coverage," and Brightstar "reasonably relie[ed] on

those actions to its detriment," see Def. Opp. Mem. at 46 (quoting Burt Rigid Box, Inc., 302 F.3d

at 95).  Specifically, Brightstar argues that it "relied on Starr to conduct a survey of the Frankfurt

warehouse and to notify Brightstar of any issues with the warehouse." Id.  Despite receiving the

O'Brien February 20, 2013, Email stating "[w]e are planning on beginning operations at the end

of February, so we will have to move on this one," and providing an address and contact

information for a survey, Brightstar argues that "Starr chose not to move; but, instead, did not

survey the warehouse and did not even add it to the list of Brightstar's warehouses Starr

maintained." Id.  Accordingly, Brightstar argues that Starr should be "estopped from denying

the full $25 million in coverage for warehouses 'on file' or the automatic coverage for

warehouses that met the minimum standards in the Policy." Id.

"The doctrine of equitable estoppel can be applied to prevent an insurer from asserting

valid defenses or exclusions to coverage." Mattimore v. Patroon Fuels, Inc., 103 A.D.2d 981,

982 (3d Dep't 1984) (citing Schiff Assoc. v. Flack, 51 N.Y.2d at 699, and O'Dowd v. American

Sur. Co. of N.Y., 3 N.Y.2d 347, 355 (1957)); accord Lamorak Ins. Co. v. Fulton Boiler Works,

-74-

Inc., 2019 WL 690337, at *5 (N.D.N.Y. Feb. 19, 2019); Frazier v. Royal Ins. Co. of Am., 110 F.

Supp. 2d 110, 115 (N.D.N.Y. 2000).  "Premised on the equitable maxim that no party should be

permitted to take advantage of its own wrongs, equitable estoppel prevents a party from

enforcing or asserting rights where its own conduct has induced another to justifiably and

detrimentally rely upon the belief that such enforcement would not be sought." K. Bell &

Assocs., Inc. v. Lloyd's Underwriters, 827 F. Supp. 985, 989 (S.D.N.Y. 1993) (citing, inter alia

Nassau Tr. Co. v. Montrose Concrete Prods. Corp., 56 N.Y.2d 175, 184 (1982)); accord Nassau

Tr. Co., 56 N.Y.2d at 184 (estoppel "is imposed by law in the interest of fairness to prevent the

enforcement of rights which would work fraud or injustice upon the person against whom

enforcement is sought and who, in justifiable reliance upon the opposing party's words or

conduct, has been misled into acting upon the belief that such enforcement would not be

sought").  It has also been said that estoppel "arises where an insurer acts in a manner

inconsistent with a lack of coverage, and the insured reasonably relies on those actions to its

detriment." Burt Rigid Box, Inc., 302 F.3d at 95 (citing Albert J. Schiff Assocs., Inc., 51 N.Y.2d

692).  Unlike waiver, the doctrine of equitable estoppel may prevent an insurer from denying

coverage under a policy where none previously existed, where the insured reasonably relies on

the insurer's actions or omissions and prejudices its position in so doing.  See Schiff, 51 N.Y.2d

at 699 ("Distinguished from waiver, of course, is the intervention of principles of equitable

estoppel, in an appropriate case, such as where an insurer, though in fact not obligated to provide

coverage, without asserting policy defenses or reserving the privilege to do so, undertakes the

defense of the case, in reliance on which the insured suffers the detriment of losing the right to

control its own defense.  In such circumstances, though coverage as such does not exist, the

insurer will not be heard to say so.") (citations omitted).  Under New York law "estoppel

-75-

requires a showing of prejudice to the insured." Burt Rigid Box, Inc., 302 F.3d at 95; accord

Reeve v. Gen. Acc. Ins. Co. of N.Y., 239 A.D. 2d 759, 761 (3d Dep't 1997) ("[E]stoppel will

only lie if the insured has demonstrated that [he/she] has been prejudiced by the insurance

carrier's actions").  In addition, "equitable estoppel requires that the party invoking it establish,

among other elements, 'that its detrimental reliance [on the misrepresentation] was reasonable

under the circumstances.'" Intelligent Digital Sys., LLC v. Beazley Ins. Co., 962 F. Supp. 2d

451, 458-59 (E.D.N.Y. 2013) (quoting Levine v. Greece Cent. Sch. Dist., 353 F. App'x. 461, 464

(2d Cir.2009)).

        In order to evaluate Brightstar's estoppel argument, it is necessary to determine what

Brightstar's "reasonable expectations" were with respect to O'Brien's email providing

information to arrange a "site survey."  That is, the question is whether it was reasonable under

the circumstances for Starr's silence in response to that email to induce Brightstar to believe that

the German Warehouse was covered under the Policy.

        As noted, Endorsement No. 17 (as well as Endorsement No. 40) contained a provision

that read: "Upon notification of any new location, Starr Marine will order a loss control survey

and forward the resulting recommendations for compliance as soon as received."  Policy at

STARR 14644, 15702.  There are several reasons why it was "unreasonable" for Brightstar to

conclude that coverage for the German Warehouse would be bound, without more, based on the

February 20, 2013, email and the above-described clause.  Most strikingly, even assuming

arguendo that it would have been reasonable for Brightstar to believe that the German

Warehouse was covered shortly after O'Brien sent his email, having heard nothing to the

contrary from Starr, Brightstar could not reasonably have relied on Starr's non-response to the

O'Brien February 20, 2013, Email after Factor sent his March 19, 2013, email containing a full

-76-

list of warehouses to be verified by Brightstar.  See Pl. Reply Mem. at 35.  At this point,
Brightstar was put on unmistakable notice that Starr had not included the German Warehouse in
its schedule of locations, and any assumption that the German Warehouse had been "added" was
no longer reasonable.  What is more, Starr explicitly asked Brightstar, through Gallagher, to
"please confirm that all locations are listed," Factor March 19, 2013, Email, and indeed
Brightstar assigned someone to verify the list, see Fumagali Dep. at 232.  Starr was never
informed that Brightstar believed that the German Warehouse was included.

In addition, as we have discussed, the record indicates that it was the parties' course of
performance for a survey to be conducted after Starr agreed to add a new warehouse to the
Policy after receiving COPE and other required information, such that it would not be reasonable
for Brightstar to believe that a survey would be ordered without sending the required information
first.  See Section III.B.3.b.iii above.  Numerous emails contained in the record, which were sent
during the terms of Endorsements Nos. 17 and 40, demonstrate this course of performance.  See
Email from Jeffrey Factor to Robin Thompson, dated July 23, 2012 (annexed as Ex. 8 to
O'Malley Decl.) (advising Thompson of the information required to "add a location to the
schedule," and stating that "once added, we will need contact details for a possible survey")
(emphasis added); Email from Jeffrey Factor to Robin Thompson, dated May 1, 2012 (annexed
as Ex. 79 to O'Malley Supp. Reply Decl. and originally filed under seal as Ex. 79 to O'Malley
Reply Decl.) (in response to email chain from Brightstar sending on COPE information to add a
new location to the Policy, and email from Gallagher asking for confirmation that the location is
covered, stating "[t]hanks Robin, you can move forward with this location, we will order a
survey and all recommendations must be complied with within thirty days of request"); Email
from Jeffrey Factor to Jessica Azucena, dated Oct. 3, 2013 (annexed as Ex. 27 to O'Malley

Decl.) (in email chain regarding the addition of a new warehouse to the Policy, which included

Brightstar sending COPE and other required information to Gallagher to be forwarded to Starr,

statement from Factor saying "[o]nce we have your confirmation, we will order survey and list

Robin [Thompson's] name as the contact"); Email from Jeffrey Factor to Robin Thompson, date

omitted (annexed as part of Ex. 24A to O'Malley Decl.) (stating that if Gallagher agrees to

Starr's proposed terms for adding additional warehouses to the Policy, "I will order the surveys

with you as the contact").  Brightstar points to no evidence to suggest that Starr had in the past

ordered a survey immediately upon receiving any type of notice about the existence of a new

warehouse.  Further, the record shows that Starr would not require surveys for locations below

the unnamed location limit, which undermines Brightstar's implicit contention that a survey was

required upon any type of notice of any warehouse location.  Indeed, Kevin O'Brien informed

other Brightstar employees that "[y]ou can store up to $3 million [in value in a warehouse]

without a survey."  See Email from Kevin O'Brien to Con Limogiannis, dated Nov. 28, 2013

(annexed as Ex. 90 to O'Malley Reply Decl.).  And, even though O'Brien's February 20, 2013,

email specifically mentions a survey, there is no evidence in the record that the parties ever

commenced the addition of a warehouse to the Policy in such a manner.  In light of these

circumstances, and in light of the fact that the parties had a clearly established course of

performance for adding a new warehouse location to the Policy, detailed in Section III.B.3.b

above, no reasonable jury could find that it was "reasonable" for Brightstar to rely on Starr's

lack of a response to the O'Brien February 20, 2013, Email as an indication that coverage was

bound for the German Warehouse.

       The cases that Brightstar cites in support of its contention that "silence or acquiescence

by an insurer has frequently been held to be a proper basis for waiver, estoppel and/or agreement

by the insurer," Def. Opp. Mem. at 35, are all distinguishable from this case.[19]  In Lloyds

Underwriters at London v. Keystone Equip. Fin. Corp., 25 So. 3d 89 (Fla. 4th Dist. Ct. App.

2009), in order to obtain coverage for a claim, the insured was required to "warrant" that the

covered vehicle was kept in a closed garage.  Id. at 91.  The court found that the insurer was

estopped from denying coverage based on the insured's failure to comply with this warranty

because the insurer had never informed the insured either in writing or orally that this warranty

was part of the policy.  See id. at 93-94.  Here, there was no such failure to give notice.  Reliance

Ins. Co. v. The Escapade, 280 F.2d 482 (5th Cir. 1960), similarly involved a case where the

insured breached a warranty — in this case, a warranty in a boat insurance policy that prohibited

the insured from chartering the boat for private use.  See id. at 484.  The insurer knew of the

breach at the time of the loss but nonetheless required the insured to take certain "costly actions"

to salvage the boat, threatening that there would be no coverage otherwise.  Id. at 490.  The Fifth

Circuit determined that the insurer's actions "were inconsistent with nonliability from a known

breach of warranty, and that the Assured had been induced by this conduct to take action to his

detriment," which the court reasoned was "the essence of estoppel."  Id.  The principle

underlying the Fifth Circuit's reasoning cannot be applied here because, for the reasons already

explained, Starr did not induce Brightstar to even believe the German Warehouse was covered,

let alone take some affirmative "costly" action.  Calisi v. CNA Ins. Co., 295 A.D.2d 219 (1st

Dep't 2002) is completely inapposite.  In that case, the insurer was found to have "waived its

right under the policy to a trial de novo" where it "silently acquies[ed]" to an "arbitration

forum's enforcement of forum rules governing the submission of evidence," even though the

---

[19]  Brightstar also cites Morrisania, 963 N.Y.S.2d 4, in this section, see Def. Opp. Mem. at 36,
which we have already distinguished in Section III.B.4.a.

insurance policy provided that "procedure and evidence will be governed by local laws." Id.

(internal quotation marks omitted).  Brightstar makes no argument as to how an insurer's

attorney's silence during arbitration proceedings has any relevance to the silence at issue in this

case.

For the foregoing reasons, Brightstar's waiver and estoppel arguments are without

merit.[20]

C.  The Scope of the Errors and Omissions Clause

Starr "seeks a ruling on the scope" of the Policy's "Errors and Omissions" clause;

specifically, Starr seeks a ruling that the "clause cannot be construed to add or extend coverage

that was not already agreed to by Starr."  Pl. Mem. at 32.  While Brightstar contends that the

Errors and Omissions clause "plainly and unambiguously applies to avoid any forfeiture of

coverage under the circumstances of this case," Def. Opp. Mem. at 47, Brightstar has not cross-

moved for summary judgment on the meaning or scope of the Errors and Omissions Clause.

Thus, we will consider only whether the clause can be "construed to add or extend coverage that

was not already agreed to by Starr."

The Errors and Omissions Clause contained in the Policy provides:

This policy shall not be vitiated by any unintentional delay, error, omission or
oversight in making any declaration that is required to be made under any provision
contained in or endorsed on this policy provided a correct declaration is communicated to
This Insurer as soon as practicable after the delay, error, omission or oversight becomes
known to The Insured's corporate risk manager or equivalent, and premium paid, if
required by This Insurer.

---

[20]  Because we find that Brightstar's waiver and estoppel arguments are without merit, we do not
reach Starr's arguments regarding the inadequacy of notice of these arguments in Brightstar's
pleadings.  See Pl. Reply Mem. at 67-68.

Policy at 9, STARR 15577, ¶ 11.  Brightstar's brief does not address the question of whether, in the abstract, the clause can be "construed to add or extend coverage that was not already agreed to by Starr."  See Def. Opp. Mem. at 47-51.  Instead Brightstar asserts that the German Warehouse was already insured under the Policy.  See id. at 48.  Courts that have considered similar clauses agree that such a clause cannot extend coverage, after a loss, to property that was never insured in the first place.  See, e.g., Wentwood Woodside I, LP v. GMAC Commercial Mortgage Corp., 419 F.3d 310, 316 (5th Cir. 2005); Port of Olympia v. Lexington Ins. Co., 73 F. App'x 949, 951 (9th Cir. 2003); Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Jackson, 2009 WL 10689281, at *7 (E.D.N.C. Sept. 2, 2009); Penn Nat'l Ins. v. HNI Corp., 482 F. Supp. 2d 568, 613 (M.D. Pa. 2007); Simon v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 782 N.E.2d 1125, 1128 (Mass. 2003).  We find the reasoning of those courts to be persuasive.  As the Ninth Circuit observed in Port of Olympia:

> [P]ermit[ting] [an insured] to correct any failure in not insuring a particular property by paying the premium after the property suffers the loss . . .  actually encourages the insured to "insure" its properties by waiting until a particular building suffers a loss and then pay the premium on that property only, thus saving the cost of insuring all its properties.

73 F. App'x at 951.  Thus, Starr is entitled to summary judgment on this issue.

    D.  The Misappropriation Exclusion Clause

Endorsement No. 40 contains a provision, which we refer to as the "Misappropriation Exclusion Clause," that provides, in relevant part:

> Notwithstanding anything contained elsewhere herein to the contrary, this policy shall not pay for loss of or damage to the goods and merchandise while covered under this endorsement caused by or resulting from:
> . . .
>
> b. Misappropriation, secretion, conversion, infidelity or any dishonest act done by or at the instigation of the Assured at any time during the currency of this coverage, or by the

Assured or other party of interest, his or their employees or agents while insured merchandise is stored in warehouses or stores, owned, leased or controlled by the Assured.

Policy at STARR 15701 ("Misappropriation Exclusion Clause").

Brightstar moves for summary judgment on the Second Cause of Action in Starr's Complaint, see Compl. ¶¶ 53-59, which seeks to deny coverage for the loss at the German Warehouse based on the Misappropriation Exclusion Clause.  See Def. Mem. at 2.  In its own motion, Starr seeks a ruling on the meaning of the terms "other party of interest," and "controlled by" contained in the clause.  See Pl. Mem. at 4, 35-43.

Under New York law, "[t]o negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case."  Westview Assocs. v. Guar. Nat. Ins. Co., 95 N.Y.2d 334, 340 (2000) (citing cases).  "If the language of the policy" — with respect to the exclusion — "is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer."  Id. (citing Hartol Prods. Corp. v. Prudential Ins. Co., 290 N.Y. 44, 49 (1943)).  Moreover, "[t]he burden of proving that the loss is within the exclusion of the policy is upon the insurer."  Facet Industries, Inc. v. Wright, 62 N.Y.2d 769, 771 (1984); accord Village of Sylvan Beach, N.Y. v. Travelers Indem. Co., 55 F.3d 114, 115 (2d Cir. 1995).[21]  Here, Starr has not met its burden of showing that the exclusion

---

[21]  The Second Circuit has held that the rule in New York law "construing exclusions against the insurer unless they are stated in 'clear and unmistakable' language, is merely a specific, heightened application of contra proferentem."  Sea Ins. Co. v. Westchester Fire Ins. Co., 51 F.3d 22, 26 n.4 (2d Cir. 1995).  The Second Circuit has also observed, in a case involving an exclusion clause, that "under New York law, courts should not resort to contra proferentum until after the consideration of extrinsic evidence."  See Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 88 n.7 (2d Cir. 2002).  Here, however, neither party has pointed to any extrinsic evidence for the Court to consider with respect to the parties' intent regarding the meaning of any allegedly ambiguous terms.  Starr argues that the evidence suggests that

applies and thus Brightstar is entitled to summary judgment dismissing the claim that the

Misappropriation Exclusion Clause excludes coverage here.

Starr does not argue that Brightstar was involved in the circumstances of the loss.  See

Def. 56.1 Statement, ¶ 20.  The parties have stipulated that the loss was caused by

"misappropriation, secretion, conversion, infidelity or a dishonest act."  Letter from Mark L.

Durbin, filed May 8, 2018 (Docket # 123), at 2.  The parties also agree that Brightstar did not

"own" or "lease" the German Warehouse.  See Def. 56.1 Statement, ¶ 24; Pl. Opp. 56.1

Statement, ¶ 24.  Accordingly, for the Misappropriation Exclusion Clause to apply, a reasonable

jury must be able to find that Brightstar "controlled" the German Warehouse and that getgoods

was an "other party of interest" within the meaning of the contract.  We address next only the

meaning of "controlled" because it is sufficient to dispose of the parties' arguments.

Starr argues that "[i]n the context of this case, a warehouse 'controlled by the Assured'

is one that the assured exercises influence over."  Pl. Opp. Mem. at 7.  Starr argues, in essence,

that the contractual rights Brightstar obtained through its contracts with getgoods is the type of

"control" over "warehouses" contemplated by the Misappropriation Exclusion Clause.  See id. at

7-11.  Brightstar argues that the Misappropriation Exclusion Clause "plainly uses the term

'control' to mean dominion, or physical control," over an entire warehouse, "not merely to goods

stored within those warehouses or merely to areas within warehouses where such goods are

stored."  Def. Mem. at 11.

---

Brightstar's previous broker, Marsh, originally supplied the language in the clause, making
Brightstar the drafter.  Pl. Opp. Mem. at 37-40.  For the reasons Brightstar articulates, however,
see Def. Reply Mem. at 20-24, we find that Starr has not met its burden of showing that the
clause was originally drafted by Brightstar.  In any event, as described below, even without the
application of the rule in Westview, N.Y.2d 334, we would conclude that Brightstar did not
"control[]" the German Warehouse within the meaning of the Policy.

1.  <u>The Agreements Between Brightstar and getgoods</u>

Because Brightstar's relationship to the German Warehouse arose only through

Brightstar's contractual arrangements with getgoods, we first look to the two documents that

governed the relationship between Brightstar and getgoods regarding the storage of Brightstar's

goods at the German Warehouse.  One was the "Master Agreement for Performance of Logistics

Services" (annexed as Ex. 65 to O'Malley Opp. Decl.) ("Master Agreement").  The other was

Brightstar's "Standard Operating Procedure for 3PL Warehousing, Frankfurt (Oder) - Germany"

(annexed as Ex. 66 to O'Malley Opp. Decl.) ("SOP").

The Master Agreement provides that "getgoods shall perform logistics services on behalf

of the Client in accordance with the terms of this Agreement."  Master Agreement at 1.1.  The

Master Agreement contains several "annexes," including Annex A, which governed

warehousing.  <u>See id.</u> at BSupp00000267.  Annex A "govern[ed] the warehousing of goods of

the Client [Brightstar] and the activities to be performed by getgoods in the field of order

picking."  <u>Id.</u>  The Annex provides, in several instances highlighted by Starr, <u>see</u> Pl. Opp. Mem.

at 13-14, for Brightstar to give getgoods specific instructions regarding the handling of its goods

at the German Warehouse.  For example, the Annex provides that "[t]he Client shall hand over

the goods described in the Warehousing Process Description (Annex II.A.1) for warehousing and

shall provide getgoods in good time with all information and instructions necessary for

appropriate warehousing and treatment."  Master Agreement at 1.1.1.  The Annex also provides

that "getgoods shall assemble consignments for shipment from the warehouse (order picking) on

behalf of the Client," and that "[t]hese services shall be performed in accordance with specific

instructions from the Client to the extent that such are confirmed by getgoods in the given

individual case."  <u>Id.</u> at 1.1.5.  The Annex provides that getgoods shall perform "[o]rder picking

and removal from storage in accordance with [Brightstar Germany's] written instructions."  Id.
at 2.1(c).  With respect to Brightstar's rights of access to the warehouse, the Annex provides that
Brightstar Germany "shall be entitled — having provided suitable advance notice — to inspect
the warehouse space or have the warehouse space inspected during customary business hours
and in the presence of a getgoods employee."  Id. at 3.1.  With respect to "inbound storage," the
Annex provides that "[u]pon inbound storage, getgoods shall record the goods designations,
volume and batch number of the goods to be stored and record this information in the warehouse
stock programme," and that Brightstar Germany "shall be entitled to inspect the warehouse
register in respect of the accuracy and completeness of the goods it has stored."  Id. at 4.3.  In
sum, the Master Agreement allowed Brightstar to closely direct the way in which getgoods
handled Brightstar's own goods, but did not give Brightstar the right to direct getgoods'
management of the warehouse and did not give Brightstar the right to direct the manner in which
getgoods handled other clients' goods.  The Master Agreement also gave Brightstar certain
inspection rights, though it did not give Brightstar the right to enter the German Warehouse
without prior permission from getgoods and accompaniment by a getgoods employee.

  As Starr highlights in its briefing, see Pl. Opp. Mem. at 15-16, the SOP similarly
provides, in several instances, for Brightstar's involvement with and supervision of the handling
of its goods by getgoods, which is referred to in the SOP as the "Third Party Logistics Provider."
The SOP's "Purpose and scope" states that "[t]he purpose of this document is to outline key
processes and procedures that Brightstar requires from the designated Third Party Logistics
Provider (3PL) [that is, getgoods] to provide to the business in warehouse operations and
forward and reverse logistics to the customers channel."  SOP at 1.0.  The SOP provides that
getgoods' "[r]esponsibilities required, but [were] not limited to: . . . [p]rovid[ing] efficient

-85-

Logistic services [i]n line with the stated minimum service levels," id. at 2.0, including "[s]ecure warehousing, onsite guarding for site access, CCTV (storage of recordings is currently a month) in main storage, inwards & dispatch areas and also other areas of operation where our product may be located," id.  With respect to the arrival of a shipment at the German Warehouse, the SOP lists "some of the points which Brightstar requires of the 3PL provider at the time of stock arriving at your site," including "[c]heck[ing] the quantity of cartons or pallets when offloading pallet from the truck," with "any discrepancy . . . to be reported to Brightstar immediately."  Id. at 4.2(2).  The SOP provides that "[t]he decision to receive or reject a shipment if any loss or damage needs to be agreed upon with a Brightstar representative."  Id. at 4.3.  The SOP also contains "Key operating procedures" that governed "[r]eceiving and [p]ut away," which included, among other procedures, that "[o]nce received into the 3PL providers' WMS and ready for put away all stock will need to be wrapped or strapped sufficiently for put away within facilities racking system (within 3PL providers OH&S requirements) . . . for security and safety purposes," and "[n]o double stacking of the pallets with product on it."  Id. at 5.1, 5.3.  The SOP also includes site security requirements mandated by Brightstar, such as "[s]ecure warehousing, including 24 hour on site security and CCTV in storage and working areas of operation," "[s]ite audits by Brightstar and or associated insurance parties . . . required with 24 hours notification," and a requirement that Brightstar's inventory "be stored separately from the rest of the 3PL operation," with access "restricted to supervisory or authorized personnel involved with the management of Brightstar's goods."  Id. at 13.0-13.3.  Thus, the provisions of the SOP highlighted by Starr pertain to the handling and storage of Brightstar's goods as well as some requirements regarding overall site security.

2.  Whether the German Warehouse was "Controlled by the Assured"

Starr argues that language in the Master Agreement and the SOP show that Brightstar "controlled" the German Warehouse, Pl. Opp. Mem. at 13, and that "Brightstar Germany exercised control over Getgoods' employees," id. at 18.  But, as just discussed, the Master Agreement and the SOP gave Brightstar the right to exercise control over the ways in which getgoods employees handled Brightstar's own goods, not over the way in which the employees managed the warehouse at which the goods were stored.  At most, certain provisions of the SOP required the German Warehouse, overall, to comply with certain minimum security requirements, see, e.g., SOP at 2.0, but this contractual obligation is far from sufficient to show that Brightstar "controlled" the German Warehouse.

While the Policy insures "goods and merchandise," see Endorsement No. 40, ¶ 1, Policy at STARR 15701, the Misappropriation Exclusion Clause does not speak to the insured's control over "goods and merchandise."  Instead, the clause applies to "warehouses . . . controlled by the Assured."   By using this language, the clause unambiguously refers to the control of a "warehouse[]," not to control merely over the manner in which the insured's own goods and merchandise are handled.  Starr cites the verb and noun forms of "control" contained in Black's Law Dictionary, which are, respectively, "to exercise power or influence over" and the "direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise."  Pl. Opp. Mem. at 7 (citing CONTROL (verb), and CONTROL (noun), Black's Law Dictionary (10th ed. 2014)).  But in its discussion of these definitions, Starr fails to address that the Misappropriation Exclusion Clause requires control to be exercised over "warehouses" — not the goods stored in a warehouse.

Starr focuses on the inclusion of the word "influence" in the definitions that it and Brightstar cite, see id. at 7-8, but the notion of having "influence" over a warehouse (as opposed

to a person or circumstance) is nonsensical and thus we do not consider this aspect of the definition.  This is made clear by a definition in the Cambridge Dictionary cited by Brightstar, which states that the verb "control" means "the ability or power to decide or strongly influence the particular way in which <u>something will happen or someone will behave</u>."  <u>See</u> Def. Mem. at 11 (emphasis added).  A warehouse  cannot be a "someone" and cannot be a "particular way in which something will happen."

Obviously, Brightstar "controlled" how getgoods was to handle its product stored in the warehouse, but this does not equate to Brightstar controlling the "warehouse."  We agree with Starr that "a party may exercise control through a contractual relationship with another party," Pl. Opp. Mem. at 8, and that physical control is not the only type of control possible, <u>see</u> <u>id.</u> at 10.  But Brightstar did not have either contractual or physical control of the "warehouse" as a whole.  Giving both the word "warehouse" and the word "controlled" their ordinary meanings, the fact that Brightstar had contractual rights to determine the ways in which its goods were handled and stored in a warehouse — especially one that handled others' goods — does not reflect that Brightstar "controlled" the warehouse.

Starr's arguments regarding "legal control" are no more convincing.  Starr cites several cases that distinguish between "legal control" and "actual physical control," arguing that "control" within the Misappropriation Exclusion Clause must refer to "legal control."  <u>See</u> <u>id.</u>  This is so, according to Starr, because "controlled" is in the same clause as "owned, leased or controlled by the Assured," and "owned" and "leased" imply legal control.  <u>See</u> <u>id.</u> at 10-11.[22]

---

[22]  In making this argument, <u>see</u> Pl. Opp. Mem. at 9-10, Starr is applying <u>noscitur a sociis</u>, the "ancient maxim" that holds that "the meanings of particular words may be indicated or controlled by associated words."  11 Williston on Contracts § 32:6 (4th ed., 2019 update).  The principle, however, applies only where there are "unclear words," <u>id.</u>, or, as the Supreme Court puts it, "where a word is capable of many meanings," <u>Jarecki v. G. D. Searle & Co.</u>, 367 U.S.

While the cases Starr cites discuss the concept of "legal control" and "actual, physical control," they do not support Starr's contention that the type of contractual rights Brightstar had are sufficient to establish "legal" control over the warehouse.  Thus, in Gen. Elec. Credit Auto Lease, Inc. v. Brody, 124 Misc. 2d 805 (N.Y. Cty. Civ. Ct. 1984), the court held only that a car leased to the defendant that was stolen while parked was in the defendant's "legal" control by virtue of the fact that the lease gave the defendant the right to possess and "physical[ly] control" the car, even though he was not in actual physical possession of the car when it was stolen.  Id. at 808.  A similar ruling was made in Salamone v. Riczker, 32 Mass. App. Ct. 429 (Mass. 1992). See id. at 431 (control over a car was shown by virtue of the party's "physical dominion" over the car, even though he did not have a "legitimate right" to use the car).  These and other cases cited by Starr have no application here because there was no arrangement giving Brightstar the right to "physical" control over the warehouse as a whole.

Starr argues that "Brightstar admitted that it controlled the German Warehouse" when in February 2014, after the Loss, Brightstar circulated a draft Insurance Master Schedule in connection with its annual adjustment, which contained a column which read "Location Owned or Controlled by Brightstar."  See Pl. Opp. Mem. at 12.  The German Warehouse row was marked "yes."  Id.  This evidence is not enough to defeat summary judgment, however, simply because there is no evidence that the term "control" in the schedule was intended by Brightstar to match the meaning of the term "control" in the insurance contract.  Thus, a reasonable jury

---

303, 307 (1961).  But if in fact "controlled" is unclear or capable of many meanings, New York law provides that the exclusion clause cannot be applied against Brightstar.  See Westview Assocs., 95 N.Y.2d at 340 ("To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case.").

could not use this notation to find that Brightstar exercised or had the right to exercise the type of control required by the Misappropriation Exclusion Clause.[23]

Starr also points to the deposition testimony of Brightstar CEO Oscar Fumagali, who served as Brightstar's corporate representative.  See Pl. Opp. Mem. at 12 (citing Fumagali Dep. at 379-89).  Upon being asked about the spreadsheet, Fumagali explained that because of the date on which the schedule was sent (during the adjustment process), he "can't assume that it's a complete schedule or accurate schedule at this point."  Fumagali Dep. at 388.  He also noted that the schedule was sent at this point to be checked and updated.  See id.  He offered that the "controlled by Brightstar?" column might be checked with respect to the German Warehouse because Brightstar had a contract with getgoods, unlike with other warehouses operated by FedEx, or UPS, for example.  See id. at 388-89.  This equivocal deposition testimony is insufficient to create a triable issue of fact as to whether Brightstar "controlled" the German Warehouse within the meaning of the Policy.  Indeed, the information Fumagali provides simply reaffirms that Brightstar had contractual rights with respect to the German Warehouse.  Thus, no reasonable jury could use this evidence to conclude that Brightstar controlled the German Warehouse under the Misappropriation Exclusion Clause.[24]

---

[23]  In any event, as Brightstar points out in its brief, the heading in the previous year's schedule had asked whether the entity listed (in that case, Brightstar Germany GmbH) was owned or controlled by Brightstar, not whether the warehouse was owned or controlled by Brightstar.  Def. Reply Mem. at 26.  Accordingly, there is a strong inference that the column was erroneously marked "yes" because someone had changed the title of the column without updating the rest of the spreadsheet.  See id.  Also, as Brightstar notes, an email sent as part of the 2014 Policy Adjustment noted that the German Warehouse had been deleted from the Policy, see id. at 25 (citing Email from Kevin O'Brien to Klaus Freese, dated Jan. 31, 2014) (annexed as part of Ex. C to Edwards Reply Decl.), such that Starr had "no basis . . . to rely on or pay any attention to the information concerning the Frankfurt Warehouse," id.

[24]  We have considered Starr's other scattered arguments on the Misappropriation Exclusion Clause and find them similarly unpersuasive.

*   *   *

In sum, because the meaning of the phrase "warehouses . . . controlled by the Assured" is clear and unambiguous, and because there is no evidence in the record upon which a reasonable jury could find that the German Warehouse was "controlled . . . by [Brightstar]," we hold that the Misappropriation Exclusion Clause is inapplicable as a matter of law.  But even if Starr's position that Brightstar did "control" the German Warehouse through contractual or legal control was a potential reading of that term, that reading would be only one of several reasonable readings available.  As noted, when there are multiple reasonable meanings of a term available, an exclusion cannot negate coverage.  See Westview Assocs., 95 N.Y.2d at 340.  Accordingly, Brightstar is entitled to a ruling that the Misappropriation Exclusion Clause does not apply to the Loss.

IV.  CONCLUSION

For the reasons stated above, the plaintiff's motion for partial summary judgment (Docket # 127) is granted in part and denied in part and the defendant's motion for partial summary judgment (Docket # 131) is granted.  To summarize, summary judgment is granted as follows: (1) the German Warehouse was an "unnamed/unscheduled" location under Endorsement No. 40; (2) the Errors and Omissions Clause contained in Endorsement No. 40 cannot extend coverage to locations not already insured under the Policy; (3) the Misappropriation Exclusion Clause does not apply to the Loss and thus Starr's Second Cause of Action, Compl. ¶¶ 53-59, is dismissed.

-91-

SO ORDERED.

Dated: July 12, 2019
        New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge